James A. Janowitz (JJ 8788)
William L. Charron (WC 1735)
Suyin So (SS 7404)
PRYOR CASHMAN SHERMAN & FLYNN LLP
410 Park Avenue
New York, New York 10022
(212) 421-4100
Attorneys for Plaintiff/Counterclaim Defendant David Bakalar

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
DAVID BAKALAR,                                         :
                                                      :
                Plaintiff and Counterclaim            :
                Defendant,                            :            Index 05 Civ. 3037 (WHP)
                                                      :            (ECF Case)
        -against-                                     :
                                                      :
MILOS VAVRA and LEON FISCHER,                         :
                                                      :
                Defendants and Counterclaimants.      :
-----------------------------------------------------------X

**DECLARATION OF WILLIAM L. CHARRON IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT DISMISSING COUNTERCLAIMS**

1.      I am an associate with Pryor Cashman Sherman & Flynn LLP, 410 Park Avenue,

New York, New York 10022, which is counsel for plaintiff/counterclaim defendant David

Bakalar ("Bakalar") in the above-captioned action. To assist the Court with the presentation of

evidence, I submit this declaration pursuant to Fed. R. Civ. P. 56 in support of Bakalar's motion

for summary judgment to dismiss the counterclaims of defendants/counterclaimants Milos Vavra

("Vavra") and Leon Fischer ("Fischer") (collectively, "Defendants").

2. ·    The issue presented in this case is whether Bakalar, an innocent purchaser for

value of certain artwork (the "Drawing") over four decades ago, should be forced to surrender

his property to Defendants, who, together with their families, allowed nearly six decades to pass

before making any attempt to claim title in the Drawing. Defendants, by their delay, have

permitted a near total loss of evidence concerning their allegations that the Drawing was stolen by the Nazis in 1938, and thus allegedly wrongfully sold to Bakalar.  The absence of evidence directly prejudices Bakalar.  Accordingly, summary judgment should be awarded to Bakalar dismissing Defendants' counterclaims.

**Bakalar's Purchase and Attempted Sale of the Drawing**

3.      David Bakalar is an 80-year old prominent Massachusetts businessman, physical metallurgy engineer trained at Harvard University with a Ph.D. from the Massachusetts Institute of Technology, former Marshall Plan representative, professional sculptor, movie producer and art collector.  He is also an active and important member of the Jewish community in Boston, and is the largest individual contributor to the Jewish Memorial in Boston which is dedicated to studying the Holocaust.  (Relevant portions of Bakalar's deposition testimony in this action are annexed as **Exhibit 1**.  Bakalar's testimony concerning his background can be found at Tr. 6:10-11 and 7:5-10:7.  See also Compl. dated Mar. 21, 2005 at ¶¶ 16-19.)

4.      In or about 1964, during a trip to New York City, Bakalar visited a well known art gallery owned by Dr. Otto Kallir ("Kallir"), the Galerie St. Etienne.  (Exhibit 1 at Tr. 10:8-17, 11:7-10.)  Bakalar had visited Kallir's gallery in the past and knew it to be reputable.  (Id. at Tr. 10:8-11:6, 12:2-3, 26:2-19.)

5.      Bakalar purchased an Egon Schiele watercolor drawing known as "Seated Woman With Bent Left Leg (Torso)" (the "Drawing").  (Id. at Tr. 10:18-22.)  The Drawing has a date of 1917.  (The 1917 date is confirmed by two catalogs that have exhibited the Drawing:  a 1956 catalog of works by Egon Schiele prepared by a Swiss gallery formerly known as Gutekunst & Klipstein and currently known as the Galerie Kornfeld (the "Kornfeld Catalog"), a copy of which is annexed as **Exhibit 2** -- the Drawing can be found at page P 0080; and a 2005

catalog by Sotheby's, the relevant portion of which is annexed as **Exhibit 3**.)  Bakalar was not a collector of art of this period; he simply liked the look of the Drawing.  (Exhibit 1 at Tr. 10:18-22.)

      6.      Bakalar had no reason to, and did not, doubt the Drawing's provenance when he bought it.  (Exhibit 1 at Tr. 10:23-12:4, 17:13-20.)

      7.      Indeed, defendant Fischer concedes that Bakalar is innocent, is "an honorable person," and was not "in cahoots with people who [allegedly] stole the work."  (Relevant portions of Fischer's deposition testimony in this action are annexed as **Exhibit 4**.  Fischer's testimony concerning the above can be found at Tr. 147:25-149:10.)

      8.      Bakalar kept the Drawing in his home in Massachusetts for 40 years.  In 2004, he consigned the Drawing to Sotheby's, which sold the Drawing at auction in London in February 2005, for approximately $726,000.  (Exhibit 1 at Tr. 28:4-14, 30:23-25; copies of Bakalar's Consignment Agreement with Sotheby's and an amendment thereto are annexed collectively as **Exhibit 5**; the sale price for the Drawing is reported in British pounds at the following website: http://search.sothebys.com/jsps/live/lot/LotDetail.jsp?sale_number=LO5002&live_lot_id=22.)

      9.      The Sotheby's sale was never consummated because Defendants asserted that the Drawing's chain of title was supposedly tainted by Nazi theft in 1938, and that Defendants are allegedly the true owners of the Drawing through their relationship to the alleged original owners, Franz Friedrich ("Fritz") and Elisabeth Sara ("Lilly") Grunbaum.  (Copies of Defendants' agents' correspondence to Sotheby's demanding that the Drawing not be sold are annexed collectively as **Exhibit 6**.)

**The History of the Drawing**

**Fritz and Lilly Grunbaum**

10.     Fritz Grunbaum was a famous cabaret performer in Austria before World War II. (Compl. ¶ 5; Verif. Ans. & Countercls. dated June 1, 2005 ("Ans.") at ¶ 5.)  He had a large art collection that included many works by Egon Schiele.  (Id.; a copy of an inventory of the Grunbaums' property in April 1938 by Dr. Franz Kieslinger on behalf of the National Socialist Department for the Movement of Goods (the "Kieslinger Inventory"), together with an English translation, are annexed as **Exhibit 7** -- a collection of works by Egon Schiele can be found at pages D&M 00017 & 18.)

11.     Fritz and Lilly Grunbaum were both killed by the Nazis.  (Compl. ¶ 5; Ans. ¶ 5.) They died without children.  (A copy of a Grunbaum family tree produced by Defendants is annexed as **Exhibit 8**.)

12.     The Drawing was never identified in any documents as being in the possession of Fritz or Lilly Grunbaum.

**There Is No Evidence That the Nazis Possessed the Drawing**

13.     The Drawing was also never identified in any documents as being in the hands of the Nazis.

14.     Nevertheless, Defendants allege that the Nazis confiscated the Drawing and consigned it to a storage company known as Schenker & Co. ("Schenker").  (Ans. ¶¶ 110-111.)

15.     According to this hypothesis, after the War the owner of the Galerie Kornfeld, Eberhard Kornfeld ("Kornfeld"), acquired the Drawing from Schenker.  (Id. ¶ 179.)

16.     There is no evidence that the Nazis took the Drawing.  Nor is there any evidence linking Kornfeld to the Nazis or to Schenker.  Moreover, Defendants have engaged in extensive

4

international investigations and discovery in this matter and have not suggested that any such evidence exists.

17.    Instead, Defendants infer from two documents prepared in 1938, that the Nazis confiscated the Drawing from the Grunbaums.

18.    The first is the Kieslinger Inventory, Exhibit 7 hereto.  The Kieslinger Inventory is extensive and specific with regard to numerous works of art which are often identified by title or description.  The Drawing, however, is not identified in the Kieslinger Inventory.

19.    Rather, Defendants have inferred the Drawing's inclusion in the Kieslinger Inventory from the following entry:

> Large drawings by Schiele, 55 works colored
> a.  20 drawings and 1 print from Schiele

(Exhibit 7, page D&M 00018; Ans. ¶ 206.)

20.    According to a leading expert on Egon Schiele's art, Jane Kallir, Schiele produced at least 2,700 drawings in his lifetime.  (A declaration from Jane Kallir is annexed as **Exhibit 9**.)

21.    Second, Defendants look to a September 1938 export permit application by Schenker concerning the Grunbaums' property (the "Schenker List").  (A copy of the Schenker List, and English translation thereof, are annexed collectively as **Exhibit 10**.)

22.    The Schenker List is more generalized than the Kieslinger Inventory and it does not identify the Drawing either.  Rather, Defendants again speculate that the Drawing was included in the Schenker List because it identifies:  "10 Drawings" and "278 Drawings, some in color."  (Exhibit 10, page D&M 00374.)

23.    Notably, the Kieslinger Inventory lists over 450 individual works of art as of April 27, 1938, but the Schenker List identifies only 417 pieces of art as of September 8, 1938.  (Compare Exhibit 7 with Exhibit 10.)  Therefore, between April and September 1938, Lilly

Grunbaum may have transferred at least 30 pieces of art, although there is no evidence of which art was transferred, or how or to whom.

24.     Neither the Kieslinger Inventory nor the Schenker List identifies the Drawing. Furthermore, neither inventory establishes that any of the property listed was in the custody of anyone but Lilly Grunbaum.  Moreover, there is no evidence that the Drawing or any Grunbaum property was disposed of by Schenker.

### The Drawing Surfaces For the First Time in 1956

25.     The first time the Drawing was identified as existing was in the 1956 Kornfeld Catalog.  (Exhibit 2, page P 0080.)

26.     Kornfeld has maintained that he acquired the Drawing and the other works in the Kornfeld Catalog from Fritz Grunbaum's sister in-law, Mathilde Lukacs ("Lukacs"), in the mid-1950s.

27.     In particular, annexed as **Exhibit 11** is a January 15, 1998 letter (and English translation thereof) from Kornfeld to an attorney representing a different set of claimants (*i.e.*, the Reifs, discussed more below) concerning a different work of art by Egon Schiele (*i.e.*, "Dead City") that was part of Kornfeld's 1956 exhibition and included in the Kornfeld Catalog. Defendants have averred that this letter is authentic.  (Defendants' First Request for Admissions dated September 9, 2005 (the "RFAs") at RFA Nos. 73 and 82.)  Kornfeld recounted his relationship with Lukacs in this letter.

28.     Similarly, annexed as **Exhibit 12** is a series of e-mail communications between the Galerie Kornfeld and Sotheby's, between August 17, 2004 and August 18, 2004, regarding the provenance of the Drawing.  These e-mails have been authenticated by supporting Declaration of Elizabeth Gorayeb, the author and recipient from Sotheby's of the e-mails in

Exhibit 12.  Ms. Gorayeb's declaration is annexed as part of Exhibit 12.  The Galerie Kornfeld represented Lukacs' ownership of the Drawing in these e-mails.

29.      Annexed as **Exhibit 13** is another series of communications between the Galerie Kornfeld and Sotheby's on February 14, 2005 and February 19, 2005, reconfirming the Drawing's provenance.  These communications (including originals and English translations prepared by Defendants) have been authenticated by supporting Declaration of Patrick Legant, the author and recipient from Sotheby's of the communications in Exhibit 13.  Mr. Legant's declaration is annexed as part of Exhibit 13.  The Galerie Kornfeld again represented Lukacs' ownership of the Drawing in these communications.  (See also Exhibit 3, page STHBY 000102 - - reporting Lukacs' ownership of the Drawing.)

30.      Finally, annexed as **Exhibit 14** is a collection of correspondence and sales receipts between Kornfeld and Lukacs over the period of May 3, 1952 through October 25, 1957, together with English translations thereof prepared by Defendants.  These documents were voluntarily provided by Kornfeld (through his counsel in Switzerland) to us (on behalf of Bakalar) in July 2005, upon our having reached out to Kornfeld and his counsel in the context of this case to solicit information.  According to our understanding of Swiss laws, Kornfeld is under no obligation at this time to provide testimony or other information to the parties in this case.

31.      The documents in Exhibit 14 chronicle the transactions and communications between Lukacs and Kornfeld.  They reflect questions that Lukacs asked, meetings between them, and Lukacs' arrangements to sell many works of art.  There are also receipts for payment with respect to sales.

32.      The transactions by Lukacs through Kornfeld, and then to the Galerie St. Etienne in New York City, establish the commercial transactions leading to Bakalar's acquisition of the

Drawing from the Galerie St. Etienne as a *bona fide* purchaser for value.  (See Exhibit 2, page

STHBY 000102 and Exhibit 11 regarding the chain of title of the Drawing and other works from

the 1956 Schiele exhibition passing from Kornfeld to the Galerie St. Etienne in or about

September 1956.)  Nevertheless, Defendants assert that the correspondence and documents

furnished by Kornfeld are whole forgeries, and that his account of having purchased works from

Lukacs is a "fabrication."  (Ans. ¶ 120.)

33.     Although Defendants' contention of "forgery" is not an issue to be decided on this

motion, Defendants' attack of Kornfeld's account of his dealings with Lukacs underscores the

importance of Lukacs in this case.  Indeed, Lukacs is the central figure and source of

information, and, as discussed below, Defendants and their predecessors had ample opportunities

to obtain information from her.

**As a Result of Their Delay and Lack of Diligence,
Key Evidence and Testimony Have Been Lost**

### Defendant Milos Vavra

34.     Fritz Grunbaum was survived by three relatives:  his wife, Lilly, who died in

1942; his brother, Paul Grunbaum, who also died in 1942 without issue; and his sister, Elise

Zouzouli nee Grunbaum.  (Exhibit 8.)  Elise Zouzouli lived until 1977.  (Id. at page D&M

01271.)  Defendant Vavra claims his interest to Grunbaum property as the heir, by will, of Elise

Zouzouli's daughter, Marta.  (Id.)

35.     Vavra concedes that prior to being approached by a lawyer in 1998, he and his

family had done nothing to investigate possible stolen Grunbaum art.  (Annexed as **Exhibit 15** is

a July 21, 1998 letter, and English translation thereof provided by Defendants, from the Law

Offices of Turek, Mucha, Kostrohryz in the Czech Republic to Vavra, advising of a "search for

unknown heirs" of the Estate of Grunbaum.)  These facts were confirmed in a telephone

conversation between Defendants' counsel, Raymond Dowd, and me on January 19, 2006, which conversation was further memorialized by my letter of same date to Mr. Dowd, a copy of which is annexed as **Exhibit 16**.

36.     Vavra lives in the Czech Republic and has not been deposed in this case, due in substantial part to his apparent ill health and significant fear of travel by air or sea, but also due to his counsel's representation that Vavra has very little information to offer, including no documents to produce.  These facts are also confirmed by Exhibit 16.

37.     As reflected in Exhibit 16, the news of Vavra's connection by will to Fritz Grunbaum's estate came "totally out of the blue" and was "a complete surprise" to Vavra at that time.

38.     Thus, Defendants cannot point to any investigation or claims by Fritz Grunbaum's side of the family for supposed stolen art.  Elise Zouzouli, the best source of information about her brother until 1977, was apparently not interested in pursuing anything.

**Defendant Leon Fischer**

39.     Lilly Grunbaum nee Herzl was survived by four siblings:  Bertha Fischer nee Herzl, who was killed by the Nazis ten days after Lilly's death in 1942 (her issue have made no claims in this case); Anna Reiss nee Herzl, who died in 1948 without issue; Mathilde Lukacs nee Herzl, who died in 1979 without issue; and Max Herzl.  (Exhibit 8, pages D&M 01272-74.)  Max Herzl died in 1946, leaving a wife, Gisele Herzl (who lived until 1981), a daughter, Renee Herzl (who lived until 1996), and a grandson, defendant Leon Fischer.  (Id.)  Thus, the best sources of information about Lilly Grunbaum for over three decades after the War were Lilly Grunbaum's sister, Lukacs, and her sister in-law, Gisele Herzl.

40.     Fischer's parents and Gisele Herzl "kept in touch" and corresponded with Lukacs after the War, and Fischer believes his parents visited Lukacs in Belgium in or about April or May 1956. (Exhibit 4 at Tr. 29:3-39:20, 58:15-21, 137:5-7.) Fischer even thinks he may have met Lukacs on a trip to Europe. (Id. at Tr. 29:3-34:10, 58:15-21.)

41.     Fischer recalls his parents and grandmother talking about Lukacs (whom the family referred to as "Tilde" as a nickname for Mathilde) when they would "discuss news in the family." (Id. at Tr. 39:2-12.) Lukacs is the only one of Max Herzl's sisters that Fischer ever heard about. (Id. at Tr. 60:3-8.)

42.     Fischer also knows from his parents' and grandmother's discussions that a relative had died during the Holocaust, but Fischer does not know and never asked who that relative was. (Id. at Tr. 40:24-41:10, 44:11-45:8.) Although Fischer believes that his family "obviously knew the details themselves … that relatives had been murdered," he thinks the family "hid" from him how the Holocaust affected his background. (Id. at Tr. 43:19-44:10.) Fischer was not told about his great uncle Fritz Grunbaum or his great aunt Lilly Grunbaum; "[a]ll [he] knew [was] that someone had died" in the War. (Id. at Tr. 43:4-18.)

43.     Notably, Fischer's parents had fled Belgium in the early 1940s, after Nazi Germany had invaded the country. (Id. at Tr. 24:10-25:3.) Although his parents were able to have their possessions shipped to them in the United States, Fischer's father had abandoned a printing press business to escape Belgium. (Id. at Tr. 23:14-24:9, 25:15-20, 45:25-46:25.) He never filed a claim for reparations after the War. (Id.)

44.     Fischer also grew up surrounded by a significant collection of art. (Id. at Tr. 60:17-21.) In 1954 or 1955, his parents inherited a dozen or so paintings by famous artists (including Chagall, Ensor, Vlaminck and Permeke) from Fischer's paternal grandparents. (Id. at

Tr. 47:2-49:20, 50:10-52:22, 60:17-21.)  Fischer thinks his parents also bought art for themselves.  (Id. at Tr. 61:2-11.)

45.     Notwithstanding Fischer's family's interest in art, their knowledge of the Grunbaums and their close relationship with Lukacs, the subject of artwork owned by Lukacs or the Grunbaums was never discussed with Lukacs, or if it was, Fischer's family chose not to share or pursue any information they learned.  (Id. at Tr. 58:22-24, 43:4-15.)  Fischer's mother died in 1996, having never even told Fischer about his Grunbaum lineage.  (Id. at Tr. 63:20-64:19; see also Exhibit 8, page D&M 01273.)

46.     Therefore, Defendants' predecessors in interest failed to obtain or share any information from the last best source regarding Defendants' various theories, Mathilde Lukacs.

**Recent Efforts Undertaken on Behalf of Fischer and Vavra**

47.     Like Vavra, the first time that Fischer had ever heard the name "Grunbaum" was in or about 1998 or 1999, when he was contacted without solicitation by a genealogist, Dennis Langel ("Langel").  (Exhibit 4 at Tr. 63:20-19.)  Although Fischer ignored Langel's initial attempts to meet, he ultimately met with Langel, who told Fischer that he was "probably the heir of Elisabeth Grunbaum.  And apparently there were assets … [and Langel] felt that the Grunbaum family had some resources … [and] he wanted to pursue this."  (Id. at Tr. 64:20-68:11.)  Fischer "was basically … agreeable" to working with Langel and a German law firm known as the Hoerner Bank ("Hoerner") on a "strictly contingent" basis.  (Id. at Tr. 68:9-72:8.)

48.     Langel and others went searching for Fischer and Vavra after another set of unrelated claimants, Paul and Francis Reif (and later their widows, Rita and Kathleen Reif) (the "Reifs"), had failed in their claim to other alleged Grunbaum art.  Although the Reifs had themselves declared heirs of the Grunbaum estate in or about 1963, they were discovered in or

about 1998 not to be legitimate heirs, and their inheritance certificate was revoked. (Annexed as **Exhibit 17** is March 1998 notice of decision, and English translation thereof, revoking the Reifs' inheritance certificate that had been issued on May 28, 1963. Defendants have averred in their RFAs No. 41 that these documents are authentic.)

49.    The Reifs had undertaken a number of steps to try to take possession of a painting by Schiele ("City on the Blue River I" or "Dead City") that was in the custody of the Museum of Modern Art ("MoMA") in New York City. (Annexed as **Exhibit 18** is an affidavit from Kathleen Reif that has been produced by the MoMA in response to a subpoena served by Defendants in this case. The affidavit summarizes the Reifs' efforts to investigate the whereabouts of "Dead City.")

50.    There is no evidence that the Reifs conducted any investigation into the Drawing. Defendants admit that "there is no legal family relationship between Defendants and the Reifs, and none according to Austrian probate documents." (Ans. ¶ 42.) Fischer also testified to ignoring Rita Reif's initial attempts to meet with him. (Exhibit 4 at Tr. 149:12-151:4.)

51.    Fischer ultimately gave Hoerner and others powers of attorney, but Fischer does not necessarily know how that power has been exercised. (Id. at Tr. 76:21-77:8.) In particular, Fischer was unaware until being deposed that he had asserted a claim to Lukacs' estate and the he had been declared Lukacs' sole legal heir in or about 1999. (Id. at Tr. 73:14-76:24, 80:22-81:10, 84:6-86:15; annexed as **Exhibit 19** are documents provided by Defendants that reflect Fischer's capacity to act on behalf of the Lukacs estate; see also Exhibit 8, page D&M 01274 noting Fischer's status as Lukacs' sole legal heir.) Fischer also did not recall a claim being filed on his and Vavra's behalves on or about July 24, 2001, seeking return of property once owned by Fritz Grunbaum from Austrian federal museums and collections. (Exhibit 4 at Tr. 94:9-95:12,

115:18-122:3; annexed as **Exhibit 20** is a copy of Defendants' claim against Austrian federal

museums and collections, together with an English translation provided by Defendants.) Fischer

also could not accurately identify the Drawing at issue in this case during his deposition, and he

had to have the Drawing pointed out to him. (Exhibit 4 at Tr. 139:13-141:12.)

52.     On or about September 12, 2002, Fischer and Vavra were declared to be

Grunbaum heirs. (Id. at Tr. 94:6-8; annexed as **Exhibit 21** is the Sept. 12, 2002 Estate

Assignment Certificate, together English translation provided by Defendants, declaring Fischer

and Vavra to be heirs of the Grunbaum estate, and amendment thereto.) Fischer is aware of

Vavra's role in this case as a co-heir and co-counterclaimant, but the two have never met or

spoken. (Exhibit 4 at Tr. 87:5-88:14.)

53.     Fischer has been a stamp dealer for more than 35 years, and he is aware of an

organization that registers claims of expensive stolen stamps. (Id. at Tr. 6:3-8, 130:12-18.)

Nevertheless, Fischer did not research a similar means to register the Drawing as "stolen," such

as through the well known "Art Loss Register." He only did so as part of his litigation efforts in

this case. (Id. at Tr. 128:5-130:11.)

54.     I declare under penalty of perjury that the foregoing is true and correct.


        WHEREFORE, plaintiff/counterclaim defendant David Bakalar respectfully requests that

the Court award him summary judgment dismissing Defendants' counterclaims.

Executed on January 27, 2006.

                                        _____
                                        William L. Charron

13