James A. Janowitz (JJ 8788)
William L. Charron (WC 1735)
M. Mona Simonian (MS 2654)
PRYOR CASHMAN LLP
410 Park Avenue
New York, New York  10022
(212) 421-4100

Attorneys for Plaintiff and Counterclaim Defendant David Bakalar

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                 :

DAVID BAKALAR,                                :
                                                 :
           Plaintiff and Counterclaim         :
           Defendant,                       :        Index No. 05 Civ. 3037 (WHP)
                                                   :        (ECF Case)
    -against-                               :
                                                 :        **AMENDED COMPLAINT**
MILOS VAVRA and LEON FISCHER,      :        <u>**FOR DECLARATORY RELIEF**</u>
                                                   :
          Defendants and Counterclaimants.   :
                                                   :
-------------------------------------------------------------X

## JURISDICTION AND VENUE

1.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as there

is complete diversity of citizenship between Plaintiff and Defendants and the matter in controversy

exceeds $75,000, exclusive of interest and costs.

2.       Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) as

Defendant Fischer is subject to personal jurisdiction here, and a substantial part of the events or

omissions giving rise to the claims herein occurred in this District.

3.       This Court has jurisdiction to grant the requested relief pursuant to 28 U.S.C.

§§ 2201(a) and 2202.

## NATURE OF THE ACTION

4.      Plaintiff David Bakalar, a prominent Massachusetts businessman, artist and philanthropist brings this action seeking a declaration that he is the rightful owner of a drawing by the Austrian expressionist artist Egon Schiele known as "Seated Woman With Bent Left Leg (Torso)" ("the Drawing").

5.      The Drawing was once owned by Mathilde Lukacs-Herzl ("Lukacs-Herzl"), who sold the Drawing in or about 1955 or 1956 to an art dealer in Switzerland named Eberhard Kornfeld ("Kornfeld"). Lukacs-Herzl is known to have been the sister-in-law to Fritz Grunbaum, a well-known Viennese cabaret performer. Fritz Grunbaum is also known to have collected a number of works by Egon Schiele. Fritz Grunbaum is further known to have died at the Dachau concentration camp in 1941. His wife, Elisabeth, is known to have died one year later.

6.      In or about 1956, Lukacs-Herzl sold the Drawing and other Schiele works to a reputable art gallery in Bern, Switzerland where they were included in a public exhibition.

7.      In late 1956, a New York gallery acquired the Drawing from the Swiss gallery. The Drawing was included in a catalogue published by the New York gallery in 1957, and was exhibited in 1960 at the Institute of Contemporary Art in Boston. It was also illustrated in an article which appeared in the Kenyon Review in 1954.

8.      In or about 1963, Plaintiff purchased the Drawing from the New York gallery. In 1990, the Drawing was included in the definitive reference work ("catalogue raisonne") on Schiele which identified it as belonging to Plaintiff's personal collection.

9.      The Drawing remained in Plaintiff's personal collection from 1963 until in or about August 2004, when Plaintiff consigned it to Sotheby's for inclusion in an upcoming auction. On February 8, 2005, the Drawing was sold at auction for approximately £400,000 ($675,400).

10.     Two days later, on February 10, 2005, a lawyer representing Defendants, apparent heirs of Fritz Grunbaum, contacted Sotheby's asserting that they had a claim to the Drawing because allegedly it had been expropriated from Fritz Grunbaum by the Nazis in 1938.  They further asserted that Lukacs-Herzl could never have owned the Drawing and therefore could not possibly have sold it to the Swiss gallery in 1956.  In a subsequent letter, Defendants asserted that even if Lukacs-Herzl came to possess the Drawing after the war, she had not been declared a proper heir to the Grunbaum estate by an Austrian court and therefore lacked the authority to sell the Drawing to the Swiss gallery in 1956.

11.     However, the evidence that Defendants have subsequently provided to Plaintiff strongly suggests that their claim is nothing more than a baseless attempt to cause Plaintiff to part with a valuable possession which he acquired in good faith, in a perfectly lawful manner, many years ago.  Notably, Defendants have presented no evidence that the Drawing actually ever fell into Nazis hands or that its transfer was somehow coerced.  To the contrary, the Drawing, by all credible historical accounts, escaped confiscation during the war, and was returned to the custody of a close relative, Lukacs-Herzl, who thereafter sold it and other Schieles to the Swiss gallery in 1956.

12.     Yet this Court need not even consider the lack of factual support for Defendants' claims in order to declare Plaintiff the rightful owner of the Drawing.  Under the Swiss Civil Code, regardless of whether Lukacs-Herzl was the proper heir under Austrian law, the Swiss gallery acquired good title when it purchased the Drawing in 1956 because it was acting in good faith and because more than five years had passed since the alleged disappearance of the Drawing in 1938.  Furthermore, under the Swiss Civil Code, the New York gallery also acted in good faith in purchasing the Drawing since it reasonably relied on the Swiss gallery's outstanding reputation in the

art community.  Under New York law, the New York gallery, in turn, clearly conveyed good title to Plaintiff in 1963.

13.    Moreover, even assuming, _arguendo_, Defendants could establish that the Drawing had been stolen by the Nazis in 1938, and further assuming, _arguendo_, Lukacs-Herzl lacked hereditary title to the Drawing, under New York law, the Drawing lost any taint it may have had as stolen goods when Lukacs-Herzl recovered it after the war, acting as an agent on the family's behalf.

14.    Finally, Defendants' potential claims are equitably barred under New York law by the doctrine of laches.  Defendants' unreasonable, decades-long delay in asserting a claim has prejudiced Plaintiff in many ways, including by impairing his ability to prove conclusively that the Drawing was not stolen by the Nazis.  Given the passage of time, Plaintiff is hard pressed to recreate the whereabouts of the Drawing during the war, or the exact circumstances surrounding its sale in 1956. Many of the facts at issue here occurred move than 60 years ago, in a variety of different European countries.  Important documents and records may no longer be available.  Many key witnesses are long dead, and the memories of others are likely to have faded over the years.

15.    Plaintiff sympathizes with those who were truly dispossessed of art and other valuable property by the Nazis.  But the records reflect that no such theft occurred here.  To the contrary, the evidence reflects that the Drawing escaped confiscation by the Nazis and came into the possession of Fritz Grunbaum's sister-in-law who freely and voluntarily sold it to the Swiss gallery in 1956.  For decades thereafter, the Drawing was exhibited in various locations, described in scholarly texts and publicly documented as belonging to Plaintiff's collection.  This case is not about the Holocaust; it is about a voluntary sale by a close relative of Fritz Grunbaum which occurred years after the war, and which remained unchallenged for decades.  Through the exercise of even minimal due diligence, Defendants could have located works they claim to be from the Grunbaum

collection, but they made no such effort. In sum, the law owes no special deference to claimants such as Defendants who have sat on their alleged rights for years before attempting to dispossess an innocent good faith purchaser such as Plaintiff.

**THE PARTIES**

16.     Plaintiff is a resident of the Commonwealth of Massachusetts who was born in Boston in 1925. He holds both bachelor's and masters degrees in physics from Harvard University. In 1951, he was awarded a doctorate from the Massachusetts Institute of Technology ("MIT"). Following his education, Plaintiff worked on the Marshall Plan and later for Bell Telephone Laboratories. In the 1950s, Plaintiff founded Transitron Electronic Company, which he served as President for 35 years. At one time, Transitron was the second largest manufacturer of transistors, in the world.

17.     Since his retirement approximately 20 years ago, Plaintiff has dedicated his time almost exclusively to worthwhile artistic and philanthropic endeavors. Plaintiff is an accomplished sculptor. His sculptures have been featured in four different museum exhibitions showcasing his work. Eighteen of Plaintiff's outdoor sculptures are permanently installed including one in front of the building housing Columbia Law School and one in front of a building on the campus of Pace University. Another of Plaintiff's sculptures stands in front of the Thomas Dodd Building on the campus of the University of Connecticut. Recently, Plaintiff also produced a critically-acclaimed feature length commercial film entitled "Passionata" which was distributed nationwide by the Samuel Goldwyn Company.

18.     Plaintiff has made substantial donations to a variety of cultural and educational institutions. For example, Plaintiff donated a Henry Moore sculpture to Harvard University, and he and his wife have endowed art galleries at MIT, Wellesley College and the Massachusetts College of

Art. Plaintiff also endowed a library at the Longy School of Music, a dance studio at Jacob's Pillow in western Massachusetts, and a cello chair for the Boston Symphony Orchestra.

19.      Finally, Plaintiff is an active and important member of the Jewish community in the Boston metropolitan area. Plaintiff was involved in establishing the Jewish Memorial in Boston which is dedicated to studying and understanding the Holocaust and is the Memorial's largest individual contributor.

20.      Upon information and belief, Defendant Milos Vavra is a resident of Prague, Czech Republic.

21.      Upon information and belief, Defendant Leon Fischer is a resident of New York, New York.

## BACKGROUND

22.      Fritz Grunbaum was a successful Jewish cabaret performer in Vienna during the period between the two world wars. Grunbaum and his wife, Elisabeth, had a substantial art collection which included a number of works by the Austrian expressionist, Egon Schiele (1890-1918).

23.      On information and belief, in or about July 1938, a Nazi art historian conducted an inventory and appraisal of the Grunbaums' art collection which made reference to a number of works by Schiele. Later in 1938, the Grunbaums' Vienna residence was aryanized (i.e. confiscated) by the Nazis.

24.      Fritz Grunbaum was deported by the Nazis to Dachau concentration camp, where he died in 1941. His last will was never found. His widow, Elisabeth, stated in an official court document that Fritz had bequeathed her nothing. Elisabeth was deported by the Nazis to Minsk in October 1942 where she died. Elisabeth's sister, Mathilde Lukacs-Herzl, fled Austria for Belgium

with her husband in 1938 and eventually settled in Brussels.  She is known to have visited Vienna regularly after the war.

25.    There is some mystery about the fate of the Grunbaum Schiele collection between 1938 and 1952.  There is no evidence that the Schieles were actually looted by the Nazis after the taking of the inventory.  Scholars generally have posited two theories for what happened to the collection.

26.    One theory posits that Elisabeth succeeded in hiding the Schieles from the Nazis prior to her deportation, and that her sister, Lukacs-Herzl, managed to take the collection with her into exile in Belgium.  Scholars generally believe, however, that it is unlikely that Lukacs-Herzl could have saved the entire collection, given the circumstances under which she left Austria.  But it is certainly possible that she was able to take certain paintings or drawings in this manner.

27.    A second theory posits that after the Grunbaum's apartment was aryanized by the Nazis in 1938, the family's library and art collection were purchased by a Viennese antiquarian bookseller who lived in the same neighborhood for approximately $90, and that the Viennese book seller then either sold or gave the collection to Lukacs-Herzl at some point thereafter.

28.    At this point, there is no way to resolve the mystery surrounding the events between 1938 and 1952.  Under any of the above theories, however, pursuant to the "recovery doctrine" under New York law, even if the Drawing had been stolen by the Nazis, the Drawing ceased being considered stolen because as subsequent events establish, it was recovered by Lukacs-Herzl who was acting as an agent of the Grunbaum family, particularly in the absence of any other family members available at that time.

29.    In or about 1952, Lukacs-Herzl approached Eberhard Kornfeld, the owner of the Gutekunst & Klipstein art gallery in Bern, Switzerland, to discuss the sale of numerous art works

which she indicated she had inherited.  On information and belief, Lukacs-Herzl began selling

pictures from the Grunbaum collection to Kornfeld in several installments over the next few years.

30.    On information and belief, in or about 1954, Lukacs-Herzl petitioned an Austrian

court to certify Elisabeth's death.  The petition was withdrawn a month later for unknown reasons.

31.    In or about 1956, Lukacs-Herzl sold a large number of Schieles, including the

Drawing and a painting known as "Dead City," to Kornfeld at his gallery in Bern.

32.    Gutekunst & Klipstein held a comprehensive exhibition of Schiele's prints and

drawings in the fall of 1956. An illustration of the Drawing appeared in a catalogue entitled Egon

Schiele: Bilder. Aquarelle, Zeichnungen, Graphik (Lagerkatalog) which was issued by Gutekunst &

Klipstein in connection with the exhibition.

33.    In or about late 1956, the Drawing and other Schiele works were purchased from

Gutekunst & Klipstein in Bern by Otto Kallir, the owner of Gallerie St. Etienne in New York, a

highly regarded gallery specializing in German and Austrian expressionist art.  An illustration of the

Drawing appeared in a catalogue entitled Egon Schiele, Watercolors and Drawings issued by

Gallerie St. Etienne in connection with a selling exhibition at the gallery in or about 1956-57.

34.    Between in or about 1957 and 1963, the Drawing was sold to Norman Granz, a

private collector in New York, who sold the Drawing back to Gallerie St. Etienne during the same

time period.

35.    In 1960, the Drawing was included in an exhibition entitled Egon Schiele at the

Institute of Contemporary Art in Boston.  An illustration of the Drawing appeared in an article in the

Kenyon Review in 1964.

36.    In or about 1963, Plaintiff purchased the Drawing at Gallerie St. Etienne in New

York.  At the time of the purchase, Otto Kallir advised Plaintiff that the Drawing had been acquired

from Gutekunst & Klipstein in Switzerland. The Drawing thereafter remained in Plaintiff's personal collection.

37.     Mathilde Lukacs-Herzl died intestate in Vienna in 1979. Her estate was ordered forfeited to the Republic of Austria.

38.     In 1990, the Drawing, identified as "Seated Woman With Bent Left Leg (Torso)," was included (Item No. 1974, p. 579) in Egon Schiele: The Complete Works, the catalogue raisonne by Jane Kallir, granddaughter of Otto Kallir. The entry for the Drawing stated, in relevant part:

> Private collection. Provenance: Gutekunst & Klipstein, Bern; Galerie St. Etienne, New York; Norman Granz; Galerie St. Etienne, New York; David Bakalar. Exhibitions: Bern, 1956, no. 51, ill.; New York, 1957, no. 28, ill.; Boston, 1960, no. 63, ill. Literature: Kenyon Review, 1964, facing p. 616.

Thus, the present owner and location of the Drawing have been public since at least 1990, and yet, on information and belief, Defendants made no effort whatsoever to recover the Drawing or any other Schiele that they allege was part of the Grunbaum collection sold by Lukacs-Herzl until February 2005, with the instant claim against Plaintiff.

39.     Aside from the Drawing, there are a number of works that were part of the 1956 selling exhibition at Gutekunst & Klipstein which are now in museums around the world including at least one work in each of the following institutions: Leopold Foundation, Vienna; Albertina Museum, Vienna; Museum of Modern Art, New York; Allen Memorial Museum, Oberlin College, Ohio; Coninx Museum, Zurich; Santa Barbara (California) Museum of Art; Art Institute of Chicago; and the Carnegie Institute Museum of Art, Pittsburgh. The fact that there are Schieles from the Grunbaum collection in each of these locations has been publicly available information since at least 1990 when the catalogue raisonne was published and yet, on information and belief, Defendants never took any steps to assert claims to any of these works.

40.    On information and belief, at least six works identified as being from the 1956 Gutekunst & Klipstein selling exhibition have been sold at auction by Christie's in recent years.

41.    In 1998, the Manhattan District Attorney's office seized two Schiele paintings, "Portrait of Wally,, and "Dead City" that had been loaned to the Museum of Modern Art in New York by an Austrian foundation.  "Dead City" was part of the original Fritz Grunbaum collection sold by Lukacs-Herzl in Switzerland in 1956; "Portrait of Wally" had a difference provenance. Members of the Reif family, who are related to the Grunbaums, initially asserted a claim to "Dead City."  The seizures received enormous worldwide publicity, including articles that appeared in, among other publications, The New York Times, The Wall Street Journal, The International Herald Tribune, Deutsche Press-Agentur, and Agence France Presse.

42.    The District Attorney's Office alleged that both paintings had been stolen from their rightful owners by the Nazis.  A New York court later vacated the seizure.  Federal authorities intervened and seized "Portrait of Wally" alleging it was stolen property.  The federal authorities, however, declined to seize "Dead City" and the painting was returned to Austria.  On information and belief, the Reif family made no further efforts to pursue their claim to the painting.

43.    In or about August 2004, Plaintiff consigned the Drawing to Sotheby's in New York for inclusion in an upcoming auction. Subsequently, the Drawing was included in an auction of German and Austrian Art held at Sotheby's in London.  The auction catalog entry (Lot No. 22) for the Drawing included all of the provenance information described in ¶ 38 above, although pursuant to Sotheby' s normal practice it did not identify the current owner (i.e., Plaintiff) specifically by name.  In connection with its due diligence on the piece, Sotheby's contacted Joel Levi, as counsel to the heirs of Bertha Salomon-Herzl, a great-aunt of Defendant Fischer, and a co-heir to Fritz Grunbaum.  Levi advised Sotheby's that the heirs of Fritz and Elisabeth Grunbaum had no claim to

the works which were sold by Lukacs-Herzl in 1956, and that there was no impediment, legal or

otherwise , to Sotheby' s proceeding with the sale of the Drawing.

44.     On February 8, 2005, the Drawing was sold at auction for approximately £400,000

($675,000) to an unidentified buyer.

45.     On February 10; 2005, two days *after* the auction, Gabriel Lansky, a Vienna lawyer

representing Defendants Leon Fischer and Milos Vavra ("Defendants' counsel") wrote a letter to

Sotheby's in London claiming that Mr. Fischer and Mr. Vavra "are the real and only heirs of the

painting [sic]..."

46.     On information and belief, defendant Leon Fischer is the grandson of Max Herzl,

Elisabeth Grunbaum's brother.  Defendant Milos Vavra is the grandson of Elise Zouzouli nee

Grunbaum, Fritz Grunbaum's sister.  Thus both defendants claim Fritz Grunbaum to be their great

uncle.  According to the letter, "Mathilde Lukacs-Herzl, could never have acquired this painting, due

to the fact that this painting has never been a part of an in rem restitution process after WWII.  Thus,

she never could have sold it in Bern in 1956 as she was not the owner."  The letter stated:

> The effect of this is that also the present seller is not the owner of
> the painting and Sotheby's is not entitled to sell the painting.  By
> selling the painting in an auction, Sotheby's moreover acted
> grossly negligent not having checked carefully the history and the
> circumstances of acquisition of the painting mentioned above.

Along with the letter, Defendants' counsel provided (a) a copy of the 1938 Nazi inventory and

appraisal of the Grunbaum collection; (b) a legal document dated August 14,.2002 described as a

"Einsntwortungsurkunde" purporting to show that Leon Fischer and Milos Vavra were the heirs of

Fritz Grunbaum; and (c) a form dated April 27, 1938 described as a "Verzeichnis uber das

Vermogen von Juden" purporting to show that the Drawing was "confiscated by the Third Reich

("arisiert") and thus could never have been owned by Mrs. Mathilde Lukacs-Herzl..."  Defendants'

counsel demanded that Sotheby's not release the Drawing to the purchaser and not provide Plaintiff

with the proceeds from the sale. Defendants' counsel threatened to take legal action if these demands were not met.

47.     The documents submitted to Sotheby's accompanying the February 10, 2005 letter do not provide any evidentiary support for Defendants' claims. While the "Verzeichnis uber das Vermogen von Juden" and the 1938 appraisal by the Nazis appear on their face to be authentic, there is no reference to the Drawing in either document. Also, neither document in any way supports the notion, as Defendants claim, that Lukacs-Herzl could not have subsequently possessed the Drawing.

48.     The "Einsntwortungsurkunde" appears to reflect that an Austrian court designated Defendants as Grunbaum heirs in or about October 2002, but does nothing to explain why Defendants' claim of ownership would be superior to that of their great-aunt, Mathilde Lukacs-Herzl. It does not purport to invalidate any other claim to the Grunbaum estate nor does it in any way address the provenance of the Drawing or any other aspect of the validity of the transactions at issue.

49.     By letter dated February 15, 2005, Sotheby's advised Defendants' counsel that it had carefully researched the history of the Drawing prior to auction and stood by the accuracy of the published provenance in its catalogue.

50.     By letter dated February 18, 2005, Defendants' counsel advised Sotheby's, in relevant part, that as a consequence of the "Einsntwortungsurkunde" court decision in October 2002, Defendants were in a position as heirs to assert a claim to the Drawing.

51.     Following its usual practice in such situations, in or about late February 2005, Sotheby's advised the winning bidder that an adverse title claim had been made against the Drawing. In early March 2005, in light of the title claim, the purchaser elected to rescind the purchase.

52.     Because of Defendants' reckless and inaccurate last-minute claims, Plaintiff has been substantially harmed in that he has been deprived of the proceeds of the sale of the Drawing.

Furthermore, Defendants' actions make sale of the Drawing virtually impossible unless and until this matter is resolved.

53.     This action is necessitated by Defendants' threat of litigation despite having been advised by Sotheby's that their claims have no merit.  Accordingly, Plaintiff respectfully seeks from this Court a declaration of his rightful ownership of the Drawing that will remove the cloud which Defendants' claims have cast over its title.

**Plaintiff Acquired Good Title To The Drawing
When He Purchased it from Gallerie St. Etienne in 1963**

54.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 53 as if fully set forth herein.

55.     Even assuming, arguendo, that Mathilde Lukacs-Herzl was not the proper heir to the Drawing under Austrian law, and did not recover the Drawing as the presumptive agent of the Grunbaum family, under Article 934 of the Swiss Civil Code, Gutekunst & Klipstein acquired good title to the Drawing in 1956 because it was acting in good faith in making the purchase and because more than five years had elapsed since the disappearance of the Drawing in or about 1938.

56.     Gutekunst & Klipstein clearly acted in good faith.  Mathilde Lukacs-Herzl was a member of the Grunbaum family.  She apparently sought fair market prices for the artworks from Kornfeld.  Under these circumstances, Gutekunst & Klipstein would not be expected or required to make further inquiries into, for instance, whether there were any other relatives who contested Mathilde Lukacs-Herzl's rights.

57.     Moreover, even assuming, arguendo, Gutekunst & Klipstein did not act in good faith in acquiring the Drawing, under Article 934 of the Swiss Civil Code, Gallerie St. Etienne clearly acted in good faith in purchasing the Drawing since it relied on Gutekunst & Klipstein's well-established good reputation in the art community.  Indeed, under the applicable principles of Swiss

law, bad faith on the part of Gallerie St. Etienne could be assumed only if it was common knowledge among art dealers at the time that title to the Drawing had been contested or that Gutekunst & Klipstein had knowledge of specific evidence that raised doubts about Lukacs-Herzl's ownership. The overwhelming weight of the evidence is to the contrary.

58.     Under applicable New York law, a purchaser of goods such as Plaintiff acquires all title which the transferor had or had power to transfer.  The transferor in this instance, Gallerie St. Etienne, clearly conveyed good title to Plaintiff in 1963 when he purchased the Drawing.

### The Equitable Doctrine of Laches Bars
### Defendants' Potential Claims to the Drawing

59.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 58 as if fully set forth herein.

60.     Defendants' threatened action to recover the Drawing is also barred by laches.  It has been at least 66 years since the Drawing was supposedly stolen from Fritz Grunbaum. Yet, on information and belief, neither Defendants nor any potential predecessors-in-interest sought to recover the Drawing from any of the subsequent owners until they wrote to Sotheby's in February 2005.

61.     Defendants provide no indication that any member of the Grunbaum family reported the loss of the Drawing or any other art work for that matter to any of the governmental or non-governmental entities set up specifically to assist in restitution of art stolen by the Nazis during World War Two.  Furthermore, Defendants have presented no evidence that they have taken any other steps to recover or locate the Drawing or any other work from the Grunbaum collection until February 2005.

62.     The Drawing appeared in the Schiele catalogue raisonne by Jane Kallir in 1990, where it was identified as belonging to Plaintiff's collection and having previously been owned by

Gutekunst & Klipstein.  With the exercise of even minimal due diligence, Defendants (who

considered themselves putative heirs of Fritz Grunbaum) surely would have become aware of such

information.  Yet there is no evidence that Defendants took any action.

63.    The controversy over the seizure of "Portrait of Wally" and "Dead City" in 1998

generated enormous publicity on both sides of the Atlantic.  With the exercise of event minimal due

diligence, Defendants surely would have become aware that a Schiele with a provenance that

included Fritz Grunbaum and Gutekunst & Klipstein had surfaced in the United States.  Yet there is

no evidence that Defendants took any action whatsoever with respect to the Drawing or any other

similar art work.

64.    Defendants' claim that they were not in a position to seek to recover the Drawing until

the Austrian court rendered a decision in October 2002 is wholly without merit.  Obviously,

Defendants could have attempted to locate and recover the Drawing (or any other Schiele from the

Grunbaum collection) even without the benefit of a formal declaration from an Austrian court

designating them as heirs.

65.    Furthermore, even assuming, arguendo, Defendants' believed they needed to await an

Austrian court decision regarding their status as heirs before even attempting to recover the Drawing

or any other works from the Grunbaum collection, it is undisputed that they still took no such steps

until February 2005, despite the fact that there was then and still is a substantial body of publicly

available information relating to Grunbaum Schieles sold by Gutekunst 8t Klipstein which are

located in a variety of prominent museums in the United States and Europe.

66.    Insofar as Defendants believed that Lukacs-Herzl had no authority to sell the

Drawing, the proper legal recourse for Defendants would have been to make a claim against her

15

estate for an accounting of amounts improperly paid as a result of the allegedly unauthorized sale by Lukacs-Herzl.  Yet, on information and belief, Defendants have never pursued such an action.

67.     Plaintiff has been prejudiced by Defendants' unreasonable delay in asserting their purported rights to the Drawing.

68.     Plaintiff's ability to defend against Defendants' threatened claims by proving that the Drawing was not stolen, or by establishing the exact circumstances under which Lukacs-Herzl came into possession of the Drawing has been seriously impaired by the passage of time in which Defendants failed to pursue their claims.  Many of the events in question would have occurred more than 60 years ago in a variety of countries, including Austria, Switzerland, the United States and possibly Belgium.  The passage of time has undoubtedly resulted in the loss of evidence, dimming of memories, and the deaths of persons having relevant knowledge.

69.     Plaintiff sympathizes with those whose families lost unique and valuable art objects during World War Two.  But this case is not about what happened during the Holocaust; rather it involves a voluntary sale by a Grunbaum family member which occurred years after the war, and which has remained unchallenged for decades.  Even the most sympathetic claimants have an obligation to document their claims and to pursue them honestly and diligently so as not to prejudice the rights of good faith purchasers such as Plaintiff.  In this case, Defendants have utterly failed to discharge their obligation in law and equity to assert their claimed rights in a timely manner.  That failure has resulted in forfeiture of their purported rights to the Drawing.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment)

70.     Plaintiff repeats and re-alleges each and every allegation in paragraphs 1 through 69 as if fully set forth herein.

71.     Plaintiff is a bona fide purchaser of the Drawing, which he purchased in good faith in 1963 and which he presently owns.

72.     Under New York law, Plaintiff acquired good title to the Drawing from Gallerie St. Etienne, which in turn acquired good title to the Drawing under the Swiss Civil Code as a good faith purchaser from Gutekunst & Klipstein in 1956.

73.     Defendants are barred by laches from pursuing their threatened action because their unreasonable delay and resulting prejudice to Plaintiff equitably precludes Defendants from claiming ownership of the Drawing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.     Declare that Plaintiff is the rightful owner of a drawing by Egon Schiele known as "Seated Woman With Bent Left Leg (Torso)."

2.     Declare that Defendants' threatened claims are barred by laches.

3.     Award Plaintiff fees and costs pursuant to Fed. R. Civ. P. 54(d).

4.     Award Plaintiff compensatory and punitive damages arising from Defendants' having slandered Plaintiff's good title to the Drawing; having tortiously interfered with Plaintiff's contractual relationship with the purchaser; causing Plaintiff to be deprived of the proceeds from its recent sate; and rendering Plaintiff unable to sell the Drawing for anything approaching its true value; and

5.      Grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
       June 5, 2008

PRYOR CASHMAN LLP

By: _____
       James A. Janowitz (JJ 8788)
       William L. Charron (WC 1735)
       M. Mona Simonian (MS 2654)
       410 Park Avenue
       New York, New York  10022
       Telephone:  (212) 421-4100
       Facsimile:  (212) 326-0806

*Attorneys for Plaintiff/Counterclaim
Defendant David Bakalar*