UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
DAVID BAKALAR,

                    Plaintiff,

       v.



MILOS VAVRA and LEON FISCHER,

                 Defendants.
------------------------------------------------------------------------x
LEON FISCHER and MILOS VAVRA, as
Co-Heirs of the ESTATE of FRITZ
GRUNBAUM,

                 Counterclaim Plaintiffs,

      v.

DAVID BAKALAR,  SCHENKER & CO. A.G.,
SCHENKER, INC., and THE GALERIE ST. ETIENNE,
INC.,

                 Counterclaim
                 and Third-Party Defendants.
------------------------------------------------------------------------x

Index No.:
05 Civ. 3037 (WHP)
(ECF Case)

**ECF CASE:**

### DEFENDANTS' STATEMENT OF THE ELEMENTS OF EACH CLAIM AND DEFENSES TO COUNTERCLAIMS

**Dunnington Bartholow & Miller LLP**
*Attorneys for Defendants/Counterclaimants*
*Leon Fischer and Milos Vavra*
1359 Broadway, Suite 600
New York, NY 10018
Tel: (212) 682-8811
Fax: (212) 661-7769

Dated:  New York, New York
       July 10, 2008

Leon Fischer and Milos Vavra assert that the Drawing was part of Fritz Grunbaum's estate and that as Co-Heirs of his estate, they are entitled to this property.

I.      First and Second Counterclaims:  Declaration of Ownership. :  Declaratory Judgment that Defendants Own The Drawing

Defendants rely on 28 U.S.C. §§ 1655 (quiet title) and 2201-02 (declaratory and further relief) and the Austrian and other statutes cited in Defendants' First Affirmative Defense *supra.*

A.      Elements of Claim

To obtain replevin, Defendants bear the burden of showing a "superior right of possession".   To meet that burden, Defendants simply must show that it was more likely than not that  A. Fritz Grunbaum owned the Drawing when he was shipped to Dachau; B. Fritz Grunbaum did not abandon the Drawing; and C. the Drawing was never returned to him or one of his legal heirs.  Menzel v. List, 267 N.Y.2d 804, 819 (Sup. Ct. NY. Co. 1966), modified 279 N.Y.S.2d 608 (1st Dept. 1967) modified and affirmed 24 N.Y.2d 91 (1969).  Proof of ownership and all facts is based on a preponderance of the evidence.

B.      Summary of Facts Relied Upon to Establish Each Element

At trial, Defendants must establish three facts to be entitled to declaration of title and replevin.

1.  legal status as heirs of Fritz Grunbaum;

2. Fritz Grunbaum's ownership of the Drawing at the time of his arrest by the Gestapo and deportation from Vienna, Austria to Dachau, Germany; and

3. Fritz's continual imprisonment from March 22, 1938 until his death in the Dachau concentration camp on January 14, 1941.

The question for the court to determine at trial is whether Defendants have established the likelihood of 1. Defendants status as Fritz Grunbaums's heirs; 2. Fritz's ownership of the Drawing and arrest and deportation; and 3. Fritz's continual imprisonment until his death by a 50.1% preponderance of the evidence.

If the Defendant establishes these three facts by a preponderance of the evidence, Defendant's case for declaration of title and replevin is complete.  To the extent that Plaintiff seeks relief at variance with the Austrian probate decree, this court lacks subject matter jurisdiction to grant such relief.

C.      Summary of Evidence Supporting Claim for Declaration of Title

Thus, Defendants' case will proceed as follows:

1.  Heirship:   2002 Estate Assignment Certificate


2.  Title to Art Collection

a.  evidence that FG's art collection was taken from him by the Nazis;
       i.   Kieslinger Inventory
       ii.  Demus/Schenker Inventory;
       iii. Rochlitzer letter;
       iv.  "Erledigt" and "Gesperrt" stamps on the Jewish Property Declaration

b.  evidence that FG never abandoned his property;

       i.   contemporary Nazi documents showing systematic looting
       ii.  contemporary Nazi documents showing Jews lost legal powers to
            effectuate a voluntary sale of artworks 1938-1941

c.  evidence that none of FG's art collection, including the Drawing was ever
    returned to FG or any legal heir;
       i.   2002 Estate Assignment Certificate.

3.      Drawing Was Part of Fritz Grunbaum Collection

a.  evidence that 15 artworks out of 20 purchased by Otto Kallir previously
    belonged to Fritz Grunbaum;

       i.   1928 Correspondence between FG and OK;
       ii.  1928 Hagenbund/Neue Galerie catalog;
       iii. 1925 Wurthle Catalog;
       iv.  1930 Kallir/Nirenstein Catalog;
       v.   1956 Kornfeld Catalog (showing FG owner of "Dead City")

b.  evidence that Plaintiff, Kornfeld and Sotheby's and independent scholars all
    concluded that the Drawing was part of Fritz Grunbaum's collection

       i.   Complaint ¶ 5 (judicial admission);
       ii.  Testimony Sotheby's
       iii. Testimony JK;
       iv.  1956 Catalog, Testimony Kornfeld;
       v.   Out of court inconsistent statements of Kornfeld;
       vi.  Independent scholarship, Jewish Community scholarship and research;

          vii. Dr. Jonathan Petropoulos (if the court reconsiders exclusion of
            testimony)

C.     Summary of Evidence of Fritz Grunbaum's Imprisonment and Death While
       Incarcerated

      On March 13, 1938, Hitler invaded Austria.   Fritz Grunbaum, Austria's most
famous cabaret performer and a film star and librettist famous throughout Germany,
Austria and Switzerland, fled to the Czech border.   Denied a visa at the border, he was
forced back to Vienna.

      On March 22, 1938, Fritz Grunbaum was arrested by the Gestapo.   After a brief
imprisonment, he was deported to Dachau, Germany.   On January 14, 1941 he died at
Dachau, having never had a moment of freedom from the time of his imprisonment until
the time of his death.

     1.     Transactions in Fritz Grunbaum's Belongings While He Was Imprisoned

      On April 26, 1938, the Nazi regime passed a law requiring all Jews who owned
over 5,000 Reichsmarks worth of property to declare such property.   They were required
to attach appraisals of certain property.

      Pursuant to that Jewish Property Declaration law, spouses of Jews who were
imprisoned were forced to get powers of attorney from them.   The Nazi custom and
practice was to have the non-imprisoned spouse use these powers of attorney to liquidate
the assets of the imprisoned spouse and to pay the proceeds to the Reich.   This was an
important and desirable source of foreign currency to finance the Nazi war machine.

      In the Dachau concentration camp, Fritz executed a power of attorney in favor of
Lily.

      From the property declarations, it is clear that Fritz and Lily owned separate
property, and that the art collection was Fritz's, not Lily's.

      At trial we will present Fritz Grunbaum's property declarations.  These Jewish
Property declarations were taken from court files found in Vienna.   Once Jews declared
their property, according to the text of the April 26, 1938 law, this property was
considered to be at the service of the Reich and subject to the control of Hermann
Goering, Director of Hitler's Four Year Plan.

      We have prepared a binder with the text of this and other laws operative in 1938
through 1940  restricting Jewish property rights and freedoms.

     2.     Jewish Property Declaration Chart

We have prepared a chart, Defendants' A, compiled from the Austrian court documents containing the Jewish Property Declarations and a declaration that that shows how Fritz and Lily were despoiled of all of their respective property from April 1938 through October, 1942, the time that Lily was deported from Austria to a death camp in Minsk, Belarus.

From the Jewish Property Declarations, we can see that Lily was kept alive so that she could liquidate an Italian life insurance policy and sell a property she owned in Slovakia.   Once she was despoiled of everything, the Nazis murdered her.

The Austrian court documents with the Jewish Property Declarations show that Lily declared Fritz's art collection until June 30, 1939.  At the time of Fritz's death, Lily was interrogated in a court proceeding and swore that Fritz died without an estate.  Based on these credible court records, we can establish that sometime between June 30, 1939 and Fritz's death, the art collection disappeared.

Based on these court records, we can also show that a Nazi lawyer named Ludwig Rochlitzer was appointed by the Nazis to act as an Aryan trustee to control all of the Grunbaum's property at least as early as January 31, 1939.

Official Nazi documents, including a law passed on December 3, 1938, restricted Jews from engaging in certain transactions and required trustees to be appointed to sell off Jewish assets and give the proceeds to the Reich.

Rochlitzer's appointment shows that as of January 31, 1939, neither Fritz nor Lily had the legal capacity to transfer their own property.

3.      The Disappearance of Fritz Grunbaum's Art Collection  During His Imprisonment

As can be seen from the chart marked Defendants' "A" – the Jewish Property Declarations and the court files show that Fritz Grunbaum's entire art collection disappeared sometime after June 30, 1939, but

Looking at the Jewish Property Declarations, we see evidence that Fritz and Lily were despoiled of many other items of property:

a.      Jewelry;
b.      Life insurance policies;
c.      Stocks, cash
d.      Real property

It is our contention that based on this credible evidence that Defendants have established by a preponderance of the evidence that Fritz Grunbaum was despoiled of his art collection.

4

We will show at trial the following:

    a.  on or around November 12, 1938 prior to the art collection's disappearance, the Reich Minister of Finance, the Reich Finance Minister issued a report showing all Jewish assets listed in Jewish Property Declarations, including the art collection, to be property of the Reich;

    b.  according to historical accounts, between 6 and 9 percent of Germany's 1939 budget came from confiscated Jewish assets;

Thus, we can show that the Nazis had the motive and the opportunity to steal Fritz Grunbaum's art collection. We can show that a Nazi trustee actually took "legal" control of Fritz Grunbaum's art collection.


II.    Once Defendants Have Shown (1) Their Status as Heirs, (2) Grunbaum Ownership of The Drawing, and (3) Grunbaum's Imprisonment and Death, The Burden Shifts To Plaintiff To Demonstrate That The Drawing Was Not Stolen

If the court determines the three questions set forth in Part I in favor of Defendants, then, under New York law the burden of showing that legal title passed to Plaintiff shifts to the Plaintiff.

    A.    New York Law Shifting Burden of Showing Drawing Not Stolen Passes to the Defendant

In New York, when a property owner reclaims property, the burden of proof shifts to the holder of the property to prove that the property was acquired lawfully. This principle was stated forcefully in <u>Guggenheim v. Lubell</u> , 153 A.D.2d 143, 153, 550 N.Y.S.2d 618, 624 (N.Y.A.D.,1990) a case in New York's Appellate Division, First Department. In affirming, New York's Court of Appeals stated:

> We agree with the Appellate Division, First Department, for the reasons stated by that court, that **the burden of proving that the painting was not stolen** properly rests with the appellant Mrs. Lubell.

77 N.Y.2d 311, 321. A complaint for wrongful detention contains every statement of fact essential to a recovery where it alleges the plaintiff's ownership of the property and the defendant's possession and refusal on demand to deliver <u>Guggenheim v. Lubell</u> , 153 A.D.2d 143, 153, 550 N.Y.S.2d 618, 624 (1st Dept. 1990) <u>citing</u> 23 NY Jur 2d., Conversion, and Action For Recovery of Chattel, § 175, p 422). We recognize this burden to be an onerous one, but it well serves to give effect to the principle that " '[p]ersons deal with the property in chattels or exercise acts of ownership over them at

their peril' " (Prosser and Keeton, *The Law of Torts, supra,* § 15, p. 93, *quoting, Hollins v. Fowler,* L.R. 7 Q.B. 639 [1874]; *see also, Bassett v. Spofford,* 45 N.Y. 387).

      **B.**      **Elements of Defendants' Claims of Title Through Fritz Grunbaum, Mathilde Lukacs, Eberhard Kornfeld and Otto Kallir**

Plaintiff claims that the Drawing once belonged to Fritz Grunbaum, but that Fritz Grunbaum's sister-in-law Mathilde Lukacs somehow gained title to the Drawing and then transferred title to the Drawing to Eberhard Kornfeld, a Swiss art dealer in Spring 1956. Am. Cplt. ¶ 11.  Plaintiff alleges that Kornfeld, in turn, shipped the Drawing to New York with 19 other works by Egon Schiele accompanied by an invoice dated September 18, 1956 to the Galerie St. Etienne, owned by Otto Kallir.   Plaintiff alleges that he purchased the Drawing  in November, 1963 in New York.

Under New York law, good faith purchasers cannot take title to stolen property. According to Plaintiff, Swiss law applies and under Swiss law, if, within five years of a good faith purchase no one challenges a transaction, that transaction transfers title to the holder, as long as any subsequent purchasers within that five-year period are in good faith.  As we will show, Plaintiff cannot establish that either Eberhard Kornfeld or Otto Kallir acted in good faith when purchasing the Drawing together with the many other artworks that accompanied the Drawing during the purchases.

      As Defendants' Austrian legal  expert opinions show, there is no possible way that under Austrian inheritance law Mathilde Lukacs could have recovered Fritz Grunbaum's property after the War.   Since Lukacs had no heirship decree, she would have been a thief under Austrian law if she did so.

      **C.**      **Elements of Plaintiff's "Mathilde Lukacs" Theory of Acquiring Title**

Plaintiff pursues the theory that he acquired legal title through Fritz Grunbaum's sister-in-law. Plaintiff sued Defendants claiming that he had evidence that the Drawing was Fritz Grunbaum's and was returned to Mathilde Lukacs, Fritz's sister-in-law after World War II.  Am. Cplt. ¶ 11.

      **1.**      **Plaintiff's Contention That Mathilde Lukacs Lawfully Acquired Grunbaum's Schieles**

At trial the court must determine whether or not Mathilde Lukacs acquired lawful possession of the Drawing.

 Defendants do not believe that Plaintiff has any evidence showing how Lukacs allegedly acquired these Grunbaum artworks.  To the extent that Plaintiff relies on Kornfeld's self-serving testimony or problematic.

Although the burden is Plaintiff's Defendants will present Austrian court documents that are strong circumstantial evidence showing that Mathilde Lukacs neither owned nor acquired any Schieles. For example, Mathilde Lukacs' Jewish Property Declaration filed before she fled Vienna showed no Schieles. After fleeing Vienna in August 1938, Mathilde Lukacs could not have obtained any Schieles from Fritz while she was in a concentration camp during World War II in Belgium. Similarly, there is no evidence following the war that Lukacs or her husband Sigmond either claimed or recovered any Schieles or otherwise believed that they owned any Schieles.

      D.     Summary of Evidence Defeating Plaintiff's Claim of Title Through Mathilde Lukacs

Defendants will present the following;

- the '56 Kornfeld catalog showing that Grunbaum, not Lukacs, sold "Dead City" to Kornfeld
- Jane Kallir's 1990 catalog showing Grunbaum sold Dead City to Kornfeld;
- The absence of Galerie St. Etienne records (under 803(7)) showing Mathilde Lukacs's name from which Jane Kallir has concluded and the court should conclude that Otto Kallir did not believe that Mathilde Lukacs sold the Drawing and other Schieles to Kornfeld
- Testimony of Erika Jakubovits, Lucien Simmons

      E.     Defendants Will Demonstrate That Under Any Factual Scenario Plaintiff Presents at Trial, Plaintiff Cannot Acquire Title Through Mathilde Lukacs under Austrian law

    To determine whether Mathilde Lukacs had legal capacity to transfer the Drawing to Plaintiff or anyone else, New York law looks to Austrian law

(b) Subject to the other provisions of this section: (1) The formal validity, intrinsic validity, effect, interpretation, revocation or alteration of a testamentary disposition of personal property, **and the manner in which such property descends when not disposed of by will**, are determined by the law of the jurisdiction in which the decedent was domiciled at death. EPTL 3.5-1 (b)(2)(emphasis supplied). <u>Southeast Bank v. Lawrence</u>, 66 N.Y.2d 910, 912 (1985)

    At trial, Defendants will present the legal opinions of Dr. Kathrin Hoefer that exclude all possibility that any Nazi-era confiscatory act, anyone "downstream" from such an act, or any family member, including Fritz's wife Lily Grunbaum or his sister-in-law Mathilde Lukacs had the legal capacity to transfer Fritz Grunbaum's property out of his estate at any time prior to her death in 1979. Defendants request that the court make specific findings of fact and conclusions of law applying Austrian law in the alternative, even if the court ultimately finds that Austrian law does not apply.

Defendants will present opinions of Austrian counsel showing that any transfer of Fritz Grunbaum's property from March 22, 1939 until his death on January 14, 1941 would have been null and void as a matter of Austrian law.   We can also show that according to Austrian probate files, no heir to Fritz Grunbaum was appointed and no decree of distribution of Fritz Grunbaum's rights that he possessed at the time of his death occurred until Leon Fischer and Milos Vavra received such a decree in 2002.

  F. Defendants Will Demonstrate That Under Any Factual Scenario Plaintiff Presents at Trial, Plaintiff Cannot Acquire Title Through Mathilde Lukacs Under New York law

If the court determines that the Drawing was Fritz Grunbaum's and that no one had the power to alienate Fritz Grunbaum's property under Austrian law, any person taking such property is to be considered a thief.   New York law does not recognize any claims to title of stolen property by alleged "good faith purchasers."

"It is a fundamental rule of law in New York that a thief or someone who acquires possession of stolen property after a theft 'cannot transfer a good title even to a bona fide purchaser for value (because) (o)nly the true owner's own conduct, or the operation of law ... can act to divest that true owner of title in his property . . . '" Kunstsammlungen Zu Weimar v. Elicofon, 536 F. Supp. 829, 833 (E.D.N.Y. 1981) citing 3 Williston Sales 23-12, aff'd  678 F.2d 1150, 1157-58 (2d Cir. 1982).

Even if New York did recognize title of good faith purchasers, Defendants will demonstrate at trial that Eberhard Kornfeld acted in bad faith.   Defendants request that the court make specific findings of fact and conclusions of law applying New York law in the alternative, even if the court ultimately finds that New York law does not apply.

  G. At Trial, Plaintiff Bears The Burden of Showing Title Passed To Him Under Swiss Law, and Then Under New York Law

Plaintiff alleges two transactions that passed title to him and alleges in the Amended Complaint that a combination of Swiss and New York law passed title to him:

1. An April 24, 1956 Sale of 26 Schieles Including the Drawing from Mathilde Lukacs to Eberhard Kornfeld; and

2. A September 18, 1956 Sale of 20 Schieles from Eberhard Kornfeld in Berne, Switzerland to Otto Kallir's Galerie St. Etienne in New York (catalog mailed to New York, 20 Schieles shipped to New York, Kallir made payment from New York);

3. A November 13, 1963 exchange between David Bakalar and Otto Kallir of two Kaethe Kollwitz lithographs originally purchased from the Galerie St.

Etienne in 1961 for two original Schiele drawings plus cash, delivery in Massachusetts.

H.  Elements of Plaintiff's Claim That Eberhard Kornfeld's Acquired Good Title

If Plaintiff persuades the court that Swiss law, rather than Austrian law applies to this transaction, then the court must decide:

    1.   whether or not Kornfeld acquired the Drawing in bad faith;
    2.   whether or not under Swiss law Kornfeld's status as an art dealer and the transaction in which Kornfeld acquired the Drawing required him to conduct due diligence or inspect Mathilde Lukac's source of ownership under Swiss law;
    3. applying Swiss law, whether or not due diligence in April, 1956 would have revealed a defect in title;

I.  Summary of Evidence Defeating Plaintiff's Claim That Eberhard Kornfeld Acquired Good Title

Defendants contend that the following evidence defeats any transfer of title

- pre-WW II Schiele catalogs Kornfeld knew about showing works owned by Grunbaum
- '56 Catalog admission "Dead City" owned by Grunbaum
- Kornfeld gallery's status as art dealer for Nazis
- Kornfeld gallery's reputation for forging Nazi-era provenances;
- Kornfeld's status as expert art dealer requiring due diligence
- Art trade as profession requiring due diligence under Swiss Civil Code, Custom and practice of art industry, as opposed to general provisions of Civil Code
- WW-II warnings to Swiss art dealer by Allies and then by Swiss government to investigate provenances of works originating from occupied Austria
- Lack of Austrian export license
- Lack of Swiss import documentation
- Lack of Ownership documentation of Mathilde Lukacs

J..  Elements of Plaintiff's Claim That Otto Kallir's Acquisition of 20 Schieles from Eberhard Kornfeld Including The Drawing Conveyed Good Title Under Swiss Law

With respect to the September 18, 1956 invoice Kornfeld sent to Otto Kallir for the 20 Schieles that Kornfeld mailed to Galerie St. Etienne in New York, the court must

consider and determine the following elements to determine whether title passed under Swiss law.

1.  whether or not Otto Kallir acquired the Drawing in bad faith;
2.  whether or not Article 714 of the Swiss Civil Code requires possession to pass in Switzerland for title to pass in Switzerland;
3.  If title did not pass in Switzerland because Article 714 requires possession to pass, did title pass in New York and if so, does New York or Swiss law apply to this transaction;
4.  whether or not under Swiss law Kallir's status as an art   dealer and the transaction in which Kallir acquired the Drawing required him to conduct due diligence or inspect Eberhard Kornfeld's and Mathilde Lukacs' source of ownership under Swiss law;
5.  applying Swiss law, whether or not due diligence in April, 1956 would have revealed a defect in title;

K.  Summary of Evidence Defeating Any Transfer of Title to Otto Kallir

Defendants contend that the following evidence to be presented at trial defeats any transfer of title to Otto Kallir:

- pre-WW II Schiele catalogs Kallir knew about showing works owned by Grunbaum
- '56 Catalog admission "Dead City" owned by Grunbaum
- Kornfeld gallery's status as art dealer specialized in works with Austrian and German pre-WW II provenance
- Galerie St. Etienne's practice of concealing Grunbaum provenance information as reflected in business records of the gallery;
- Kornfeld's status as expert art dealer requiring due diligence
- Art trade as profession requiring due diligence under both Swiss Civil Code, Custom and practice of art industry, as opposed to general provisions of Civil Code and New York law requiring due diligence'
- WW-II warnings to New York art dealers by Allies and then warnings in the 1950's by U.S. State Department to New York art dealers, museums and collectors to investigate provenances of works originating from occupied Austria
- Lack of Austrian export license
- Lack of Swiss import documentation
- Lack of Ownership documentation of Mathilde Lukacs

III.   Defendants' Claim For Conversion

A.   Elements of Claim

• Defendants had superior right to possession;

- After learning of Defendants' superior right to possession, Plaintiff retained possession.

    a.  Legal Standard for Conversion Does Not Require Any Showing that Bakalar Acted in Bad Faith

Conversion encompasses both wrongful takings and wrongful detention. <u>Nat Koslow, Inc. v. Bletterman</u>, 197 N.Y.S.2d 583, 586 (N.Y.Sup.1960)

Conversion requires neither bad faith, e.g., <u>Nat Koslow, Inc.</u>, 197 N.Y.S.2d at 586; <u>Parker v. P & N Recovery of N.Y., Inc.</u>, 697 N.Y.S.2d 462, 467 (N.Y.Civ.Ct., 1999), nor wrongful intent, e.g., <u>Spodek v. Liberty Mut. Ins</u>. Co., 547 N.Y.S.2d 100, 102 (2d Dep't 1989).

    IV.  Plaintiff's Defense of Statute of Limitations

New York's statute of limitations accrues from the date Defendants made the demand for return of the Drawing upon Plaintiff's New York agent.  This date is February, 2005 and is conceded in the Amended Complaint.  New York's statute of limitation is three years.   Alleged ownership and the date of demand are the only relevant factors in applying the statute of limitations.  <u>Guggenheim v. Lubell</u>, 77 N.Y.S.2d 311 (1911).

Plaintiff alleges that a Swiss limitations period applies.  Plaintiff's Swiss law expert has conceded that all alleged "good faith transfers" in Switzerland must be in good faith for Switzerland's five-year limitations period to apply.  Even if Plaintiff could demonstrate Otto Kallir's good faith at trial, since Kornfeld mailed the Drawing to Otto Kallir in New York within several months of acquiring the Drawing, Switzerland's limitations period does not apply to Otto Kallir's acquisition.

    V.  Plaintiff's Third Affirmative Defense:  Laches

        A.      Elements of Plaintiff's Claim of Laches

As this court found in <u>Bakalar v. Vavra</u>,  2006 WL 2311113, 3 -4  (S.D.N.Y. Aug. 10, 2006)(WHP):

It is well-settled in New York that "[t]he mere lapse of time, without a showing of prejudice, will not sustain a defense of laches."(…). To establish this defense, Bakalar must demonstrate: (1) the Heirs knew of the their claim; (2) they delayed in taking action without excuse; and (3) Bakalar suffered prejudice as a result.(…). (citations omitted).

Plaintiff cannot establish the first prong:  1. that the Heirs had an opportunity to make a claim against the Drawing previously.

Second, Plaintiff cannot show any delay without excuse by the Defendants;

Third, Plaintiff cannot show any prejudice resulting from any alleged delay by the Defendants.   Since Plaintiff, by conducting the most minimal inquiry either prior to or following his purchase of the Drawing could have found the same information about the Drawing's provenance that he learned in 2004, he has suffered no prejudice.

      **B.**      **Missing Evidence From Regularly-Kept Business and Public Records Establish Facts That Should Have Been Known To Plaintiff and The Absence of Which Is Not Attributable To Any Action or Inaction of Defendants**

We have attached hereto as Exhibit "A" a chart showing the facts that defeat Plaintiff's laches claims which may be ascertained from regularly kept business records or public records that are still extant.

At trial, we will demonstrated that this is not "missing" evidence cause by Defendants' alleged delay, but that there is proof positive that Plaintiff has no title that is to be derived from these missing entries.

      **C.**      **Summary of Evidence Defeating Plaintiff's Claim of Laches**

            **1.**      **Elizabeth Gorayeb/Sotheby's Testimony**

Gorayeb is a VP of Sotheby's and provenance researcher.   She learned in August 2004 by email that Kornfeld was claiming to have gotten the Drawing from a Grunbaum family member.   Gorayeb wrote the Sotheby's original catalog entry attributing the Drawing to Grunbaum.   Her precise words were blocked at deposition, but she advised Lucien Simmons that according to her usual practices the Grunbaum family would have to be contacted and Kornfeld's story confirmed.   Defendants will establish that Gorayeb told Simmons the Drawing was probably stolen.   Gorayeb was aware that Grunbaum had been murdered in a concentration camp and was aware of the "Dead City" case.   Based on her advice, Sotheby's withdrew the Drawing from a New York auction so that it could conduct "intensive" provenance research.

Gorayeb's testimony establishes that Plaintiff suffered no prejudice from Defendants' alleged delay.   Plaintiff's agent Sotheby's concluded the Drawing was probably stolen based on information available to Plaintiff since the 1960's.

            **2.**      **Rita Reif's Testimony and Documents**

Rita Reif will testify, the Reif family searched very publicly for Fritz Grunbaum's property and art collection beginning in the 1950's.  Rita Reif, a former arts reporter for the <u>New York Times</u> will testify that two people she enlisted to assist the Reif family were Otto Kallir and Jane Kallir.   Reif's testimony is supported by ample documentary evidence (DBM 1-277).

As Jane Kallir has confirmed and will testify, in the early 1960's, the Reifs approached Otto Kallir to seek his assistance in tracking down artworks.  Jane Kallir has also confirmed that in the early 1990's, she offered to assist the Reifs in tracking down the Grunbaum collection and negotiated an agreement to get a percentage of any recovery.

At trial, Rita Reif will present the Reif family archives, Bates nos D&M 001-277, showing this decades-long effort to track down the Grunbaum collection and to locate any other family members who might have survived the Holocaust.  Rita and her late husband Paul contacted all dealers in Austrian and German expressionism and asked for their assistance in the search for Fritz Grunbaum's art collection.   Rita's son Tim, a former partner at Debevoise & Plimpton, travelled to Switzerland to meet with Kornfeld who had promised to give him documents relating to Fritz Grunbaum's art collection. Kornfeld never delivered on the promised documents.

As this court determined in a prior decision, courts take efforts of family members into account when determining whether there has been laches.  The efforts of Rita Reif, Else Fritz Reif, Paul Reif and her son Tim Reif, who was a partner at Debevoise & Plimpton in the late 1990's establishes that the family did everything possible under the circumstances to track down Fritz Grunbaum's artworks.

If the Reifs were not successful, it was only because they were thwarted and misled by the Kallirs and fought by the Austrian government, which succeeded in getting "Dead City" returned to Austria.   As Plaintiff has conceded, he was aware of the "Dead City" controversy in 1998, which the Amended Complaint concedes was highly publicized.  Thus Rita Reif's testimony establishes that Plaintiff could not have been prejudiced by any alleged delay.

3.      Erika Jakubovits Testimony and Documents

Erika Jakubovits is the Executive Director of the Jewish Community in Vienna. She will testify as to the practical impossibility for Austrian heirs and victims of the Holocaust to obtain information on missing assets from the 1950's through the late 1990's.   In the late 1990's, the Austrian government started opening up archives to historians and researchers.

Erika Jakubovits spotted the Drawing at a Sotheby's February 2005 auction.  She and her researchers had recently concluded that all of the contents of the 1956 Kornfeld Catalog were probably owned by Fritz Grunbaum.   She informed Sotheby's of this information in writing, and asked that the Drawing not be sold until further research could be done.  Sotheby's refused to withdraw the Drawing from the London auction. As a result of the Jewish Community's research, the Schenker/Demus inventory was found in the Bundesdenkmalamt archives in 2005 showing that the last known storage place of Fritz Grunbaum's art collection was at Schenker & Co., an entity owned by the Nazis and centrally controlled from Berlin.

13

Ms. Jakubovits will testify to the systematic spoliation, deportation and mass murders of Vienna's Jews.   From a pre War population of approximately 180,000, by 1945 there were about 500 left.  The Nazis openly bragged about how much wealth they systematically extracted from Vienna's Jews.

4.      Lucien Simmons Testimony and Documents

Simmons took over the auction of the Drawing following Gorayeb's report.   He checked with the Manhattan DA's office and the US Attorney's office to see if Rita Reif was still chasing Grunbaum's assets.   When Simmons learned that Rita Reif was probably not chasing the Grunbaum collection any more, he tried to auction the Drawing in London.   Sotheby's changed the catalog entry to say that Kornfeld had the Drawing "on consignment" from Mathilde Lukacs.  Kornfeld denies this and maintains that he purchased it.

In 2004, Simmons knew that Vienna's Dorotheum was used as a clearing house in 1938-1939 for the Nazis.  He also knew of Franz Kieslinger's art looting activities in the Netherlands on behalf of the Nazis, together with Kajetan Muehlmann, Hitler's chief art looter.  Simmons was familiar with writings of Sophie Lillie and Thomas Buomberger on Fritz Grunbaum.

Rather than contacting these researchers, checking original sources, and contacting the Grunbaum family to determine whether Kornfeld's story was true, Simmons ignored all of the dangers.   In fact, he received written warnings from Cornelia Muggenthaler that Sotheby's provenance research was incomplete and that the Czech line of heirs should be contacts.

6.      Leon Fischer

Leon Fischer will testify as to his family's flight from Nazi persecution and to his family's lack of knowledge of ownership rights to be asserted.

7.      Ivan Vavra

Ivan Vavra will testify as to the Vavra line of heirs' inability to pursue claims from  1942 until the late 1990's due to persecution and Soviet Domination in what is now the Czech Republic.

8.      Herbert Gruber

Hebert Gruber will authenticate various documents, testify as to the factual search involved in locating the heirs and in determining ownership of the Drawing and will fix dates as to when the heirs learned of their rights.

VI.     Defendants' First Affirmative Defense:  Thief in the Chain of Title

Defendants have stated the basis for the First Affirmative Defense in Point I above and in the proposed Joint Pretrial Order.

VII.    Defendants' Second Affirmative Defense: David Bakalar's Unclean Hands

David Bakalar seeks to invoke an equitable remedy, laches, that addresses the "conscience of the court."   Thus, the court must find that he was diligent and honest prior to considering the question of whether the equitable doctrine of laches may be invoked.

David Bakalar is and was a highly sophisticated businessman and art afficionado who has unclean hands because he (1) ignored U.S. State Department warnings against acquiring artworks stolen from Jewish victims of the Holocaust; (2) acquired the artwork without a certificate of authenticity despite knowing that he needed such a certificate; and (3) failed to keep or produce in discovery any records of his dealings related to the artwork.  Bakalar's hands are also unclean because he published a false provenance for the artwork in 1990 and again in 1999 which (1) concealed the Grunbaum provenance and (2) failed to allege in any published provenances that Mathilde Lukacs ever handled it until February 2005; and (3) ignored evidence that the artwork was stolen prior to acquiring it or attempting to sell it.  Bakalar's unclean hands and pattern of concealment ensure that he cannot invoke or satisfy the four elements of the equitable doctrine of laches under New York law.

VIII.   Defendants' Third Affirmative Defense:  Lack of Title

New York law does not permit good faith purchaser for value to take title to a stolen artwork (elements and evidence outlined above).

IX.     Defendants' Third Affirmative Defense:  Illegality

As stated above, transport of stolen property or property smuggled in violation of import and export regulations are illegal transactions, the nature of which defeats Plaintiff's claims and shows unclean hands.

X.      Defendants' Third Affirmative Defense:  Statute of Limitations

Addressed above.

Dated: New York, New York
      July 10, 2008

                                        **Dunnington Bartholow & Miller LLP**

                    By:          /s/
                               Raymond J.  Dowd (RD-7508)
                               Carol A. Sigmond (CS-2735)
                               1359 Broadway, Suite 600
                               New York, NY 10018
                               Tel: (212) 682-8811, Fax: (212) 661-7769
                               rdowd@dunnington.com
                               csigmond@dunnington.com

TO:    James Janowitz, Esq.
        William Charron, Esq.
        Pryor Cashman LLP
        410 Park Avenue, 10th Floor
        New York, NY 10022
        Tel: (212) 421-4100
        jjanowitz@pryorcashman.com
        wcharron@pryorcashman.com

# APPENDIX A

## INFORMATION MISSING FROM REGULARLY-KEPT BUSINESS AND PUBLIC RECORDS
## TENDING TO PROVE FACTS UNDER RULES 803(7) AND 803 (10) OF THE FEDERAL RULES OF EVIDENCE

| Missing Information | Fact Tending To Be Proved Under Rule 803(7) |
|---|---|
| Fritz Grunbaum will filed for probate | *No will ever existed* (Testimony of H. Gruber) |
| Elizabeth Grunbaum death certificate until 1962 | *Prior to 1962, no family member obtained Elizabeth Grunbaum's death certificate, a first step to establishing heirship in Austria* (D. Trial Ex. J, F, N, Testimony of H. Gruber) |
| Family relationship with Emil Rosner, applicant for Elizabeth Grunbaum's death certificate in 1962 | *Emil Rosner was not a family member, claimed he was a Fritz Grunbaum cousin needing the certificate for a probate proceeding in England*<br>*This third party applying for a death certificate under false pretenses tends to indicate that identity thieves were at work* (D. Trial Ex. H, J, K, Testimony of H. Gruber) |
| Evidence that Fritz Grunbaum's art collection was Returned to Mathilde Lukacs after the war from Allied Records | *Mathilde Lukacs never recovered Fritz Grunbaum's art collection (Allies occupied Vienna 1945-1955)* (Missing Records) |
| Evidence in Jewish Property Declarations that Mathilde Lukacs owned works by Egon Schiele | *Mathilde Lukacs did not own works by Egon Schiele* (D. Trial Ex. KK, IIII) |
| Evidence that Mathilde or Sigmond Lukacs claimed artworks stolen from them after the war | *Artworks were not stolen from them, only a large emerald and cash* (D. Trial Ex. Z, AA) |

| | |
|---|---|
| Evidence that Mathilde Lukacs claimed Fritz Grunbaum's Art collection | *Lukacs did not know of its whereabouts or existence and would have claimed it if she did* (D. Trial Ex. Z, AA) |
| Mathilde Lukacs' signature on a 1954 attempt to Get Elisabeth Grunbaum's death certificate | *Lukacs knew nothing about this attempt at identity theft* (D. Trial Ex. H, J, K) |
| Austrian certificate of heirship and decree of distribution Until 2002 | *Prior to 2002, no person was able to dispose of property rights that Fritz Grunbaum had at the time of his death* (D. Trial Ex. HHHH) |
| Galerie St. Etienne of Bakalar Documentation Of Provenance of Kollwitz Lithographs | *Bakalar swapped back Kollwitz lithographs purchased from Galerie St. Etienne in 1961 because he believed them stolen* (KAL 104) |
| Galerie St. Etienne Certificate of Provenance/ Authenticity | *Otto Kallir did not issue certificate of authenticity or provenance Otto Kallir knew the Drawing was stolen* (Testimony of J. Kallir) |
| Mathilde Lukacs' Name from 1956 Kornfeld Catalog | *Mathilde Lukacs did not sell to Kornfeld* (D. Trial Ex. MMM) |
| Drawing from alleged correspondence between Kornfeld and Lukacs | *Lukacs did not sell to Kornfeld* (Bates Docs EK1 to 88) |
| Mathilde Lukacs Name from Galerie St. Etienne Records Of all artworks purchased 9/18/56 From EK | *Otto Kallir Believed Mathilde Lukacs did not sell to Kornfeld* (Bates Docs KAL 1-344) |
| 1925 Wurthle Catalog mentions in GSE Records of 14 artworks purchased 9/18/156 From EK | *Otto Kallir & Hildegard Bachert concealed FG's ownership of numerous Schiele Drawings* (D. Trial Ex. NNNN) |
| 1925 Wurthle Catalog mentions in Jane Kallir's Egon Schiele, The Complete Works (1990, 1998) | *Jane Kallir has actively concealed FG's ownership, as shown in the 1925 Wurthle Catalog, of numerous Drawings appearing in the '56 Kornfeld Catalog* (D. Trial Ex. NNNN) |

Customs Stamps on 9/8/1938 Export License

*License expired December 8, 1938 without art collection leaving Austria*
(D. Trial Ex. LLL)

Evidence Swiss Customs complied with

*Kornfeld knew Drawing came to Switzerland illegally*

Export License of Austrian Bundesdenkmalamt ("BDA")

*Drawing illegally smuggled out of Austria*
*Probably not until after the war*
*All subsequent purchasers on notice Drawing illegally smuggled out of*
*Austria* (D. Trial Ex. LLL)

Bakalar Documentation of Purchase and Ownership
Of the Drawing

*Bakalar Failure to Conduct Due Diligence Before Purchase of*
*Drawing*
*Bakalar Failure to Investigate Provenance*
*Bakalar commenced lawsuit before conducting any investigation*