James A. Janowitz (JJ 8788)
William L. Charron (WC 1735)
M. Mona Simonian (MS 2654)
PRYOR CASHMAN LLP
410 Park Avenue
New York, New York  10022
(212) 421-4100
Attorneys for Plaintiff/Counterclaim Defendant David Bakalar

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DAVID BAKALAR,                                        :
                                                      :
            Plaintiff and Counterclaim                :
            Defendant,                                :          Index 05 Civ. 3037 (WHP)
                                                      :          (ECF Case)
        -against-                                     :
                                                      :
MILOS VAVRA and LEON FISCHER,                         :
                                                      :
            Defendants and Counterclaimants.          :
------------------------------------------------------------X

**PLAINTIFF DAVID BAKALAR'S AMENDED STATEMENT OF THE
ELEMENTS OF EACH OF HIS CLAIMS AND DEFENSES TO COUNTERCLAIMS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

I.   FIRST CLAIM FOR RELIEF:
     DECLARATORY JUDGMENT OF OWNERSHIP OF ARTWORK ............................ 1

     A. Elements of Claim ............................................................................................... 1

     B. Summary of Facts Relied Upon to Establish Each Element ........................................ 1

        1.  This Action is Within the Court's Jurisdiction ...................................................... 1

        2.  An Actual Controversy Exists ........................................................................... 1

II.  FIRST AFFIRMATIVE DEFENSE TO COUNTERCLAIMS:
     FAILURE TO STATE VIABLE CLAIMS FOR RELIEF ................................................ 3

     A. Defendants Cannot Meet Their Burden of Proving
        By a Preponderance of the Evidence That the Drawing
        Was Stolen From Fritz Grunbaum's Collection by the Nazis ..................................... 3

     B. Defendants Cannot Meet Their Burden of Proving That
        Lukacs Acquired The Drawing After the Grunbaums Died ....................................... 5

     C. If Lukacs Obtained the Drawing by Gift or Entrustment, Then
        Defendants Do Not State a Claim for Relief Under Controlling Swiss Law ............... 6

     D. If Lukacs Acquired the Drawing After the War and
        Claimed Title in Excess of Her Intestate Share, Then
        Defendants Do Not State A Claim for Relief Under Swiss Law ................................. 6

     E. If the Drawing Had Been Stolen by the Nazis, Then
        Defendants Do Not State a Claim for Relief Under Swiss Law ................................. 8

III. SECOND AFFIRMATIVE DEFENSE TO COUNTERCLAIMS:
     STATUTE OF LIMITATIONS UNDER AUSTRIAN NULLITY ACT .......................... 8

IV.  THIRD AFFIRMATIVE DEFENSE TO COUNTERCLAIMS:  LACHES ..................... 8

     A. Elements of Defense ............................................................................................ 9

     B. Summary of Facts Relied Upon to Establish Each Element ........................................ 9

        1.  Fischer and His Predecessors Knew Of Their
            Potential Claims And Declined To Take Any Action ............................................. 9

## TABLE OF CONTENTS, *Continued*

2. Vavra And His Predecessor Knew Of
Potential Claims And Waived Them.................................................................11

3. Plaintiff Is Prejudiced By The Loss Of
Evidence Caused By Defendants' Delay ............................................................13

CONCLUSION ....................................................................................................................15

## TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(s)**

Bakalar v. Vavra,
     No. 05 Civ. 3037 (WHP), 2006 WL 2311113 (S.D.N.Y. Aug. 10, 2006)...........................9

DAL International Trading Co. v. Sword Line, Inc.,
     286 F.2d 523 (2d Cir. 1961)...........................................................................................13

Greek Orthodox Patriarchate v. Christie's, Inc.,
     No. 98 Civ. 7664 (KMW), 1999 U.S. Dist. LEXIS 13257
     (S.D.N.Y. Aug. 18, 1999) ...........................................................................................14

Maryland Casualty Co. v. Pacific Coal & Oil Co.,
     312 U.S. 270 (1941)......................................................................................................1

Sanchez v. Trustees of the Univ. of Pa.,
     No. 04 Civ. 1253 (JSR), 2005 U.S. Dist. LEXIS 636 (S.D.N.Y. Jan. 13, 2005)...............15

Sprott v. Avon Products, Inc.,
     596 F. Supp. 178 (D.C.N.Y. 1984) ...............................................................................13

Wertheimer v. Cirker's Hayes Storage Warehouse, Inc.,
     300 A.D.2d 117, 752 N.Y.S.2d 295 (1st Dep't 2002) ......................................................15

In re Zweig's Will,
     261 N.Y.S. 400 (Sur. Ct. 1932).....................................................................................13

**STATUTES**

28 U.S.C. § 1332(a) ...............................................................................................................1

28 U.S.C. § 2201(a) ...............................................................................................................1

Pursuant to Rule 6(B)(ii) of the Individual Practices of the Hon. William H. Pauley III, plaintiff/counterclaim defendant David Bakalar ("Plaintiff") respectfully submits his statement of the elements of each claim against, and defenses to the counterclaims of, defendants/counterclaimants Milos Vavra ("Vavra") and Leon Fischer ("Fischer") (collectively, the "Defendants").

## I. FIRST CLAIM FOR RELIEF:<br>DECLARATORY JUDGMENT OF OWNERSHIP OF ARTWORK

Pursuant to 28 U.S.C. § 2201(a), Plaintiff seeks a declaration that he is the owner of a work of art by the artist Egon Schiele known as "Seated Woman With Bent Left Leg (Torso)" (the "Drawing").

### A. Elements of Claim

This Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," provided that this action presents "a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a).

### B. Summary of Facts Relied Upon to Establish Each Element

#### 1. This Action is Within the Court's Jurisdiction

The parties concur that subject matter jurisdiction over Plaintiff's claims exists and is based upon complete diversity of citizenship between the parties, pursuant to 28 U.S.C. § 1332(a). (JPTO § II(A).) The parties have also consented by their respective pleadings to this Court's personal jurisdiction over each of them.

#### 2. An Actual Controversy Exists

An "actual controversy" means that "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941).

Defendants confirmed the existence of an actual controversy in February 2005 when they, through their representatives, interfered with Sotheby's attempted sale of the Drawing (on Plaintiff's behalf) at an auction in London, England.  (Pl. Trial Exs. 97-104.)

Plaintiff purchased the Drawing on November 12, 1963 at the price of $3,300 from the Galerie St. Etienne in New York City.  (Pl. Trial Ex. 111.)  On August 23, 2004, Plaintiff consigned the Drawing to Sotheby's for auction.  (Pl. Trial Ex. 6.)  Sotheby's obtained a successful bidder for the Drawing at an auction in London on February 8, 2005, for the price of approximately $726,000.  (Pl. Trial Ex. 106.)

Shortly thereafter, Defendants' representatives from Austria asserted to Sotheby's that Defendants are the rightful owners by inheritance of the Drawing, which they claimed was once owned by Franz Freidrich ("Fritz") Grunbaum in Vienna, Austria and further claimed was stolen from Grunbaum by the Nazis during World War II.  (Pl. Trial Exs. 97-104.)  Sotheby's provenance research did not support Defendants' claims of ownership.  (Id.)  As a consequence of Defendants' assertions and claims, however, the successful auction bidder cancelled the pending sale of the Drawing on March 3, 2005.  (Pl. Trial Exs. 8, 106.)

Plaintiff commenced this declaratory judgment action on March 21, 2005 to declare the parties' ownership rights and legal relations with respect to the Drawing.  (Pl. Trial Ex. 1.)  On June 1, 2005 Defendants confirmed the existence of an actual controversy regarding ownership of the Drawing, when they asserted counterclaims against Plaintiff that alleged, *inter alia*, that Defendants are entitled to a declaration that they are the rightful owners of the Drawing.  (See Pl. Trial Ex. 147.)

2

II.    **FIRST AFFIRMATIVE DEFENSE TO COUNTERCLAIMS:**
       <u>**FAILURE TO STATE VIABLE CLAIMS FOR RELIEF**</u>

     A.    **Defendants Cannot Meet Their Burden of Proving**
              **By a Preponderance of the Evidence That the Drawing**
              <u>**Was Stolen From Fritz Grunbaum's Collection by the Nazis**</u>

There is no direct evidence linking the Drawing to Fritz Grunbaum's art collection.  The first time the Drawing is ever identified as existing is in a 1956 catalog of Egon Schiele works published by the Galerie Gutekunst & Klipstein in Bern, Switzerland (the "1956 Kornfeld Catalog").  (Pl. Trial Ex. 2.)  The sponsor of that exhibition and catalog, Eberhard Kornfeld ("Kornfeld"), testified in this case to having purchased the Drawing from Mathilde Lukacs ("Lukacs") on or about May 22, 1956.  (Kornfeld 5/25/07 Dep. 31:16-37:6, 57:5-59:20, 64:20-65:7; Pl. Trial Ex. 112 at EK 00029-31.)  Kornfeld also testified that he did not make any association between Lukacs and Grunbaum until 1998, when another set of alleged (and since-discredited) Grunbaum heirs, the Reifs, informed Kornfeld that Lukacs was Fritz Grunbaum's sister in-law.  (Kornfeld Dep. 110:10-114:2, 121:5-124:2, 126:16-127:9, 140:14-20.)  That is the first time Fritz Grunbaum became associated with the Drawing's provenance.

Accordingly, if Defendants wish to assert Grunbaum provenance of the Drawing, they must do so through the testimony of Kornfeld that he acquired the Drawing from Lukacs.  There is no other basis to infer Grunbaum provenance.

Defendants have admitted that if Lukacs once possessed the Drawing, then the Drawing could not have been stolen by the Nazis because it is unreasonable to infer that Lukacs was able to obtain the Drawing from the Nazis.  (Defs.' Fifth Am. Ans. & Cntrclms. dated June 25, 2008 ("Ans.") at ¶¶ 106, 286.)  This Court has relied upon Defendants' admission in a previous Order dated July 28, 2006, which denied Defendants' motion for certification of a counterclaim defendant class.  (Pl. Trial Ex. 151 at pp.11-12.)  It is also noteworthy in this regard that on July

15, 1938, Lukacs declared to the Nazi government her personal ownership of "22 pictures" (without titles) valued at 400 RM. (Pl. Trial Ex. 23.) There is nothing in the record to disprove the hypothesis that the Drawing was one of Lukacs's "22 pictures."

In order to maintain their theory that the Nazis once stole the Drawing, Defendants reject Lukacs's role in the Drawing's provenance and insist that Lukacs never possessed the Drawing. (Ans. ¶ 5.) If correct, then there is no evidence by which Defendants can prove that Fritz Grunbaum, more likely than not, once owned the Drawing.

Defendants' only evidence in support of their theory of Grunbaum provenance, sans Lukacs, is the July 20, 1938 appraisal of Grunbaum art by Franz Kieslinger, which identified the existence of 55 large colored drawings by Schiele and 20 pencil drawings by Schiele, without titles. (Pl. Trial Ex. 20.) The Drawing is not a pencil drawing. (JPTO § VI(A)(2).) Moreover, Schiele created approximately 2,700 drawings. (JPTO § VI(A)(1).) Therefore, there is only about a 2% chance that the Drawing was one of the 55 large colored drawings by Schiele appraised by Kieslinger in the Grunbaum home – far short of the preponderance standard of proof. This point was also previously recognized by the Court in the July 28, 2006 Order denying class certification. (Pl. Trial Ex. 151 at pp.10-11.) Additionally, as the Court noted in its July 28, 2006 Order, Defendants have acknowledged in Court that the drawings identified by Kieslinger without titles are incapable of "individualized determinations." (Id. at p.10.)

Nor is there any evidence that the Nazis confiscated all of the items appraised by Kieslinger. Kieslinger appraised approximately 449 total works of art in the Grunbaum home on July 20, 1938. (JPTO § VI(A)(14).) However, an export permit application signed in the name of Elisabeth Grunbaum, Fritz's wife, on September 8, 1938, identified only approximately 417 total works of art to be shipped from the Grunbaum home. (JPTO § VI(A)(19).) Therefore,

Elisabeth Grunbaum may have transferred at least 32 works of art from her home between July 20, 1938 and September 8, 1938. Moreover, Mathile Lukacs and her husband, Sigmund Lukacs, are known to have fled Austria for Belgium during this period, on August 12, 1938, after the Gestapo arrested Sigmund and forced him on May 18, 1938 to sign a "commitment to leave Austria." (JPTO § VI(A)(22).)

It is also apparent that the Lukacses were able to transport their property from Austria to Belgium. In an effort after the War to reclaim property that had been stolen from the Lukacses by the Nazis, Sigmund Lukacs executed two reclamation registrations on May 15, 1947: one identifying an emerald that had been stolen in Vienna in 1938; and a second seeking the return of cash that the Lukacses had been ordered to pay in 1938 "for export promotion purposes" so they could leave Austria with certain jewelry. (JPTO § VI(A)(21)-(27); Pl. Trial Exs. 23, 138.) The Lukacses did not seek reclamation or restitution of any other property, including Mathilde Lukacs's "22 pictures" or any other artwork she may have received prior to fleeing Austria or during her time in Belgium.[1]

### B.     Defendants Cannot Meet Their Burden of Proving That Lukacs Acquired The Drawing After the Grunbaums Died

As discussed above, no one can claim to explain with any degree of certainty how Mathilde Lukacs obtained the Drawing. Defendants cannot demonstrate that Lukacs acquired the Drawing after the War (when Lukacs lived in Brussels) and after the Grunbaums had died.

---

[1] If Elisabeth Grunbaum did transfer 32 works of art to Lukacs after July 20, 1938, and Lukacs had already owned 22 other works, then Lukacs may have fled Austria with 54 works in total. It is interesting to note that the 1956 Kornfeld Catalog exhibits 54 works of art, most of which Kornfeld claims to have purchased from Lukacs. (Pl. Trial Ex. 2; Kornfeld Dep. 121:5-20.) Although one can only speculate as to whether there is significance to those facts or whether they are pure coincidence, such speculation typifies the manner in which Defendants ask the Court to resolve this case. The truth is no one knows or can explain with any degree of certainty how Lukacs obtained the Drawing, which is why Defendants cannot possibly meet their burden of proof to support a declaratory judgment or any other award in their favor.

Therefore, Defendants cannot satisfy their burden of proving that Lukacs took title to the Drawing in excess of her intestacy share of Fritz Grunbaum's estate. The evidence also reflects that on June 9, 1941, Elisabeth Grunbaum signed a registration for Fritz Grunbaum's death identifying herself as the "heir" and representing that "there is no estate." (JPTO § VI(A)(28)-(29).)

###### C.    If Lukacs Obtained the Drawing by Gift or Entrustment, Then Defendants Do Not State a Claim for Relief Under Controlling Swiss Law

By Orders dated May 30, 2008 and June 18, 2008, the Court held that Swiss substantive law controls the resolution of Defendants' Counterclaims, and that, if necessary, New York law controls the resolution of Bakalar's laches defense.

If Lukacs obtained the Drawing while Fritz and/or Elisabeth Grunbaum were alive, either as a purchase, a gift or in entrustment during the War, then under Swiss law Defendants cannot divest Plaintiff of the Drawing. Swiss law recognizes under a purchase, gift or entrustment theory that Kornfeld acquired title to the Drawing immediately upon transfer from Lukacs. (Pl. Trial Ex. 15 at §§ 2.1.1, 4.1, 4.2; Pl. Trial Ex. 16 at §§ 3.1.3, 3.1.4, 3.3.2, 4.2.)

As discussed above, Defendants cannot demonstrate how Lukacs obtained the Drawing, and thus cannot disprove either a purchase, gift or entrustment theory of acquisition. Once again, Lukacs is known to have owned 22 pictures prior to the time of the Kieslinger Inventory, and Elisabeth Grunbaum appears to have entrusted at least 32 works of art with someone between the July 20, 1938 Kieslinger Inventory and the September 8, 1938 export permit request.

###### D.    If Lukacs Acquired the Drawing After the War and Claimed Title in Excess of Her Intestate Share, Then Defendants Do Not State A Claim for Relief Under Swiss Law

If one were to assume that Lukacs did not acquire the Drawing until after the War and after the Grunbaums had died (the circumstances of such a hypothesized acquisition, of course,

would remain a mystery to all), then under Swiss law there is no basis to divest Plaintiff of the Drawing.

Swiss law recognizes Kornfeld's acquisition of valid title immediately upon his purchase of the Drawing from Lukacs, provided that Kornfeld acted in good faith. (Pl. Trial Ex. 15 at §§ 2.1.1, 2.2, 4.) Kornfeld's good faith is presumed under Swiss law and is amply supported by the evidence, including Kornfeld's deposition testimony and extensive documentation regarding his dealings with Lukacs between 1952 and 1957. (Pl. Trial Exs. 15 (at §2.2.1), 42-85, 112; see generally Kornfeld Dep.) In addition, Swiss law would not have required Kornfeld to investigate and comprehend the intestacy laws of foreign jurisdictions, such as Germany (where Fritz Grunbaum died), Belarus (where Elisabeth Grunbaum died), or Austria (where the Grunbaums had lived). (Pl. Trial Ex. 17 at §§ 7, 9.) Therefore, even if Lukacs had exceeded the intestacy rights of other potential Grunbaum heirs, that would not be a basis under Swiss law to infer that Kornfeld acted in bad faith.[2]

---

[2] Although no will by the Grunbaums has been located, Lukacs referred to the existence of a will by Elisabeth Grunbaum, Lukacs's sister, and Lukacs purported to attach a copy of that will when Lukacs, in 1954, sought a declaration of death for Elisabeth in order to be named the heir to Fritz Grunbaum's estate. (Pl. Trial Ex. 88.) A copy of that will is acknowledged as having been returned when Lukacs later withdrew her application for a declaration of death. (Pl. Trial Ex. 139.) One could reasonably infer from these facts that Elisabeth Grunbaum's will identified Lukacs to be her heir. Defendants offer no evidence to the contrary. It is equally possible that Elisabeth Grunbaum selected Lukacs to be the beneficiary of a gift of the 32 works of art that Elisabeth apparently transferred between the time of the July 20, 1938 Kieslinger Inventory and the September 8, 1938 export permit request. (Pl. Trial Exs. 20, 25.) One can only guess, but again Defendants offer no evidence to the contrary. Moreover, because Lukacs obtained the Drawing and sold it to Kornfeld well before Defendants received their certificates of heirship, Defendants are not entitled under Austrian intestacy law to divest Plaintiff of title. (Pl. Trial Ex. 16 at §§ 3.3.2, 3.3.3.)

### E.    If the Drawing Had Been Stolen by the Nazis, Then
####      Defendants Do Not State a Claim for Relief Under Swiss Law

If one were to assume that the Nazis had stolen the Drawing and that it somehow

nonetheless ended up with Lukacs, then Defendants still fail to meet their burden of proving that

Kornfeld did not acquire good title under Swiss law.

Under Swiss law, a dispossessed owner of stolen art "may only claim restitution during

five years after the theft, [irrespective of the good faith acquisition by a third person and]

regardless of how many times the object has changed hands during these five years." (Pl. Trial

Ex. 15 at § 2.1.2.)  Thereafter, "a good-faith possessor is protected under the rules of possession

and may keep the object.  He or she then has valid title to the object by virtue of [the Swiss Civil

Code] and by adverse possession (acquisitive prescription)." (Id.)

The good faith acquisition of the Drawing by Kornfeld is an issue for trial.  If Kornfeld is

determined to have purchased the Drawing from Mathilde Lukacs in good faith, then the state of

knowledge of Kornfeld's later transferee, Otto Kallir, is irrelevant.

## III.   SECOND AFFIRMATIVE DEFENSE TO COUNTERCLAIMS:
##        STATUTE OF LIMITATIONS UNDER AUSTRIAN NULLITY ACT

Plaintiff's legal defenses to the Austrian Nullity Act have been addressed in pretrial

motions *in limine*.

## IV.    THIRD AFFIRMATIVE DEFENSE TO COUNTERCLAIMS:  LACHES

Even if the Court were to find in favor of Defendants under Swiss law, New York's law

regarding laches should nonetheless bar Defendants' counterclaims under both of Defendants'

inconsistent and alternative theories:  either (a) that Lukacs never possessed the Drawing and that

it was stolen from Fritz Grunbaum by the Nazis; or (b) that Lukacs did possess the Drawing but

acquired it after the Grunbaums died, and that she took title in excess of her intestate share.

A.     **Elements of Defense**

To establish a laches defense in this context, Plaintiff must show:  (1) that Defendants or their preceding family members knew of their potential claims; (2) that they delayed in taking action to pursue their claims without excuse; and (3) that Plaintiff suffered prejudice because of the loss of evidence due to the passage of time.  Bakalar v. Vavra, No. 05 Civ. 3037 (WHP), 2006 WL 2311113, at *3 (S.D.N.Y. Aug. 10, 2006) (Pauley, J.).

B.     **Summary of Facts Relied Upon to Establish Each Element**

1.     **Fischer and His Predecessors Knew Of Their Potential Claims And Declined To Take Any Action**

Fischer's predecessors had every opportunity to obtain answers to all of the questions that Defendants have raised in this case, but Fischer's predecessors chose not to do so.  Mathilde Lukacs was the aunt to Fischer's mother (i.e., Fischer's great-aunt), and the sister in-law to Fischer's grandmother.  (JPTO § VI(A)(33).)  Fischer's parents and grandmother knew Mathilde Lukacs – known in the family by the nickname, "Tilde" – and corresponded with Lukacs until her death in 1979.  (Id. at § VI(A)(47)-(50).)  Indeed, Sigmund and Mathilde Lukacs moved to Belgium from Austria in 1938, a decision that could have been prompted by the fact that Sigmund – a trader of precious jewels – may have wanted to be closer to Fischer's parents (i.e., Sigmund's niece and her husband) because Fischer's father was a diamond dealer in Belgium at the time.  (Pl. Trial Exs. 26, 138; Fischer Dep. 23:14-24:3.)

Fischer's parents also visited Lukacs in Belgium in April or May 1956 (Fischer's parents fled to the U.S. in or about 1940 after the Nazis invaded Belgium), and Fischer's parents (possibly together with Fischer himself) again met with Lukacs in Switzerland in or about 1960 (the Lukacses moved to Switzerland in 1957).  (Fischer 1/17/06 Dep. 23:14-25:20, 29:3-39:20, 45:25-46:25, 58:15-21, 137:5-7; Pl. Trial Ex. 146.)  The question of whether Lukacs obtained

any art or other property from the Grunbaums and under what circumstances could have been answered easily by Lukacs herself, but Fischer's family never asked.

Fischer's parents and grandmother also must be charged with knowledge of their potential claims to Grunbaum property. Fischer's family collected significant artwork, including works by Chagall, Ensor, Vlaminck and Permeke. (Fischer Dep. 47:2-49:20, 50:10-52:22, 60:17-21, 61:2-11.) Part of that collection (about a dozen works) had been inherited by Fischer's father from Fischer's paternal grandparents in or about 1955, before the Fischers visited Lukacs in Belgium in April or May 1956, and before Lukacs sold the Drawing (and other art) to Kornfeld on May 22, 1956. (Id.) Fischer's parents and grandmother simply chose not to pursue similar inheritance possibilities from the maternal side of the family.

In addition, Fischer's parents knew first-hand about the forfeiture of property by Jews to the Nazis during World War II because Fischer's father had to abandon a printing press business in Belgium in order to escape after the Nazis invaded that country in 1940. (JPTO § VI(A)(45)-(46).) However, Fischer's father decided not to pursue a claim for reparations after the War. (Fischer Dep. 23:14-24:9, 25:15-20, 45:25-46:25.) Fischer's family's decision to avoid dealing with Holocaust issues altogether is equally apparent from their decision not to share with Leon Fischer any details about "someone" from their family who had died during the Holocaust. (JPTO § VI(A)(51).)

Nor did Fischer's grandmother, Gisele Herzl, pursue information from Lukacs relevant to a possible "intestacy" claim. Gisele was married to Mathilde's brother, Max Herzl, who died in 1946. (JPTO § VI(A)(33).) Fischer's new and belated assertion of intestacy rights against Mathilde Lukacs, springing from Max Herzl, are not well founded where Gisele Herzl decided not to pursue the matter with Lukacs.

For his part, Leon Fischer made no effort to learn any details about the Grunbaums or other members of his family, until contingency lawyers in Europe tracked him down and enticed him into this case with the promise that Fischer would not have to do or pay anything. (Fischer Dep. 63:20-72:8.) He testified to having no real knowledge of the conduct of his representatives, and he could not identify the Drawing at his deposition and had to have it pointed out to him. (Fischer Dep. 73:14-77:8, 80:22-81:10, 84:6-86:15, 87:5-88:14, 94:9-95:12, 115:18-122:3, 139:13-141:12.)

### 2.   Vavra And His Predecessor Knew Of Potential Claims And Waived Them

Vavra's relationship to Fritz Grunbaum is more attenuated than that of Fischer. Vavra is not a blood relative of the Grunbaums. (I. Vavra Tr. 15:25-16:7.) Vavra's great uncle was married to Fritz Grunbaum's sister, Elise Zozuli ("Zozuli"). (Pl. Trial Ex. 125 at Interrog. Resp. 4.) Vavra's claim to Grunbaum's property is based upon a will executed in his favor by Zozuli's daughter, Marta Bakalova nee Zozuli. (Pl. Trial Ex. 121 at ¶ 3.)

Vavra claims to have known of his relationship to Fritz Grunbaum "since childhood"; claims to have known that Fritz Grunbaum "perished in a concentration camp"; claims also to have known that Fritz Grunbaum was "a man of substantial means" and a "collector of art"; and further claims "always" to have been "interested in family history." (Pl. Trial Ex. 125 at Resps. 5(a), 6, 7(d), 9, 10, 13.) Nevertheless, Vavra testified that prior to European attorneys reaching out to him in the late 1990s to be a party in this case, he and his family made no efforts to locate, trace or establish title to any property belonging or alleged to have belonged to Fritz Grunbaum. (Id. at Resps. 14, 15; see also Pl. Trial Ex. 27; I. Vavra Tr. 7:5-8:17.)

Vavra's inactivity concerning Grunbaum property cannot be overlooked. Vavra tried in this litigation to explain his and his family's inactivity by asserting, conclusorily, that "[t]he

conditions in Communist Czechoslovakia rendered pursuit of any restitution efforts impossible and dangerous." (Pl. Trial Ex. 125 at Resp. 11; accord Pl. Trial Ex. 121 at ¶¶ 6-8.)  Vavra asserted that Czech citizens "could not hire" Austrian lawyers to pursue family property outside of Czechoslovakia.  (Id.)  However, there is no evidence in the record to support Vavra's assertion.  Indeed, the evidence produced by Defendants in this case contradicts Vavra's claim.

The evidence shows that sometime between 1950 and 1953, a lawyer in Vienna contacted Zozuli (who lived in Czechoslovakia) and told her that she appeared to be the "last surviving member of the Grunbaum family and that the unclaimed [music] royalties from the deceased Fritz Grunbaum were lying dormant in Vienna."  (JPTO § VI(A)(41).)

Zozuli initially pursued this Grunbaum property, and she "sent all the necessary papers, ran up various expenses, [and] had to go to Prague to the Austrian Consulate" to pursue her claim.  (JPTO § VI(A)(42).)  However, Zozuli's lawyer subsequently advised her that the "Brussels sisters" of Elisabeth Grunbaum (i.e., Mathilde Lukacs, who was the only living sister of Elisabeth Grunbaum in the 1950s, and who did live in Brussels at the time) had presented as Fritz Grunbaum's heir.  (JPTO § VI(A)(43); Pl. Trial Ex. 21.)  At that point Zozuli stopped pursuing her claims for Grunbaum's property.  She did not challenge Lukacs's claim to Fritz Grunbaum's estate even though Lukacs asserted her rights as Elisabeth Grunbaum's sister and Zozuli could have asserted rights as Fritz Grunbaum's sister.  Nor is there any evidence of Zozuli reaching out to Lukacs to try to learn more even though she knew about the existence of "Brussels sisters."[3]  Instead Zozuli considered the inheritance matter "settled" and she did nothing further. (Pl. Trial Ex. 21.)

---

[3] Vavra similarly charges Zozuli with an awareness of Lukacs's existence.  (Pl. Trial Ex. 125 at Resp. 29.)

It is thus clear that Zozuli knew about her potential intestate rights to Fritz Grunbaum's property but she waived her right to pursue such property. Zozuli and her successors are now bound by that decision which was an informed and knowing decision by Zozuli based on the advice of counsel. See DAL Int'l Trading Co. v. Sword Line, Inc., 286 F.2d 523, 525 (2d Cir. 1961); Sprott v. Avon Prods., Inc., 596 F. Supp. 178, 180-83 (D.C.N.Y. 1984); In re Zweig's Will, 261 N.Y.S. 400, 418 (Sur. Ct. 1932). Although Vavra may now second-guess the wisdom of his predecessor's conduct, he is not entitled decades later to assert intestacy claims that his predecessor waived.

It is also apparent that Zozuli desired to bind her family to her inaction because she elected not to share details of her earlier Grunbaum estate claims with her family. As discussed above, Vavra knew nothing of Zozuli's efforts even though Vavra testified that "[u]ndoubtedly a part of what I know about Fritz Grunbaum came directly from his sister Lilli Zozuli." (Pl. Trial Ex. 125 at Resp. 13.) Similarly, Vavra's brother, Ivan Vavra, who claims to be an authority regarding his family's history, was unaware of Zozuli's efforts. (Pl. Trial Ex. 121 at ¶ 7.)

Furthermore, where Vavra testified that his family also knew about Fritz Grunbaum's art collection, Zozuli's decision not to pursue her brother's music royalties as an heir must be considered equally binding upon her successors as a decision not to pursue Fritz Grunbaum's art.

### 3. Plaintiff Is Prejudiced By The Loss Of Evidence Caused By Defendants' Delay

Defendants' counterclaims are speculation built upon speculation. Nothing is known about the Drawing until 1956 when it appeared in Kornfeld's catalog in Switzerland. That is the first time the Drawing is ever documented as having existed (apart from the artist's dating of the Drawing itself in 1917).

Defendants ask the Court to reject the only evidence that explains how Kornfeld acquired the Drawing (i.e., Kornfeld's testimony and documents reflecting his dealings with Mathilde Lukacs), and to assume in its place that Kornfeld acquired the Drawing from the Nazis.  Having dispensed with Kornfeld and Lukacs, Defendants further invite the Court to assume that the Nazis stole the Drawing from Fritz Grunbaum, even though the only evidence of Grunbaum provenance is Kornfeld's testimony that Lukacs once owned the Drawing.

Defendants' theory about Kornfeld fabricating over five years' worth of correspondence with Lukacs is frivolous and could have easily been debunked by Lukacs herself.  However, due to the decisions by Defendants' predecessors not to pursue or even inquire of Lukacs regarding Grunbaum property and possible intestacy claims, evidence from Lukacs disappeared when she died in 1979.  Consequently, Bakalar is prejudiced by Defendants' inaction and is forced to defend his ownership based upon very little direct evidence concerning the Drawing.

Bakalar is equally prejudiced by the failure of Defendants' predecessors to inquire of Lukacs or take other steps to determine if Lukacs did obtain the Drawing after the Grunbaums died, and if so whether she had a copy of a will or if she believed she took by intestacy.

This case presents the possibility of an unfair result:  either Bakalar, a good faith and innocent purchaser for value of the Drawing, must be forced to surrender his property to strangers; or else Defendants must be held to have lost their rights to property potentially once owned by their distant family, to which laws of intestacy may have otherwise entitled them.  The central question with regard to the laches analysis is which side should have to bear that burden. Where Bakalar had no opportunity to discover the truth from Lukacs or other Grunbaum family sources, but Defendants and their predecessors were capable of obtaining such information and chose not to do so, it is equitable to bar Defendants' counterclaims by laches.  See Greek

14

Orthodox Patriarchate v. Christie's, Inc., No. 98 Civ. 7664 (KMW), 1999 U.S. Dist. LEXIS 13257, at *24 (S.D.N.Y. Aug. 18, 1999); Sanchez v. Trustees of the Univ. of Pa., No. 04 Civ. 1253 (JSR), 2005 U.S. Dist. LEXIS 636, at *8 (S.D.N.Y. Jan. 13, 2005); Wertheimer v. Cirker's Hayes Storage Warehouse, Inc., 300 A.D.2d 117, 118, 752 N.Y.S.2d 295, 297 (1st Dep't 2002).

## CONCLUSION

For the foregoing reasons, Bakalar respectfully requests judgment in his favor and a declaration that he is the owner of the Drawing, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
      July 10, 2008             PRYOR CASHMAN LLP

                         By:    /s/
                              James A. Janowitz
                              William L. Charron
                              M. Mona Simonian
                         410 Park Avenue
                         New York, New York  10022
                         (212) 421-4100
                         Attorneys for Plaintiff/Counterclaim Defendant
                         David Bakalar