UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID BAKALAR,

Plaintiff/Counterclaim Defendant,

-against-

MILOS VAVRA and LEON FISCHER,

Defendants/Counterclaimants.

Index 05 Civ. 3037 (WHP)

**DECLARATION OF WILLIAM L. CHARRON IN OPPOSITION TO DEFENDANTS' MOTION TO REOPEN THE RECORD AND RETRY THE CASE**

1. I am a member of Pryor Cashman LLP, counsel for plaintiff/counterclaim defendant David Bakalar ("Bakalar") in the above-captioned action. I respectfully submit this declaration in opposition to the motion by defendants/counterclaimants Milos Vavra ("Vavra") and Leon Fischer ("Fischer"; collectively, "Defendants") to reopen the record on remand and retry this case.

**This Court's And The Second Circuit's Past Rejections Of Defendants' Efforts To Reopen The Record To Include Evidence From Jonathan Petropoulos**[1]

2. Defendants commenced their expert discovery in this action in November 2005, by producing two foreign law expert reports concerning Swiss and Austrian law and a further purported expert handwriting analysis of documents voluntarily produced by the Swiss art dealer Eberhard Kornfeld. As set forth below, expert discovery revolved around those three specific areas throughout the extensive period of discovery in this case, during which time this Court

[1] Much of the following discussion is largely a reprint of the discussion presented by Bakalar to the Second Circuit in opposing Defendants' issue raised on appeal that this Court had supposedly abused its discretion in declining to further extend expert discovery to accommodate Defendants' inexcusably untimely designation of Petropoulos. As explained below, the Second Circuit did not agree with this portion of Defendants' appeal.

extended expert deadlines on multiple occasions to accommodate Defendants. Defendants, however, did not identify Jonathan Petropoulos as a new potential expert in an entirely new subject matter (*i.e.*, "Nazi customs and practices" and "art history") until all expert discovery was set to complete.

3.      Specifically, following Kornfeld's commissioned deposition in Switzerland on May 25, 2007, Defendants asked this Court for permission to supplement their November 2005 Swiss and Austrian legal expert reports. This Court granted that request during a hearing held on August 17, 2007. It was agreed that Defendants would supplement their foreign law reports by September 7, 2007, and that Bakalar would produce rebuttal reports by October 5, 2007. Defendants additionally asked this Court to approve a second commission upon the Swiss Department of Justice to permit expert handwriting analysis of Kornfeld's original documents. Notwithstanding the pointlessness of that exercise where Defendants' first handwriting expert had concluded that no conclusions as to Mathilde Lukacs's handwriting were possible because there is no suitable baseline signature from her for comparison, this Court nonetheless accommodated Defendants and by Scheduling Order No. 8 dated August 30, 2007 directed all expert discovery to conclude by November 30, 2007. Defendants still did not identify Petropoulos at this time as a potential expert for their case.

4.      After Defendants failed to meet their September 7, 2007 deadline to submit a supplemental Swiss law report, this Court by Scheduling Order dated October 24, 2007 declined to sanction Defendants but extended the period of expert disclosure for Bakalar's rebuttal Swiss law report until November 26, 2007. In addition, due to delay from the Swiss Department of Justice concerning the request to examine Kornfeld's original documents in Switzerland, this

Court also extended the period of handwriting expert discovery until January 31, 2008. Again, Defendants did not mention Petropoulos.[2]

5. On November 21, 2007, Defendants' counsel wrote to this Court with the surprising request for "an extension to February 15, 2008 to file an expert report from an art historian" who was identified as Petropoulos. (See **Exhibit A** annexed hereto.) If granted, Defendants' request would have required at least a three-month further extension of expert discovery in order to permit Bakalar to counter-designate an expert and prepare a rebuttal report, and for the parties' respective experts to be deposed.

6. Defendants asserted that Petropoulos could "provide evidence of Nazi 'custom and practice' of handling Jewish deportation issues relating to Fritz's imprisonment in Dachau and Viennese Nazi art looting practices …." (Exhibit A.)

7. Bakalar objected that Defendants did not seek to offer genuine expert opinion about the meaning of fact evidence assembled during discovery concerning the provenance of the Egon Schiele drawing at issue in this case: "Seated Woman With Bent Left Leg (Torso)." Rather, in the absence of facts concerning custody and possession of the Drawing during the War, Petropoulos was being offered to fill in the gaps with conjecture.

8. Ironically, although Defendants argued that Bakalar's complaint dated March 21, 2005 had "open[ed] the door" to "scholarly opinion" from Petropoulos, Defendants offered no explanation for their two and a half year delay in designating Petropoulos.

9. Defendants' counsel also claimed to have "[n]ewly-discovered evidence" that justified Petropoulos's untimely designation, which Defendants' counsel had mentioned in a

[2] Defendants eventually abandoned their handwriting analysis exercise and no handwriting analysis of Kornfeld's original documents was performed. Defendants also did not introduce their initial November 7, 2005 handwriting report as an exhibit at the trial in this case.

letter to this Court on November 2, 2007.  Such "new" evidence consisted of a book from 2005 and an article from 2006 that Defendants' counsel had apparently recently found and translated.

10.     Therefore, Bakalar contended that Defendants sought to unduly prejudice Bakalar by "extending this litigation and increasing its costs beyond reason" without legitimate basis.  On December 3, 2007, this Court denied Defendants' request to further extend expert discovery by a period of months to accommodate Defendants' inexcusably untimely designation of Petropoulos. (Exhibit A.)

11.     In flagrant disregard for this Court's December 3, 2007 ruling, Defendants went ahead and had Petropoulos prepare a 105-page report anyway, which he signed on March 25, 2008.  (Dowd Declaration Exhibit D.)  Defendants' counsel then again wrote to this Court on April 18, 2008 and asked the Court to revisit retroactively its December 2007 ruling, which this Court denied during a conference on April 25, 2008.  (4/25/08 Tr. at 28:4-9.)

12.     Defendants again renewed their request to admit Petropoulos during the parties' pre-trial motions *in limine*, and during the final pre-trial conference on July 11, 2008, this Court denied that request.  (7/11/08 Tr. at 13:19-14:2.)

13.     By motion dated November 19, 2008, Defendants asked this Court to "correct and supplement the record" for appeal to include, among other things, the Petropoulos Report.  This Court denied that request during a hearing held on December 11, 2008.

14.     Defendants subsequently moved the Second Circuit on December 22, 2008 to "correct and supplement the record" on appeal pursuant to Fed. R. App. P. 10(e) to include, *inter alia*, the Petropoulos Report.  (See **Exhibit B** annexed hereto.)

15.     By Order dated March 11, 2009, the Second Circuit (Winter, Sack, Cogan, JJ.) denied Defendants' motion to add the Petropoulos Report to the record.  (See **Exhibit C** annexed hereto.)

16.     In their appeal on the merits to the Second Circuit, Defendants raised a great number of issues and challenged nearly every aspect of this Court's Opinion and Order dated September 2, 2008 awarding judgment to Bakalar.  Among other issues raised on appeal, Defendants argued:

   a)     that this Court's crediting of Kornfeld's documents and testimony was clearly erroneous (Defs.' Appeal Br. at 12, 15, 38);

   b)     that New York's Dead Man's Statute, C.P.L.R. § 4519, should have barred any testimony or documentary evidence from Kornfeld about his dealings with Lukacs (id. at 39-40);

   c)     that this Court abused its discretion in denying Defendants' request to further extend expert discovery in order to permit the inexcusably belated introduction of the Petropoulos Report, which Defendants had offered at the close of expert discovery, more than two years after Defendants had commenced their production of expert reports in this case (id. at 36-37);

   d)     that New York estate law, E.P.T.L. § 3-5.1, provided the operative choice of law rule and should have compelled judgment in Defendants' favor in recognition of Austria's issuance of a Grunbaum estate certificate to Defendants in 2002 (id. at 26-30);

   e)     that this Court made a mistake of law in applying Swiss sales laws instead of Austrian or New York sales laws under New York's choice of law rules in replevin cases (id. at 30-33); and

   f)     that Bakalar's laches defense should be dismissed as a matter of New York law (id. at 30).

(See **Exhibit D** annexed hereto (table of contents to Defendants' appeal brief).)

17.     Defendants received the benefit of certain *amici* submissions to the Second Circuit.  One set of *amici* known as the "Beliak Amici" argued in favor of Defendants'

alternative choice of law analyses (including Defendants' New York estate law, E.P.T.L. § 3-5.1, argument), and further argued that this Court should have permitted testimony by Petropoulos. (See Dowd Declaration Ex. G at 7-8, 12-15.)

18. The only issue raised by Defendants on appeal and supported by the *amici* with which the Second Circuit agreed was the argument that New York's replevin choice of law rules required application of New York sales laws instead of Swiss laws. Bakalar v. Vavra, 619 F.3d 136 (2d Cir. 2010).

19. The Second Circuit did not accept Defendants' argument that the Petropoulos Report should have been admitted into evidence during the trial. Nor did the Second Circuit purport to rely on Petropoulos or even mention Petropoulos in its full panel decision or in Judge Korman's separate concurrence.

**This Court's Past Rejection Of Evidence From Milan Kostohryz[3]**

20. During a discovery conference with this Court on August 17, 2007 that was meant to address areas of contemplated expert disclosure, the parties and the Court discussed only three subjects: (i) issues concerning Swiss law; (ii) issues concerning Austrian law; and (iii) handwriting analysis of Eberhard Kornfeld's documents. This Court's Scheduling Order No. 8 dated August 30, 2007 and the parties' stipulated schedule to exchange reports were based upon those three areas of contemplated expert discovery.

21. It thus came a surprise to Bakalar's counsel to find embedded within a supplemental fact discovery document production by Defendants on September 6, 2007, a declaration dated September 5, 2007 from Milan Kostohryz, a lawyer from the Czech Republic who described himself as having been "retained by the Co-Heirs of Fritz Grunbaum **in 1998**."

[3] Much of the following discussion is largely a reprint of the discussion presented by Bakalar to this Court in a joint discovery dispute letter dated September 28, 2007.

Kostohryz opined about the laws and legal conditions in Communist Czechoslovakia in the 1950s in support of Defendants' contention that the Czech predecessors of co-defendant Milos Vavra could not have acted with any diligence to try to claim Fritz Grunbaum's property after World War II.

22.     Defendants' counsel had never notified Bakalar's counsel or the Court of an intention to make Czech law an issue in the case, and Defendants' counsel was silent on the issue during the August 17 conference, even though the point of that conference had been to address all contemplated expert discovery.  Therefore, by a joint discovery dispute letter dated September 28, 2007, Bakalar asked this Court to preclude the Kostohryz Report to avoid undue cost and prejudice to Bakalar where the issue of Vavra's predecessors' activities were properly the subject of direct fact discovery.

23.     Indeed, the conclusive evidence concerning the diligence of Vavra's predecessors is a handwritten letter dated January 13, 1964 from Elise Zozuli, who was Fritz Grunbaum's sister and from whom Vavra derives his rights.  Both sides stipulated to the authenticity and non-hearsay nature of this letter, and it and its translation (offered by Defendants) were admitted at the trial as Plaintiff's Exhibit 21.  (See **Exhibit E** hereto.)

24.     Notwithstanding Defendants' assertion and Kostohryz's opinion that Vavra's predecessor, Zozuli, could not have acted with diligence in Communist Czechoslovakia in the 1950s to try to claim Fritz Grunbaum's property, Zozuli herself wrote that a lawyer from Vienna had contacted Zozuli in Czechoslovakia in or about the early 1950s to invite her to make a claim in connection with an estate proceeding for Fritz Grunbaum that had commenced in Vienna in 1951.  Zozuli, who knew about Fritz Grunbaum's art collection (according to the trial testimony of Vavra's brother, Ivan Vavra (7/16/08 Trial Tr. at 506:9-20, 513:9-514:2)), wrote that she had

initiated a claim at that time, "sent all the necessary papers, ran up various expenses, [and] had to go to Prague to the Austrian Consulate" to pursue her claim. Nevertheless, Zozuli discontinued her claim and considered the matter "settled" after her Viennese lawyer advised her sometime prior to July 1953 that the "Brussels sisters" of Fritz Grunbaum's wife, Elisabeth Grunbaum (i.e., Mathilde Lukacs, the sole surviving sister of Elisabeth Grunbaum after 1948 and a resident of Brussels at the time) had already presented herself as Fritz Grunbaum's heir.

25. Therefore, regardless of Kostohryz's opinions about the laws and generalized experiences of others in Communist Czechoslovakia in the 1950s, the direct fact evidence in this case is conclusive and undisputed that Vavra's predecessor did act with diligence in Communist Czechoslovakia in the 1950s to pursue Fritz Grunbaum's property, but she deliberately abandoned and waived her claim after learning about Mathilde Lukacs.

26. Following a hearing on October 24, 2007, this Court entered Scheduling Order No. 10 dated October 24, 2007, which, among other things, granted Bakalar's application to exclude the Declaration of Milan Kostohryz. (See **Exhibit F** annexed hereto.) Defendants did not seek reconsideration or appeal that ruling.

**Defendants' Mischaracterization That Trial Testimony By Jane Kallir (Of The Galerie St. Etienne) And Lucien Simmons (Of Sotheby's) Constituted "Expert" Testimony For Bakalar**

27. In Defendants' memorandum of law supporting their motion to reopen the record on remand, Defendants assert that Bakalar improperly offered expert trial testimony from Jane Kallir and Lucien Simmons. (Defs.' 11/4/10 Br. at 17.) This assertion is false and was already conclusively rejected by this Court. (7/15/08 Trial Tr. at 293:20-294:19, 303:7-24; 7/16/08 Trial Tr. at 411:17-414:15 (Court's repeated rejection of Defendants' counsel's characterization of Jane Kallir as an expert witness) (**Exhibit G** annexed hereto); Stipulation & Order dated May 29,

2008 acknowledging that Lucien Simmons would testify as a fact witness in connection with

Sotheby's auction of the Drawing and Sotheby's research into the provenance of the Drawing in

preparation for auction; see also 7/16/08 Trial Tr. at 483:17-484:14, 491:25-492:24 (further

acknowledgement and ruling that Simmons's testimony was limited and was not offered as an

expert witness) (**Exhibit H** annexed hereto).)

**Recent Defamatory Statements By Defendants' Counsel Against Eberhard Kornfeld**

28.     Notwithstanding this Court's finding of fact that Eberhard Kornfeld's documents

and testimony about his dealings with Mathilde Lukacs in the 1950s are credible, supported, and

true – a finding specifically embraced by the Second Circuit and by Judge Korman's separate

concurrence in particular (as explained more fully in Bakalar's accompanying memorandum of

law) – Defendants' counsel, Raymond Dowd, has seen fit to grant interviews following the

Second Circuit's decision in this case where he continues to assert that Kornfeld's documents are

"forged" and that Kornfeld "invented a fairy story about Fritz Grunbaum's sister in law [*i.e.*,

Lukacs]" that Defendants' "handwriting experts debunked … [as] based on clearly false and

fraudulent documents." (See **Exhibit I** annexed hereto (Sept. 7, 2010 Law.com article & Sept. 5,

2010 letter from Raymond Dowd to Austrian Bureau of the Commission for Provenance

Research).) Mr. Dowd's statements are entirely unsupported and are not buttressed by anything

contained in the Second Circuit's decision or in Judge Korman's concurrence.

29.     Defendants assert in their memorandum of law that they "had no meaningful

opportunity to challenge [Kornfeld's] evidence" during discovery in this case. (Defs.' 11/4/10

Br. at 6.) This assertion is false and was conclusively rejected previously by this Court on two

occasions: first, in denying Defendants' application to re-open discovery on April 25, 2008 (see

April 18, 2008 letters from counsel & Scheduling Order dated April 25, 2008); and second, in

denying at the July 11, 2008 final pre-trial conference Defendants' motion *in limine* to preclude the use of copies of Kornfeld's documents in lieu of originals (see 7/11/08 Tr. at 7:6-8:24.)

30. I declare under penalty of perjury that the foregoing is true and correct.

WHEREFORE, plaintiff/counterclaim defendant David Bakalar respectfully requests that this Court deny Defendants' motion to reopen the record to include discovery from Jonathan Petropoulos and/or Milan Kostohryz.

Executed on November 24, 2010.

[signature]

WILLIAM L. CHARRON

# Exhibit A

DUNNINGTON, BARTHOLOW & MILLER LLP

ATTORNEYS AT LAW

477 MADISON AVENUE

NEW YORK, N. Y. 10022

TELEPHONE: (212) 682-8811
FACSIMILE: (212) 661-7769
DBM@DUNNINGTON.COM
WWW.DUNNINGTON.COM

MARVIN M. BROWN
RAYMOND J. DOWD
JOHN T. DUNLAP
GEORGE W. GOWEN
MICHAEL J. KOPCSAK
STEVEN E. LEWIS
ROBERT T. LINCOLN
ALBERT L. LINGELBACH
THOMAS V. MARINO
JOSEPH MICHAELS IV
C. FREDERICK ROGGE
JOHN W. SHROYER
CAROL A. SIGMOND
LOUIS E. [illegible]

FREDERICK W. LONDON
FRANCIS J. MOONEY, JR.
JOHN I. FORRY
OF COUNSEL

MEMO ENDORSED

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/4/07

November 21, 2007

**BY HAND**

Hon. William H. Pauley III
United States District Court
Southern District of New York
500 Pearl Street - Room 2210
New York, NY 10007

NOV 26 2007
CHAMBERS OF
WILLIAM H. PAULEY III

Application denied.

SO ORDERED:

WILLIAM H. PAULEY III U.S.D.J.
12/3/07

*Re: Bakalar v. Vavra, OS Civ. 3037 (WHP)*

Dear Judge Pauley:

We submit this letter to request an extension to February 15, 2008 to file an expert report from an art historian. Defendants and Co-Heirs of Fritz Grunbaum Leon Fischer and Milos Vavra wish to designate Professor Jonathan Petropoulos as an expert art historian to report and testify. As set forth below, Dr. Petropoulos' testimony would satisfy Rule 702 of the Federal Rules of Civil Procedure since 1. it would be helpful to the trier of fact; 2. it would provide information on the customs and practices involved in Nazi deportations, expropriations and art looting in Vienna 1938-1941; 3. Dr. Petropoulos has access to scholarly references unavailable to Defendants; and 4. it would compensate for Plaintiffs agent Sotheby's refusal to testify regarding its investigation into the Drawing's provenance. The current deadline for expert discovery was extended to January 31, 2008 to accommodate handwriting expert discovery. Dr. Petropoulos has agreed to prepare a report by February 15, 2008. Plaintiff suffers no prejudice. Newly-discovered evidence discussed in our November 2, 2007 letter makes this expert testimony critical.

On October 24, 2007, the court extended the deadline for expert discovery to January 31, 2008 to accommodate handwriting expert discovery. The original date for Defendants to produce expert reports was September 7, 2007. The Plaintiff does not consent and views this as a last-minute irrelevant attempt to "manufacture facts that don't exist through the mouthpiece of an 'expert'". Plaintiff objects to the unreasonable cost and believes that the present request is a substantive discovery dispute.

Expert Qualifications. Dr. Petropoulos is one of the world's leading experts on the art looting practices relevant to the current dispute. His testimony led to the decision of the U.S. Supreme Court in Republic of Austria v. Altmann, 541 U.S. 677, 124 S. Ct. 2240 (2004). In Cassirer v. Kingdom of Spain, 461 F. Supp.2d 1157 (C.D. Cal. 2006), citing Rule 702 of the Federal Rules of Civil Procedure, the court stated that "at this stage Mr. Petropoulos's testimony on these issues of German history, National Socialism, art looting and the Holocaust cannot be disregarded." In the Second Circuit, expert testimony of

historians to be critical in analyzing ancient documents and giving them meaning and context. State of New York v. The Shinnecock Indian Nation, 2007 WL 3307089 (E.D.N.Y.) at *69-71 (discussing ease law). Dr. Petropoulos' 16-page CV has been provided to Plaintiff's counsel under separate cover.

Relevant Allegations. The Complaint alleges "...the Drawing, by all credible historical accounts, escaped confiscation during the war, and was returned to the custody of a close relative, Lukacs-Herzl, who thereafter sold it and other Schieles to the Swiss gallery [Gutekunst & Klipstein] in 1956." Cplt. ¶ 11. The Complaint further alleges that "the Drawing lost any taint it may have had as stolen goods when Lukacs-Herzl recovered it after the war, acting as an agent on the family's behalf." Cplt. ¶ 13 (emphasis supplied). The Drawing was part of Fritz Grunbaum's art collection. Cplt. ¶5. Fritz Grunbaum died in the Dachau concentration camp in 1941. Cplt, ¶ 5.

Defendants' Undisputed Legal Title. Defendants have diligently engaged in formal discovery related to legal title to the Drawing. Under §797 of the Austrian Civil Code it is 100% clear and uncontested that no one could have legally disposed of Fritz Grunbaum's property prior to the Certificate of Heirship issuing to Defendants Vavra and Fischer in 2002. 10/29/2007 Rebuttal Expert Opinion of Dr. Kathrin Hofer ("Hofer Rebuttal") at 2. Thus, any tales involving Mathilde Lukacs receiving artworks are irrelevant to legal title. Defendant's Austrian expert has not disputed this. Id. The 1954 Skrein application in Lukacs' name for Lily Grunbaum's death certificate, precludes the possibility of good faith acquisition under Austrian law. Hofer Rebuttal at 4. It is uncontroverted that Lukacs had no Certificate of Heirship to present to Eberhard Kornfeld. Thus, Swiss law precludes Kornfeld's 1956 acquisition being protected by good faith, since Kornfeld had a duty to investigate under the circumstances as alleged by Plaintiff. DBM 4636-4638. It is undisputed by Kornfeld that he failed to make even minimal inquiries into documents or the source of the artworks, even after being warned by the Swiss government.

Actions By Plaintiff Creating Need for Expert. To create uncertainty over title to the Drawing, the Complaint alleges that various (unnamed) scholars have "posited" theories of what happened to Fritz Grunbaum's collection and that what transpired is all a big mystery. Cplt. ¶¶ 25-28. Under Austrian law, these various theories are irrelevant to legal title. Supplemental Expert Opinion of Dr. Kathrin Hofer at DBM 4525. Plaintiff has failed to provide evidence of scholars to supporting the various "theories". Indeed, contemporary scholars have long questioned the allegations that Mathilde Lukacs possessed the Grunbaum collection, noting that Otto Benesch and Otto Kallir surely recognized the Grunbaum collection at Kornfeld's 1956 sale. See, e.g., OBER 58-59 Letter of Art Loss Register to Oberlin College dated June 13, 2003. Sotheby's has refused to reveal its analysis or opinions received regarding the Drawing's provenance. Sotheby's claims attorney client and work product privileges. 8/27/2007 Deposition of Lucien Simmons at 191.15- 201.2; 25 1.15 - 261.14; 27 1. 14 - 28. 1.13; 28 1. 24- 291.18; 341.4 - 351. 20; 971. 21 - 991. 17; 123 11. 14-21. Plaintiff joined in Sotheby's objections. Sotheby's produced documents belatedly, long after the close of fact discovery. Sotheby's knew of Grunbaum's murder, of outstanding claims that the Drawing was stolen before it held the February 8, 2005 London auction, that Mathilde Lukacs never had an Austrian certificate of inheritance, and that Sotheby's lacked the consent of the Grunbaum heirs to sell the Drawing. Simmons Depo. (123 l. 4; 87 1.24; 130 1. 4). Sotheby's pays the Art Loss Register to research its pieces. Simmons Depo,. (114 11. 2-19). Sotheby's failed to produce an Art Loss Register report on the Drawing. Sotheby's knowledge of contemporary historical scholarship is relevant

to defeat Plaintiffs laches claim, demonstrating that Plaintiff suffered no prejudice. Additionally, such evidence proves Defendant's Third Counterclaim for conversion.

Clearly, the Complaint "opens the door" to evidence of scholarly opinion. Plaintiff and its agent Sotheby's have stymied Defendants' probing pre-auction evidence available to Plaintiff and Plaintiffs agent Sotheby's. Since the Defendants are blocked from getting documents such as the Jean Vlug report on the Dienststelle Muhlmann's activities at the Getty Institute, it is critical to Defendants' case to permit expert testimony of a scholar on Muhlmann's 1938 art looting activities in Vienna and the Vlug report. "Vlug's report is flawed in many ways . . . yet his observation is accurate with respect to Muhlmann's assiduousness as a plunderer." Petropoulos, The Faustian Bargain at 193 (Oxford 2000). Thus Dr. Petropoulos' knowledge of and access to the Vlug Report and surrounding circumstances is likely to reveal information relevant to the whereabouts of Fritz Grunbaum's art collection from 1938-1952.

Dr. Petropoulos wrote " *[Muhlmann] was a fairly practical individual and was prepared to sacrifice certain works to the Reichsdeutsche [non-Austrian Germans following Anschluss], and especially to his patrons. He sent Goring lists of objects from both Jewish collections and confiscated church property and expressly noted that the works were for the Reichsmarschall to take: one letter, for example, stated that the objects came from the "Viennese (Jewish) collections of Lederer and Bondy. Muhlmann hoped that passing on a limited number of works to Nazi leaders would enable him to keep the majority of the art in Vienna.* Id. at 183. In The Polycratic Nature of Art Looting: The Dynamic Balance of the Third Reich, Petropoulos wrote: "Because many Viennese Jews possessed a relatively great amount of art and cultural property, this was indeed a significant category of plunder; while most of the museum quality art went to the Neue Berg and the confiscated Rothschild Schloss Wildhof, much that was valuable was never processed in an official repository." From Networks of Nazi Persecution (Berghahn Books 2005)(emphasis supplied). Thus, Dr. Petropoulos can provide evidence of Nazi "custom and practice" of handling Jewish deportation issues relating to Fritz's imprisonment in Dachau and Viennese Nazi art looting practices involving Jewish property inventories such as the Kieslinger Report. This testimony aids the trier of fact in determining weight and inferences from both existing and missing documentation.

Expert testimony is particularly compelling here. During the course of argument of a motion, the court stated that after the July 20, 1938 Kieslinger inventory, Lily Grunbaum "could have carried any of those works out of the apartment and given them to a relative." 4/2712006 Tr. at 21 l. 11-12. The court stated that after the Kieslinger inventory was taken, "any number of works could have been transferred by [Lily Grunbaum]." 4/27/2006 Tr. at 21. ll. 6-7. These statements reflect disputed facts not amenable to judicial notice, particularly without affording Defendants expert testimony.

Respectfully submitted

Raymond J. Dowd

cc: James Janowitz, Esq.
William Charron, Esq.

# Exhibit B

UNITED STATES COURT OF APPEAL
FOR THE SECOND CIRCUIT

---

DAVID BAKALAR,

Index No. 08-5119-cv

Plaintiff-Counter-Defendant-Appellee,

v.

MILOS VAVRA and LEON FISCHER,

Defendants-Counter-Claimants-Appellants.

---

**MEMORANDUM OF LAW IN SUPPORT OF APPELLANTS' MOTION TO CORRECT AND SUPPLEMENT THE RECORD**

**Dunnington Bartholow & Miller LLP**
*Attorneys for Appellants*
*Leon Fischer and Milos Vavra*
1359 Broadway, Suite 600
New York, NY 10018
Tel: (212) 682-8811
Fax: (212) 661-7769

Dated: New York, New York
December 22, 2008

## TABLE OF CONTENTS

Page

I. The Record Should Be Supplemented to Include Letter Applications Made to the Hon. William H. Pauley Dated August 8, 2008 and August 11, 2008, and the Exhibits Thereto....3

A. Jane Kallir's Catalogue Raisonneé Was Considered By the Court at Trial, Is Essential to the Appeal and Should Be Considered Part of the Record Below....3

B. Kornfeld's Prior Inconsistent Statements Claiming To Have Acquired 80% of Fritz Grunbaum's Estate Were Proffered To The Trial Court Both Before and After Trial and So Should Properly Be Part of the Record Below....4

C. The Requests for Judicial Notice of Adjudicative Facts dated August 11, 2008 Were Timely, Are Reasonably Necessary to Determine Issues on the Appeal and Should Be Part of The Record Because They Were Considered and Rejected By the Court Below....6

1. Requests for Judicial Notice of Scholarly Articles are Granted at Both the Trial and Appellate Level and Are Thus Timely....6

2. Judicial Notice of Facts Relating to Nazi Governmental Practices of Spoilating Jews in General and the Spoliation of Fritz Grunbaum in Particular Is Appropriate....7

D. The Record Should Be Supplemented to Include An Austrian Foreign Legal Expert Report That Was Proffered, But Excluded At Trial....8

E. The Record Should Be Supplemented to Include the Expert Report of Dr. Jonathan Petropoulos That Was Proffered, But Excluded....9

II. Appellants' Proposed Joint Pretrial Order should be reflected on the District Court Docket....11

# Exhibit C

S.D.N.Y.
05-cv-3037
Pauley, J.

# United States Court of Appeals
FOR THE
SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 11th day of March, two thousand nine,

Present:

Hon. Ralph K. Winter,
Hon. Robert D. Sack,
*Circuit Judges*,
Hon. Brian M. Cogan,*
*District Judge*.

David Bakalar,

*Plaintiff-Counter-Defendant-Appellee*,

v. 08-5119-cv

Milos Vavra and Leon Fischer,

*Defendants-Counter-Claimants-Appellants*,

Schenker, Inc. and Schenker & Co. A.G.,

*Counter-Defendants*.

The Appellants, through counsel, move to correct and supplement the record on appeal and to file a supplemental appendix. Upon due consideration, it is hereby ORDERED that the motions are granted in part, and denied in part. To the extent the Appellants seek to supplement the record with the expert report of Dr. Katherin Hoefer and evidence concerning an inconsistent statement by Eberhard Kornfeld, their motion to supplement the record is GRANTED because the record indicates

*The Honorable Brian M. Cogan, United States District Court for the Eastern District of New York, sitting by designation.

SAO-MWV

that the district court considered the contents of these materials before it denied admitting them as evidence, and thus the omission of these materials from the record on appeal was error. *See* Fed. R. App. P. 10(e)(2); *Leibowitz v. Cornell University*, 445 F.3d 586, 592 n.4 (2d Cir. 2006). Accordingly, the motion to file a supplemental appendix also is GRANTED to the extent it seeks the inclusion of these two pieces of evidence.

As to the remaining materials, including the Appellants' version of the Joint Pre-Trial Order, the motions are DENIED because the Appellants have not demonstrated that the materials were omitted from the record by error or accident, since there has been no showing that: (1) copies of the materials were submitted to the district court; and (2) the district court reviewed and based any decision, in whole or part, on the contents of the materials.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

By: [signature]

# Exhibit D

# 08-5119-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

DAVID BAKALAR,

*Plaintiff-Counter-Defendant-Appellee,*

—against—

MILOS VAVRA and LEON FISCHER,

*Defendants-Counter-Claimant-Appellants,*

SCHENKER, INC. and SCHENKER & CO. A.G.,

*Counter-Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANTS-COUNTER-CLAIMANT-APPELLANTS**

RAYMOND J. DOWD, ESQ.
DUNNINGTON, BARTHOLOW
& MILLER LLP
1359 Broadway
New York, New York 10018
(212) 682-8811

*Attorneys for Defendants-Counter-Claimant-Appellants*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.....v

STATEMENT OF JURISDICTION.....1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW.....2

STATEMENT OF THE CASE.....2

PROCEDURAL BACKGROUND.....4

STATEMENT OF FACTS.....6

A. Fritz Was Arrested By The Nazis And Imprisoned Until His Death.....6

B. Nazis Forced Jews To Register Property: Elizabeth Files Her First Jewish Property Declaration On August 1, 1938.....7

C. Nazi Use Of Illegal Powers of Attorneys To Force Jews To Liquidate Assets And Austrian Law Voiding Such Transactions.....7

D. Fritz's Dachau Power of Attorney And First Jewish Property Declaration Showing Fritz's Art Collection.....8

E. The Kieslinger Inventory Showing Fritz's Art Collection.....8

F. November 1938 Nazi Decrees Claiming all Category IV Jewish Assets As Property of the Reich.....9

G. December 1938 Nazi Decrees Stripping Jews Of Control Over Property Through "Aryan" Administrators.....9

H. Jewish Property Declarations Show Fritz's Art Collection Intact In Vienna as of June 30, 1938.....10

I. The Confiscation of Fritz's Art Collection While He Was In Dachau Prior To His January 14, 1941 Death....11

J. October 5, 1942: Elisabeth's Deportation and Murder....12

K. Kornfeld's Knowledge And Swiss Government Warnings That He Was Dealing in Potentially Looted Art....12

L. Kornfeld's Missing April 24, 1956 Invoice And Business Records Contradict An Acquisition Of Schieles From Mathilde Lukacs....13

M. The 1956 Kornfeld Catalog Featuring *Dead City* and the Drawing....16

N. Prewar Documentation Showing Otto Kallir's Knowledge of Fritz's Schieles....16

O. Kornfeld's September 18, 1956 Delivery of the Drawing and *Dead City* To Otto Kallir in New York....17

P. Bakalar Swaps Kollwitz Lithographs For The Drawing And Keeps His Ownership Of The Drawing Confidential....18

Q. District Attorney Morgenthau Seizes Fritz's *Dead City* in 1998....19

R. Bakalar Seeks To Evade Austrian Probate Decree With London Auction and New York Lawsuit in 2005....19

S. Bench Trial on Issues of Swiss Law and Final Judgment Finding Swiss Transfer of Title to Bakalar....20

SUMMARY OF ARGUMENT....21

STANDARD OF REVIEW....24

ARGUMENT....25

I. THE DISTRICT COURT ERRED AS A MATTER OF LAW BY CONCLUDING THAT PUTTING

FRITZ IN THE DACHAU CONCENTRATION CAMP, TRANSFERRING HIS ART COLLECTION TO AN ARYAN TRUSTEE AND MURDERING HIM WAS NOT A "THEFT" OF HIS ART COLLECTION....................25

A. The 1946 Austrian Nullification Law Voids All Transactions Following Fritz's Execution of the Dachau Power of Attorney.........27

B. As A Matter of Austrian Law, No Property Could Have Been Transferred Out of Fritz's Estate By Any Family Member Prior To The 2002 Probate Decree....................28

1. Universal Succession Under Austrian Law....................29

2. The Requirement of Partition....................29

C. Since This Court Has No Jurisdiction to Modify The Plain Language of the Probate Decree, Bakalar's Laches Claim Should Be Dismissed....................30

II. THE DISTRICT COURT ERRED AS A MATTER OF LAW BY CONCLUDING THAT PASSING A STOLEN ARTWORK THROUGH SWITZERLAND CONFERS LEGAL TITLE IN NEW YORK....................30

A. New York Does Not Recognize Good Faith Purchasers of Stolen Property....................31

B. New York Places The Burden of Showing A Voluntary Transfer From Fritz's Estate On Bakalar....................31

III. THE DISTRICT COURT ERRED AS A MATTER OF LAW BY INTERPRETING THE FEDERAL RULES TO DEPRIVE THE CO-HEIRS OF AN ESTATE AWARDED TO THEM BY A 2002 AUSTRIAN PROBATE DECREE RECOGNIZED BY NEW YORK LAW....................33

A. The District Court's Protective Order Barring All Discovery Into Possessors of Fritz's Artworks Stripped the Co-Heirs Of Property Rights Guaranteed By New York Law....................34

B. Precluding Dr. Jonathan Petropoulos' Testimony Without Explanation Seven Months Prior To Trial Deprived The Co-Heirs Of Substantial Rights....................................................36

C. Galerie Kornfeld's Detailed Inventory Showing Acquisitions Of 126 Grunbaum Works From Lukacs Is A Statement Against Interest....................................................37

D. Rule 601 of the Federal Rules of Civil Procedure Bars Kornfeld's Testimony Because New York, Not Swiss, Law Applies The Substantive Rule of Decision....................................................39

CONCLUSION....................................................40

# Exhibit E

29

PLAINTIFF'S
EXHIBIT

PLAINTIFF'S
EXHIBIT

Mr. D 57 W 58 St
Paul Reif
151 W 57 the
Street New York
13.1.64

D&M 00081

Pilsen 13/I. 6[?]

PAGE 1

Paul Reif!

Vor Jahren schrieb mir ein Advokat aus Wien, dass Ihr ein Mr. Paul Reif aus New York auf mich aufmerksam gemacht hat, als letzte Überlebende der Familie Grünbaum und dass in Wien Kunst [illegible] Kunstwerken nach dem gestorbenen Fritz Grünbaum

[?]offe, dass dieser Paul ich traue mich nicht zu, nicht ihr angesprochen[?] von aufklärende Worte zu sind!

[M]it besten Grüße

Lilli Zozuli[?]

Pilsen

Lidická 3

li…en.

sandte ihm alle nötigen
… ein, hatte verschiedene
…gen, mußte nach Prag
…herr. Konsulat auf
…und mir gutes Geld
…, und der Advokat,
…ich die Grüssler Schwestern
…lli Grünbaum (Kitzens
…gemeldet machen, als

…es wäre erledigt – aber
Paul Reif? Wieso
…h gemeldet?

Ist dieser Paul Reif ein Geschw. der Gladys Reif??

PAGE 2

Ich wäre dankbar für ein paar aufklärende Worte.

Im November starb mir mein geliebter Gatte, mit dem ich 53 Jahre in guter, treuer Gemeinschaft gelebt habe. So ist mir ungeheuer bange und nun ich alte Briefschaften liquidiere, fand ich die ganze große Korrespondenz mit dem Wiener Advokaten. —

D&M 0008[illegible]

PAGE 3

brach liegen.

Ich sandte ihm alle nötigen Papiere ein, hatte verschiedene [illegible]erledigen, musste nach Prag [illegible]ans österr. Konsulat auf [illegible]ihnen und mir gutes Geld schickt mir der Advokat, [illegible]dass sich die Grussler Schwestern [illegible] Lilli Grunbaum (Fritzgen [illegible]ttin) gemeldet haben, als [illegible]ben. —

Das wäre erledigt – aber ist Paul Reif? Wieso er sich garnicht gemeldet?

Ist dieser Paul Reif ein der Gladnigg Reif?

Ich wäre dankbar ein paar aufklärende Worte.

Im November starb mein geliebter Gatte, mit ich 53 Jahre in guter Gemeinschaft gelebt ha[illegible] So ist nur übrig [illegible] und nun ich alte Büch[illegible] liquidiere, fand ich die große Korrespondenz mit Wiener Advokaten

Pilsen 13/

Paul Reif!

Vor Jahren schrieb ein Advokat aus [illegible] dass ihn ein Mr. Pau[illegible] aus New York auf[illegible] aufmerksam gemacht als letzte Überlebende Familie Grünbaum

dass in Wien [illegible] Tantiemen nach dem [illegible] ihnen Fritz Grünbaum[illegible]

Ich hoffe, dass dieser Paul Reif, (ich traue mich nicht [illegible], mich ihn anzusprechen) mir paar aufklärende Worte schreiben wird!

Mit besten Grüße

Lilli Zozuli

Pilsen

Lidická 3

D&M 00088

LETTER ADDRESSED TO PAUL REIF AT 151 WEST 57TH STREET, NEW YORK 19 WAS REDIRECTED BY THE POST OFFICE TO 57 WEST 58TH STREET. PAUL REIF LIVED AT 151 WEST 57TH FROM 1950 TO JULY 1953, THE PERIOD WHEN IT SEEMS HE WAS IN TOUCH WITH ZOZULI'S LAWYER.

---

TRANSLATION:

Pilsen, January 13, 1964

Paul Reif!

Some years ago ago a lawyer from Vienna wrote me that a Mr. Paul Reif from New York brought me to his attention as the last surviving member of the Grünbaum family and that the unclaimed royalties from the deceased Fritz Grünbaum were lying dormant in Vienna.

I sent him all the necessary papers, ran up various expenses, had to go to Prague to the Austrian Consulate, and in the end the lawyer wrote me that the Brussels sisters of Lilli Grünbaum (Fritzi's wife) presented themselves as heirs.

That now /having been/ settled - but who is Paul Reif? Why didn't he present himself at all? Is this Paul Reif a brother of Hedwig Reif?

I would be grateful for a few words of explanation...

In November I lost my beloved husband with whom I had shared 53 years in good faithful companionship. Thus I feel unutterably lonely and as I am liquedating old letters, I came across the whole voluminous correspondence with the Viennese lawyer.

I hope that this Paul Reif (I dare not call him "Du" or address him directly) will write me a few words of explanation!

With best regards,

Lilli Zozuli
Pilsen
Lidicka 3

---

NOTE: HEDWIG REIF WAS A SISTER OF OSKAR REIF, AND AN AUNT OF PAUL AND FRANCIS REIF.

# Exhibit F

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 10/25/07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------- X

DAVID BAKALAR, :

Plaintiff, : 05 Civ. 3037 (WHP)

-against- : SCHEDULING ORDER No. 10

MILOS VAVRA and LEON FISCHER, :

Defendants. :

----------------------------------- X

WILLIAM H. PAULEY III, District Judge:

Counsel having appeared before the Court on October 24, 2007, the following schedule is established on consent of the parties:

1. Plaintiff shall submit its rebuttal report on Swiss law by November 26, 2007;
2. All expert discovery shall conclude by January 31, 2008;
3. Counsel shall submit a joint pre-trial order in accord with this Court's Individual Practices by February 29, 2008; and
4. A final pre-trial conference shall take place on March 7, 2008 at 10:00 a.m.

Plaintiff's application to exclude the Declaration of Milan Kostohryz is granted.

Dated: October 24, 2007
New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

# Exhibit G

**In The Matter Of:**

*DAVID BAKALAR v.*
*MILOS VAVRA, ET AL*

---

*VOLUME 2*
*July 15, 2008*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 87FeBAKF.txt, Pages 177-350 (174)

**Word Index included with this Min-U-Script®**

Page 293

Q. Did you send me a courtesy copy of it?
A. Did I? I don't know. Yes, I think I did. If you say so.
Q. I'd like to ask you to turn to page 20 of the book. And I'd like you to read the last three sentences and the one that goes on to the following page 21.
A. Mm-mm. You want me to read these out loud?
Q. No. Just read them silently and tell me when you're done.
A. (Pause) Okay, I'm done.
Q. Now, having read this, does this reflect your -- refresh your recollection about any other connections between Bruno Grimschitz and Otto Kallir?
A. Yeah. I mean, it does to some extent, although I have to say that just the other day, in talking to my father about this, he said he seemed to recall that the person who signed off on the export documents for my grandfather's collection is Otto Demus and not Bruno Grimschitz. So this could be a mistake in the book. I'm honestly not certain.
Q. Now, what do you know about Bruno Grimschitz's politics?
A. Well, Bruno Grimschitz -- I don't know --
**MR. CHARRON:** Your Honor, I just object. I'm not sure if maybe we need to lay a little foundation to what her basis of knowledge is. I don't know if Ms. Kallir is an expert in this area or if she's just reporting hearsay from other sources.
**THE COURT:** Yes. Do you want to establish the basis

Page 294

for Ms. Kallir's knowledge in this area about events in 1938.
**MR. DOWD:** Sure.
Q. Ms. Kallir, you're a scholar, is that correct?
A. Yes.
Q. And when you were asked whether you were an expert in Schiele, you said yes, is that correct?
A. Yes.
Q. And you're here today, and the Court is permitting you to testify as an expert, is that correct?
A. That's correct.
**THE COURT:** No. She's a fact witness in this case.
**MR. DOWD:** Your Honor, I objected and that was overruled.
**THE COURT:** The question you objected to was whether or not -- does she consider herself an expert. She said yes. That doesn't qualify her as an expert because she thinks she's an expert. But I'm hearing the testimony because it's helpful to the Court. That's all. That was the question that was asked.
Q. Now, Ms. Kallir, what knowledge do you have about the circumstances under which your grandfather got works out of Austria in 1938 and 1939?
A. Can I clarify the expert question?
Q. No.
A. No, okay.

Page 295

Q. The judge did.
A. The judge did, okay. Because I am not an expert on the Holocaust.
Q. Ms. Kallir --
A. Okay. I have what I would say is a relatively accurate and complete knowledge about how my grandfather fled Austria after the Anschluss. And it comes from having reviewed some of the documents, and it also comes from things that I was told by my grandmother and by my father. So it's a -- you know, it's from a combination of sources.
Q. In preparing for your testimony today, who did you talk to?
A. I talked to my lawyer, Thad Stauber, and I talked to Bill Charron and Jim Janowitz.
Q. And did you look at any documents?
A. Yes, I did.
Q. And they told you that Otto Demos signed Otto Kallir's export license?
A. No, they didn't.
Q. Who did?
A. My father mentioned this.
Q. When?
A. I think at lunch yesterday. I --
Q. And what documents did you look at?
A. I didn't look at -- I did not look at my grandfather's export document.

Page 296

Q. What documents did you look at before you came to testify here today?
A. I looked, I think, primarily at the documents that Mr. Charron moved into evidence during my initial examination.
Q. Anything else?
A. Anything else? I think that's basically it.
(Continued on next page)

capacity, but I don't recall, you know, specifically.
Q. You don't recall any learned treatises that scholars and historians ordinarily relying on referencing Bruno Grimschitz as the director of the Austrian National Gallery?
A. He comes up in the scholarly literature a lot. I just cannot tell you exactly from what sources I have this information; I don't remember.
Q. Now, can you tell me what Otto Kallir's relationship was with Curt Valentin?
A. Curt Valentin was a Jewish dealer who had fled to the United States before my grandfather and was simply, you know, someone whom he knew from Europe when he came here, someone whom he had a prior contact with, and someone who dealt in similar types of art. So, he was a colleague.
MR. DOWD: I'd like to show the witness Defendant's Exhibit B-7.
Q. I'd like you to please turn to page DBM 5125. Is this the list of artworks you were referring to before?
A. Um-hum. And it is signed by Demus. I see that now.
Q. So you have seen this list before?
A. Yeah, yeah.
Q. Now, in terms of the entire document, have you seen this entire document before?
A. I am not sure.
Q. And do you know what this document is?

A. It appears to be a shipping document of some sort.
Q. Have you seen Austrian shipping documents from this period, or do you have any other knowledge of Austrian shipping documents from this period?
A. I have seen photocopies of the consignment sheet to Shenker in connection with this case, but I wouldn't say, you know, overall that I have seen a lot of these things, no.
Q. Have you seen a number of them in other circumstances where you were called on to study or interpret documents like these?
A. No.
Q. Turning to page DBM 5123, there is a number of stamps on that document.
A. Yeah. You know, I should say that this Xerox copy is really not very clear and not all of the stamps are very visible, and there is no English translation provided, so that makes it a little harder to make out all together what it's saying.
Q. Looking at page DBM 5123, do you see a number of stamps?
A. Got it.
Q. And, yes, some of them are difficult to read. Do you know what the significance of those stamps are?
A. They seem to be customs stamps.
Q. No, I don't want you to guess. If you don't know, please say so. If you do know, please explain.
A. They are customs stamps.

Q. OK. And do you understand what those customs stamps mean?
A. It's hard to answer this without saying "I would interpret them to mean" or "I assume they mean". And I know those are not --
MR. CHARRON: Well, if that is the basis of her answer, then I would object, your Honor.
Q. So, Ms. Kallir, we don't want you to do an interpretation that is not part of your ordinary work as a scholar or historian, but if within your knowledge as a scholar or historian you are able to tell us what those stamps mean, please answer.
MR. CHARRON: I will object again. The witness, as we've been through, she is not an expert witness. She is here to testify about her knowledge with respect to issues in this case. Asking her to opine as to what Mr. Dowd characterizes as scholarship into some other area I don't believe is appropriate.
THE COURT: Well, all right. The question is gilding the lily, but the fact of the matter is that Ms. Kallir knows a lot about Schiele and German and Austrian art in the 20th Century. If she recognizes or has seen any of these stamps in her past work, and can pick one or more of these stamps out and explain to the court what they are in answer to Mr. Dowd's question, I'm going to permit it.
So, do you recognize any of these stamps, Ms. Kallir?

THE WITNESS: Yeah. And I could tell you what they say, but I think I would feel a little bit at sea trying to put them together to make a story out of them.
Q. OK. Just briefly -- and I think the judge doesn't want us to make too many stories -- but do those stamps mean that the collection was actually exported from Austria?
A. I would think so, yes.
Q. Do you know? Or if you don't know, please say so.
A. Again, it's an assumption.
Q. Thank you.
A. OK.
MR. DOWD: I'd like to mark Defendant's H-8.
Q. Ms. Kallir, have you seen this document before?
A. No, I don't think I have actually.
Q. Isn't it true that when Otto Kallir and your grandmother came to this country that they picked up their artworks at the gallery of Curt Valentin on 57th Street?
A. They had no other address in the United States. They didn't know where they were going to go, so they shipped the works to his gallery as someone who could hold them until they arrived.
Q. So, how did they get from Vienna to Mr. Valentin's gallery?
A. By both, I assume.
Q. Did it go through the Buchholz Gallery?
A. No.

**In The Matter Of:**

*DAVID BAKALAR v.*
*MILOS VAVRA, ET AL*

---

*VOLUME 3*
*July 16, 2008*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 87gebakf.txt, Pages 351-524 (174)

**Word Index included with this Min-U-Script®**

A. That's a much better match because of -- the colors seem accurate, yeah.
Q. And so you're pretty sure that's -- that was owned by Fritz Grunbaum?
A. I would say there's a higher probability there, yes.
Q. As of 1928?
A. As of '28.
Q. Would you say 51 percent probable?
A. Okay. Do you --
MR. CHARRON: Well, I want to make sure I'm following, because number 16 on page 6366 has a date of 1919. Number 73 on page 6324 has a date of 1912.
THE WITNESS: Yeah, I was looking at the German, actually, because somehow that seems more accurate to me. They transcribed it wrong, obviously. Schiele was dead in 1919.
MR. CHARRON: That clarifies that.
Q. Would you say 51 percent probability?
A. Sure.
THE COURT: What qualifies this witness to give me an answer about probabilities?
MR. DOWD: Your Honor, she's an expert.
THE COURT: She's not an expert, all right? The only -- she's not been qualified by this Court as an expert. She was asked a question yesterday on direct examination that you've referred to twice. At page 265, line 23:

"Q Ms. Kallir, are you considered an expert in works by Egon Schiele?
"A Yes, I am."
You objected. I overruled it. That doesn't make her an expert.
MR. DOWD: I'm going to move to --
THE COURT: Every gallery owner is an -- thinks they're an expert. It's the nature of that business.
MR. DOWD: Your Honor, if I may --
THE COURT: But now you've got her testifying about probabilities, 51 percent. A few minutes ago she said that -- her answer was, it's a fair guess. That was her answer. This is a court of law. Fair guesses don't count in my courtroom. They count outside, but they don't count in a courtroom. So let's get beyond testimony that's a fair guess.
Q. Ms. Kallir --
THE COURT: She has a degree in art history from Brown University. She's not studied in probability analysis or statistics.
Do you have any degree in statistics?
THE WITNESS: No, I don't.
THE COURT: Okay.
Q. Ms. Kallir --
THE COURT: I don't want to hear any more testimony about a percentage.

BY MR. DOWD:
Q. Ms. Kallir, in the course of your professional activity, are you called upon to give expert opinions as to Schiele provenance?
A. Yes, sometimes.
Q. And do you do that for a fee?
A. No, I never have.
Q. How often are you called on to give expert certificates on Schieles?
A. That's authentication. You asked specifically about provenance. Those are two different things.
Q. Okay. If you could explain.
A. People do regularly come to me for certificates of authentication, both for works that are in the catalogue raisonné and for works that are not. And so that is one professional function that I perform.
The auction houses, when they are preparing their provenances, will very often submit them to me. They're actually submitting their work to me usually and saying, do you have any information that would supplement this or that might indicate that there's a problem with the provenance? And, you know, then I will answer their question.
Q. Is it fair to say that you are considered the world's leading expert in Schiele?
A. By a number of people, yes.

Q. By experts, other experts in the art field?
A. The only other Schiele expert or person who's considered a Schiele expert definitely would not consider me a Schiele expert.
Q. And who is that?
A. Rudolph Leopold.
Q. So according to the art community there are two Schiele experts in the world, yourself and Rudolph Leopold?
A. Correct, yes.
Q. Moving to the next slide --
THE COURT: You know, I'll just note, because I don't know what that was all about, but no expert report was ever offered from Ms. Kallir. And under the discovery rules this Court is not going to sit here and regard her as an expert, okay? I regard her as what she is: A gallery owner.
Q. I'm going to move to Kornfeld 51, so it's a few slides in.
A. Okay.
Q. Now, Ms. Kallir, looking at JK1974, is it your belief that Fritz Grunbaum once owned this work?
A. Yes, again, based on Kornfeld's information.
Q. And do you have any information that would counteract that information?
A. No, I don't.
Q. And is that information otherwise consistent with your scholarly research?

# Exhibit H

**In The Matter Of:**

*DAVID BAKALAR v.*
*MILOS VAVRA, ET AL*

---

*VOLUME 3*
*July 16, 2008*

---

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 87gebakf.txt, Pages 351-524 (174)

**Word Index included with this Min-U-Script®**

Q. Is there a joint defense agreement between Sotheby's and David Bakalar in this matter?

MR. CAHILL: Your Honor, may I be heard on this?

THE COURT: Briefly, yes.

MR. CAHILL: Briefly.

THE COURT: Why don't you just identify yourself for the record.

MR. CAHILL: My name is John R. Cahill, C-A-H-I-L-L, from Lynn & Cahill, here representing Sotheby's, the nonparty witness. I just wanted --

THE COURT: If you want to address the Court, why don't you stand up.

MR. CAHILL: Forgive me, your Honor.

THE COURT: We're in the midst of a trial.

MR. CAHILL: Forgive me, your Honor, for being disrespectful.

I just wanted to say, since Mr. Simmons and I have been here for two days expecting to testify, and to keep things from getting too far afield, I want to remind both parties that Mr. Simmons is appearing here today subject to an order of the Court dated May 29th in which he sensed his testimony was limited to two topics: One is the auction of the drawing; and two is the research into the provenance of the drawing, to the extent it involved people outside Sotheby's.

I think the last question, some of the questions have

gone beyond that. I practically have the understanding of counsel's desire, but I think the last question goes beyond what his testimony is limited to the -- has been limited to by the Court and the basis on which he's appearing here voluntarily today.

THE COURT: Do you want to be heard on that?

MS. SIGMOND: I think it would go to the witness' credibility if there was such a joint defense agreement, your Honor. I think his credibility is fair game once he takes the stand.

THE COURT: Didn't you stipulate --

MS. SIGMOND: Yes, your Honor.

THE COURT: -- to the scope of this examination?

MS. SIGMOND: Fair enough, your Honor.

THE COURT: All right. You can have a seat, Mr. Cahill.

MR. CAHILL: Thank you, your Honor.

BY MS. SIGMOND:

Q. Mr. Simmons, did you personally discuss any of the research in this matter with David Bakalar?

A. I was on a one or two calls with Mr. Bakalar, yes.

Q. One or two calls?

A. Yes.

Q. When did these calls take place?

A. My recollection is hazy, but one was certainly shortly

before the auction in February 2005.

Q. And what did you say to him or what was said to him and what did he say?

A. My recollection is -- I must emphasize is hazy, but my recollection is that we communicated to him -- and when I say "we," I mean myself and Sotheby's North American general counsel, we communicated to him the content of Ms. Jakubovits's letter. We communicated to him what had been told to us by Cornelia Muggenthaler and Joel Levi. We communicated to him the results of the further inquiries which we conducted between the time the picture had been withheld from the November 2004 sale and the February 2005 sale. And to finish up we communicated to him that Sotheby's was happy to leave the picture in the sale but, of course, as our principal and as the client, it was his call.

Q. Did you discuss with him Dead City in that conversation, the picture Dead City?

A. I have no recollection of having done so, but my recollection is not full.

Q. Is that your second call with him or your first call?

A. Second call.

Q. When was the first call?

A. I believe that that was a call with him which I was a part of around the time when the drawing was withheld from sale back in the previous fall.

Q. And what do you recall being said to him and what do you recall him saying to you?

A. My recollection is even hazier, I'm afraid, but on that occasion we communicated to him the result of our initial research into the history of the drawing and recommended that the drawing be withheld to a future sale.

Q. Again, in that conversation was there any discussion with him about Dead City?

A. Not that I recall, but I may be mistaken in my memory.

Q. The letter that Erika Jakubovits sent claimed that the provenance for the torso drawing, the drawing that's up on the board now, was questionable, and it should be restituted to the Grunbaum heirs, is that right? Is that a fair characterization of substance of the letter?

A. You will have to remind me by sight of the letter. I don't recall what the letter says.

Q. You don't recall the letter?

A. I recall the letter. I don't recall its exact wording.

MS. SIGMOND: Your Honor, may I approach? I'm just going to give the witness a copy of the answer in this case which contains a copy of the letter.

THE COURT: You may proceed.

A. I have the document in front of me, but you'll have to point me to where the letter is within it.

Q. I'm sorry.

practices would the drawing belong to the judicially declared heirs of Fritz Grunbaum?
A. I'm sorry. Can you repeat the question?
Q. If Sotheby's research showed that Mathilde Lukacs did not have the requisite heirship status to sell the drawings to Gutekunst & Klipstein, assuming that she even did, would it be Sotheby's position that the drawing should be returned to the judicially determined heirs of the estate of Fritz Grunbaum?
MR. CHARRON: Object to the form.
THE COURT: Sustained.
Q. In the course of your investigation into the provenance of the torso drawing, did you consult the Bergier report?
A. No, I did not.
Q. Are you familiar with the Bergier report?
A. No, I'm not.
Q. Did you review the 1956 Kornfeld catalog to determine that the Mathilde Lukacs provenance was missing?
A. We reviewed the 1956 Kornfeld catalog, but we didn't review it to look at whether something was missing or not. We reviewed it as part of our research process.
Q. Is Sotheby's as a matter of policy trading all of the works from the '56 catalog as having a Lukacs provenance?
MR. CAHILL: Your Honor, may I be heard?
THE COURT: Go ahead.
MR. CAHILL: Again, your Honor, I think this does go

beyond the scope. He's not here as an expert to talk about practices. He's not here to talk about other drawings. He's here to talk about this drawing, the auction of this drawing and the research of this drawing. That was the order. That was the stipulation. And this is both a question directed to him, I think, as an expert, and also, I think, beyond the scope of the order.
MS. SIGMOND: Your Honor, we printed off the Internet from the Sotheby's website the record of a June 20, 2000, sale of a piece with the same provenance, alleged provenance. It's a Schiele that seems to have come through Grunbaum through Gutekunst & Klipstein; in fact, the only -- the first item in the provenance is Gutekunst & Klipstein, and there's no reference to Fritz Grunbaum, and there's no reference to Mathilde Lukacs.
MR. CHARRON: I don't know if I've seen that document, and I'm not sure what the point is.
Well, I'm happy to show it to Mr. Cahill as well. On its face it appears to go beyond the scope, as Mr. Cahill is saying, but this is not something I've seen before, and I certainly wouldn't stipulate to it. So I object.
THE COURT: I'm going to sustain the objection as beyond the scope of the examination that was authorized and agreed to.
- - - - -

BY MS. SIGMOND:
Q. Mr. Simmons, in performing the provenance research for the torso, did Sotheby's review any of the policies of either the British or the US governments with regard to returning restituted art to Holocaust victims?
A. We certainly wouldn't have reviewed documents in the context of reviewing provenance of one particular drawing. But Sotheby's is, of course, well aware of policies of those governments, and Sotheby's attended the Washington conference.
Q. The policies of those governments are to return looted arts, looted art to the heirs, is that right?
MR. CHARRON: Object to the form.
A. That's merely a simplification.
Q. Mr. Simmons, do you have a series of white books with you at the stand?
A. They're all black.
Q. Pardon me?
A. All the books are black.
Q. All the books are black.
Would you turn, sir, to Exhibit Z as in zebra 7.
A. Sorry I'm being obtuse, but it goes from Y6 to Z6 and then A7.
Okay, I have it.
Q. You have Z7 in front of you?
A. Yes, I do.

Q. Was Rita Reif's pursuit of Fritz Grunbaum artworks a concern at the time that the Bakalar drawing was withdrawn from the November 2004 sale in New York?
A. At the time the drawing was withheld -- not withdrawn but withheld from the sale, certainly one of the things which we wanted to do was to understand more fully the circumstances surrounding the Dead City litigation.
Q. Dead City had been seized in approximately 1998 by Manhattan District Attorney Morgenthau?
A. That's correct.
Q. And Rita Reif at the time was maintaining that she was the rightful co-owner of the piece?
A. The details aren't completely fresh, but certainly Rita Reif was a party to the action or was involved in the action.
Q. In the course of your provenance research in this into the torso drawing, did you contact Rita Reif?
A. I do not believe so, no.
Q. Did you contact anyone representing Rita Reif?
A. Not that I'm aware of.
Q. In the course of your provenance research either before the sale or after the sale, did you make contact with any of the attorneys representing the -- for lack of a better word, the judicially determined heirs, the German judicially determined heirs; just so we're clear, Messrs. Vavras and Fischer?
A. No.

# Exhibit I

Case 1:05-cv-03037-WHP Document 246 Filed 11/24/10 Page 47 of 50

# INTERNATIONALnews

Select '**Print**' in your browser menu to print this document.

**Copyright 2010. ALM Media Properties, LLC. All rights reserved.**

Page printed from: Law.com: International News

Back to Article

## 2nd Circuit Sends Art Ownership Dispute Back to the Drawing Board

Daniel Wise

09-07-2010

The heirs of an art collector who perished in a Nazi concentration camp have been given another chance to establish their claim that a drawing by the Austrian expressionist Egon Schiele was stolen from their family.

The 2nd U.S. Circuit Court of Appeals last week ruled in *Bakalar v. Vavra*, 08-5119-cv, that Southern District Judge William H. Pauley erred in applying Swiss law as opposed to New York law in determining ownership of the work.

The panel's ruling vacates Pauley's finding that David Bakalar, an American art collector, became the rightful owner of "Woman Seated with Bent Left Leg (Torso)" when he bought the drawing from a New York gallery in 1963 for $4,300.

The New York gallery had acquired the black crayon and water-based paint drawing four months earlier from a Swiss gallery. In 2004, Bakalar sold the drawing at an auction conducted by Sotheby's in London for $675,000.

Sotheby's put the sale on hold after the heirs to Austrian art collector and cabaret performer Franz Friedrich "Fritz" Grunbaum stepped forward to claim ownership of the piece. Grunbaum was arrested by the Nazis as he fled Vienna in 1938 and died at Dachau in 1941.

The two heirs, Czech citizen Milos Vavra and New York resident Leon Fischer, traded lawsuits with Bakalar in 2005, with both sides seeking to be declared the rightful owner.

In declaring Bakalar to be the owner, Judge Pauley applied Swiss law, under which Bakalar, as a good-faith buyer, would acquire title to the work after five years without a claim being asserted, even if the drawing had been stolen.

New York law on the issue is very different: under no circumstances can a thief pass good title and a person from whom property was stolen has a claim superior to a good faith purchaser.

Writing for the circuit, Judge Edward R. Korman, sitting by designation from the Eastern District of New York, concluded that Pauley had relied on the wrong test in choosing to apply Swiss law. The panel remanded the case to Pauley for further proceedings, and, "if necessary, a new trial."

Korman also wrote a concurring opinion, questioning Pauley's finding that the Grunbaum heirs failed to produce "any concrete evidence that the Nazis looted the drawing."

Korman wrote that his reading of the record suggests to the contrary that Grunbaum was "divested of possession and title [of the drawing] against his will."

Judges Jose A. Cabranes and Debra Ann Livingston joined in Judge Korman's main ruling.

### Provenance in Dispute

The question of whether the Schiele drawing was stolen by the Nazis is sharply disputed.

Bakalar contends Grunbaum's sister-in-law sold the drawing along with 45 other Schiele works in 1956 to a Swiss art gallery, Galerie Gutekunst. That claim is backed up by documents in files maintained by the Swiss gallery, which show "beyond rational dispute" that the sister-in-law, Mathilde Lukacs, was the seller, said Bakalar's lawyer, James A. Janowitz, of Pryor Cashman.

Case 1:05-cv-03037-WHP Document 246 Filed 11/24/10 Page 48 of 50

The lawyer for the heirs, Raymond Dowd of Dunnington, Barthlow & Miller, called Bakalar's claims "a complete fabrication based upon forged documents."

About four months after the Galerie Gutekunst acquired the drawing, it sold it to the Galerie St. Etienne in New York, which seven years later sold it to Mr. Bakalar.

Korman said Pauley should have considered which jurisdiction had the greatest interest in the case.

New York has a "compelling interest" preserving the integrity of its art market as its state Court of Appeals has stated on several occasions, Korman wrote. For instance, in *Guggenheim Foundation v. Lubell*, 77 N.Y.2d 311 (1991), former Chief Judge Sol Wachtler wrote for a unanimous Court, "New York enjoys a worldwide reputation as a preeminent cultural center. To place the burden of locating stolen artwork on the true owner...would, we believe, encourage illicit trafficking in stolen art."

By comparison, Korman described the Swiss interest as being "tenuous." Application of New York law might cause New Yorkers to take a closer look at the work's provenance, and that in turn, he reasoned, "might adversely affect the extra-territorial sales of artwork by Swiss galleries."

For choice of law purposes, that Swiss interest, he concluded, must give way to New York's "significantly greater interest" in preventing the state "from becoming a marketplace for stolen goods."

On the question of Bakalar's ownership, Korman noted that the record indicated that Grunbaum was forced to execute a power of attorney giving his wife control of his artwork four months after he was arrested by the Nazis and imprisoned at Dachau.

Under Uniform Commercial Code §2-403(1), which has been adopted in New York, status as a good faith buyer only attaches if a transfer of property is "voluntary," he wrote.

In Grunbaum's case, the circumstances "strongly suggest he executed the power of attorney with a gun to his head," Korman said. If that was so, he wrote, under New York law "any subsequent transfer was void."

"[Mr.] Bakalar's suggestion that the power of attorney constituted a voluntary entrustment to property to [Mr. Grunbaum's] wife is a proposition that remains for him to prove."

"Unless he does so," Korman added, even if Grunbaum's wife, Elizabeth, transferred ownership to her sister to prevent the work from falling into the hands of the Nazis "she could not convey valid title to the artwork."

# Letter from Ray Dowd to Austrian Federal Ministry for Education, Arts and Culture

**This letter was send by laywer Raymond Dowd to the director of the Bureau of the Commission for Provenance Research, OR Dr. Christoph Bazil**

For the cited quotes, please read Second Circuit decision Bakalar vs. Vavra (english)

**From:** Raymond Dowd
**Sent:** Sunday, September 05, 2010 12:53 PM
**To:** 'Bazil Christoph'
**Subject:** Second Circuit Decision in Bakalar v Vavra (Estate of Fritz Grunbaum)

Dear Christoph:

I hope that all is well with you and that you enjoyed your summer. I think you will be pleased to see that the Second Circuit Court of Appeals has agreed with the Grunbaum heirs in a decision issued on September 2, 2010. Please note on page 21 of the opinion:

*Grunbaum was arrested while attempting to flee from the Nazis. After his arrest, he never again had physical possession of any of his artwork, including the Drawing. The power of attorney, which he was forced to execute while in the Dachau concentration camp, divested him of his legal control over the Drawing. Such an involuntary divestiture of possession and legal control rendered any subsequent transfer void.*

The opinion notes that this is consistent with Austrian legal principles, including recent decisions of the Austrian Supreme Court.

We note that Article 26 of the Austrian State Treaty obligates Austria to return Fritz Grunbaum's property to his heirs, as does Austrian inheritance law. You have made me many promises that you and Minister Schmied were going to investigate this case and issue a report. It has been 11 years of waiting.

We note that **Eberhard Kornfeld** invented a fairy story about Fritz Grunbaum's sister in law in 1999 after *Dead City* was seized at MoMA. Our handwriting experts debunked this story, which is based on clearly false and fraudulent documents.

But based on the new Second Circuit decision, it is clear that the whole story of Mathilde Lukacs is *legally* irrelevant. Even if she did steal it and sell it in Switzerland, this has no effect on legal title of Fritz Grunbaum or his heirs. Austrian law respects exactly this principle as well.

As a lawyer, you can now appreciate that Austria has no additional excuses for holding onto Fritz Grunbaum's property.

Now that this is all crystal clear, can you please have Austria return the stolen Schieles currently in the **Leopold** and **Albertina Museums** that the Grunbaum heirs have demanded? There is no reason that the Austrian police can't do this at your request.

You will see that the recent case decided August 12, 2010 of *Cassirer v Kingdom of Spain* has reaffirmed the right of US citizens to sue foreign governments in the United States for purchasing or displaying stolen artworks. http://www.scribd.com/doc/35962710/Cassirer-vs-Kingdom-of-Spain-9th-Cir-August-12-2010. This also applied where the government has created a Foundation (like a Stiftung) to hold the stolen objects. Spain bought the tainted Thyssen-Bornemisza Collection and tried to pretend that it could not be sued because it was in a foundation.

So you see that U.S. courts have rejected what you believed when we last spoke would be a valid defense. Putting stolen goods in the Leopold does not shield Austria from liability under these principles.

As you know, we have been very patient based on our respect for the IKG (Jewish Community in Vienna) and their view that Minister Schmied would act with fairness and diligence if permitted the opportunity.

If you need a limited amount of additional time to make a decision, please let me know how much time you need. If the amount of time is reasonable, we will of course forbear action to permit you to act.

Respectfully yours,

Raymond J. Dowd