UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
DAVID BAKALAR,                            :          05 Civ. 3037 (WHP)

        Plaintiff,                  :          MEMORANDUM & ORDER

        -against-                 :

MILOS VAVRA and LEON FISCHER,   :

        Defendants.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #:                       │
│ DATE FILED: 8/17/11          │
└─────────────────────────────┘
```

            This labyrinthine proceeding revolves around a relatively minor work by the Austrian artist Egon Schiele (the "Drawing"). In 2005, Plaintiff David Bakalar ("Bakalar") filed a declaratory judgment action against Defendants Milos Vavra ("Vavra") and Leon Fischer ("Fischer"), seeking a ruling that he is the lawful owner of the Drawing. Vavra and Fischer counterclaimed for conversion and replevin. Following a bench trial in July 2008, this Court applied Swiss law to the issue of whether Bakalar acquired title to the Drawing and awarded judgment to Plaintiff. In September 2010, the Court of Appeals vacated and remanded for consideration of that issue under New York law.[1]

            On remand, Bakalar once more moves for declaratory judgment. Defendants also move for reconsideration of this Court's order dated April 18, 2011, denying as futile their request for a pre-motion conference to strike a decision of the Austrian Restitution Committee, attached to Bakalar's moving brief. For the following reasons, this Court again awards judgment to Bakalar. Accordingly, Defendants' counterclaims are denied, and their motion for reconsideration, construed as a motion to strike, is denied as moot.

---

[1] Ironically, neither party argued before this Court or the Court of Appeals that New York law applied to the question. Bakalar urged application of Swiss law, while Vavra and Fischer argued for Austrian law.

BACKGROUND

The facts are set forth comprehensively in this Court's prior memoranda and

orders.  See Bakalar v. Vavra, --- F. Supp. 2d ----, 05 Civ. 3037 (WHP), 2011 WL 165407

(S.D.N.Y. Jan. 14, 2011); Bakalar v. Vavra, 05 Civ. 3037 (WHP), 2008 WL 4067335 (S.D.N.Y.

Sept. 2, 2008); Bakalar v. Vavra, 550 F. Supp. 2d 548 (S.D.N.Y. 2008); Bakalar v. Vavra, 05

Civ. 3037 (WHP), 2006 WL 2311113 (S.D.N.Y. Aug. 10, 2006); Bakalar v. Vavra, 327 F.R.D.

59 (S.D.N.Y. 2006).

I. The Drawing

This dispute centers on a 1917 drawing by Egon Schiele ("Schiele") in crayon and

gouache known as "Seated Woman With Bent Left Leg (Torso)."  Although the turmoil of

World War II and the loss of evidence in the intervening years have obscured the Drawing's

provenance, this Court previously made certain findings of fact.  See Bakalar, 2008 WL

4067335, at *1-5.  First, this Court found that Fritz Grunbaum ("Grunbaum")—a prominent

Austrian Jewish art collector—possessed the Drawing prior to World War II.  Bakalar, 2008 WL

4067335, at *4-5.  That determination was based on evidence of his prior ownership of another

Schiele work and the testimony of Jane Kallir, director of Galerie Gutekunst in Bern,

Switzerland.  Bakalar, 2008 WL 4067335, at *4-5.  In 1938, Franz Kieslinger, a Nazi art

appraiser, inventoried Grunbaum's art collection, including 81 works by Egon Schiele.  (JPTO

Stip. Fact 12; Ex. 105.)  The inventory listed only five Schiele works by name, none of which

correspond to the Drawing, and it is impossible to determine whether the Drawing was among

the remaining works.  (Ex. 105.)  However, based on the deposition testimony of Eberhard

Kornfeld, a former partner at Gallery Gutekunst, this Court concluded that the Drawing was sold

2

to that gallery in 1956 by Mathilde Lukacs ("Lukacs"), Grunbaum's sister-in-law.  Bakalar, 2008 WL 4067335, at *2-3.  Later that year, Galerie Gutekunst sold the Drawing to Galerie St. Etienne, a New York gallery specializing in Austrian and German art.  Bakalar, 2008 WL 4067335, at *1.  In 1964, Bakalar purchased the drawing in good faith from Galerie St. Etienne. Bakalar, 2008 WL 4067335, at *1, 9.  This Court reaffirms these factual findings.

## II.  The Grunbaum Heirs and Their Efforts to Recover Grunbaum Property

In 1938, Grunbaum was arrested by the Nazis and sent to the concentration camp at Dachau, where he was compelled to sign a power of attorney in favor of his wife, Elisabeth Grunbaum.  (JPTO Stip. Fact 18; Ex. 105 at P815.)  He died there in 1941.  (JPTO Stip. Fact 9; Ex. 149 at DBM 3975; Ex. 137 at P805.)  In 1944, Elisabeth Grunbaum also died in a concentration camp.  (JPTO Stip. Fact 32.)  Fischer and Vavra first asserted a claim to Grunbaum's estate in 1999, and an Austrian Court issued certificates of inheritance and distribution decrees in their favor in 2002, awarding each an undivided 50% interest in the estate. (Declaration of Raymond J. Dowd dated Apr. 20, 2011 ("Dowd Decl.") Ex. B: Supplemental Expert Opinion of Dr. Kathrin Höfer ("Höfer Supp. Op.") 2; Dowd Decl. Exs. F, H: Letters to Vavra and Fischer from Austrian Claims Committee.)  There is no evidence aside from those proceedings that Defendants or their ancestors had been recognized as heirs by the Austrian courts.[2]

---

[2] In 1963, a German court awarded a certificate of inheritance to Grunbaum property to Paul and Rita Reif, distant cousins of Grunbaum.  That certificate was rescinded in 1998 when German authorities learned that Paul Reif had provided false information about his relationship to Grunbaum.  (Exs. FF, 149; Tr. 595.)  The Reifs were also unsuccessful in efforts to recover Dead City III, a major Schiele work, from the Museum of Modern Art in New York.  See In re Grand Jury Subpoena Duces Tecum, 719 N.E.2d 897, 898-99 (N.Y. 1999).

A. <u>Milos Vavra</u>

Frtiz Grumbaum was survived by his brother, Paul, who died in 1942, and his sister, Elise Zozuli ("Zozuli"), who died in 1977. (JPTO Stip. Fact 30.) Zozuli had one daughter, Marta Bakalova ("Bakalova"). (JPTO Stip. Fact 30.) Vavra is Marta Bakalova's nephew. (Tr. 515.) From childhood, Vavra knew of his relationship to Grunbaum and Grunbaum's art collecting and eventual death in a concentration camp. (Ex. 125, Resps. 5, 6.) On Bakalova's death in 1994, Vavra became an heir to Grunbaum's estate. (Tr. 506.) However, prior to being contacted by an attorney in 1998, he made no effort to locate or lay claim to any Grunbaum property. (Ex. 125, Resp. 14.) Indeed, to the best of his knowledge, no such efforts were made by any member of his family. (Ex. 125, Resp. 15; <u>see also</u> Tr. 509-10). There is no evidence in the record suggesting otherwise.

Zozuli lived in Czechoslovakia after World War II. (<u>See</u> Ex. 125 Resp. 11.) Both Vavra and his brother, Ivan, stated that "conditions in Communist Czechoslovakia rendered pursuit of any restitution efforts impossible and dangerous." (Ex. 125, Resp. 11; Tr. 507-08, 515-16.) Despite the purported dangers, however, Zozuli did make certain efforts to recover Grunbaum property. Based on a letter written by Zozuli in 1964, it is apparent that, in or around 1952, Zozuli received word from an Austrian attorney that she may have a claim to Grunbaum's music royalties. (Ex. 21.) As a result, she "sent him all the necessary papers, ran up various expenses," and visited the Austrian consulate in Prague. (Ex. 21.) Thereafter, the attorney informed her that "the Brussels sisters of Lilli Grunbaum (Fritz's wife) presented themselves as heirs," and Zozuli considered the matter "settled." (Ex. 21.) The reference to the "Brussels sisters" is almost certainly a reference to Lukacs, who lived in Brussels between 1941 and 1957 and was then the only surviving sibling of Elisabeth Grunbaum. (JPTO Stip. Fact 23; Exs. 26,

4

146.)  Despite knowledge of Grunbaum's art collection (Tr. 506), there is no indication that

Zozuli made any efforts to claim it.  Given that Zozuli considered the matter of her inheritance to

certain Grunbaum property "settled" after learning of Lukacs in 1952, and that her 1964 letter

referenced no further recovery efforts, this Court finds that Zozuli considered the entire issue of

her Grunbaum inheritance "settled" in 1952.  There is no evidence in the record to contradict this

finding, nor is there any evidence of any further efforts by Zozuli to recover any Grunbaum

property prior to her death in 1977.

### B. Leon Fischer

Elisabeth Grunbaum was survived by four siblings, including her brother, Max

Herzl ("Herzl").  (JPTO Stip. Fact 33.)  Herzl died in 1946, survived by his daughter, Rene

Herzl, and a grandson, Leon Fischer.  (JPTO Stip. Fact 33.)  Fischer only became aware of his

relationship to Grunbaum in 1999.  (Tr. 630.)  However, he had known since his childhood that

one of his grandfather's sisters (i.e., Elisabeth Grunbaum) had perished in the Holocaust.  (Tr.

634-35, 655.)  Fischer's parents were well versed in their family's history.  Fischer's minimal

knowledge of the history of his family during the Holocaust originated from conversations he

overheard among family elders, including his parents.  (See Tr. 634-35, 648.)  However,

Fischer's parents generally refrained from speaking about the Holocaust with Fischer when he

was a child.  (Tr. 635, 648.)  Although the precise details of his parents' knowledge are now lost,

it is clear that they knew far more about these matters than Fischer himself.  (See Tr. 634-35,

655.)  The reasonable inference from these facts is that Fischer's parents were aware that

Elizabeth Grunbaum had perished in the Holocaust.

Fischer's parents and grandparents remained in "pretty close contact" with

Lukacs, and Fischer and his parents even visited her once on a trip to Europe in 1959.  (Tr. 633-

34.)  Yet to Fischer's knowledge, his parents never made any claims for restitution or reparation

for Grunbaum property (Tr. 655.)  Fischer's grandfather, Max Herzl, was integral to Lukacs's

escape from Austria in or about 1938, successfully obtaining emigration visas for her and her

husband.  (Exs. 158, 159.)  Similar efforts by Herzl on behalf of the Grunbaums were

unsuccessful.  (Ex. 155.)  There is no evidence, however, that Herzl made any claim to

Grunbaum property.

III.  Procedural History

After a bench trial, this Court applied Swiss law to the issue of whether Bakalar

acquired good title to the Drawing.  Under Swiss law, a person who acquires and takes

possession of an object in good faith becomes the owner even if the seller was not entitled or

authorized to transfer ownership.  Bakalar, 2008 WL 4067335, at *7.  Furthermore, a purchaser

has no general duty to inquire about a seller's authority to sell the object or about its origins

unless suspicious circumstances exist.  Bakalar, 2008 WL 4067335, at *7.  Finding no suspicious

circumstances that would require investigation, this Court held that Galerie Gutekunst purchased

the Drawing from Lukacs in good faith and therefore passed title to Galerie St. Etienne, which in

turn passed title to Bakalar.  Bakalar, 2008 WL 4067335, at *8-9.

Judge Korman, writing for a unanimous panel, vacated and remanded, holding

that New York law rather than Swiss law applies to the issue of whether Bakalar acquired good

title to the Drawing.  This ruling effectively shifted the burden to Bakalar to prove that the

Drawing was not stolen.  Bakalar v. Vavra, 619 F.3d 136, 146 (2d Cir. 2010).  In this regard, the

Court of Appeals offered the following guidance:

> The district judge found that the Grunbaum heirs had failed to
> produce "any concrete evidence that the Nazis looted the drawing

6

or that it was otherwise taken from Gumbaum." Our reading of the record suggests that there may be such evidence, and that the district judge, by applying Swiss law, erred in placing the burden of proof on the Grumbaum heirs in this regard. . . . [If] the district judge determines that Vavra and Fischer have made a threshold showing that they have an arguable claim to the drawing, New York law places the burden on Bakalar, the current possessor, to prove that the drawing was not stolen. Moreover, should the district judge conclude that the Grunbaum heirs are entitled to prevail on the issue of the validity of Bakalar's title to the drawing, the district judge should also address the issue of laches.

Bakalar, 619 F.3d at 147.

In a concurring opinion, Judge Korman wrote to "fill th[e] gap" left by the majority opinion and elaborated on the "concrete evidence that the Nazis looted the Drawing or that it was otherwise taken from Grunbaum." Bakalar, 619 F.3d 136, 148 (Korman, J., concurring). The concurrence opined that any transfer subsequent to Grunbaum's execution of the power of attorney at Dachau was void as a product of duress.[3]

DISCUSSION

I. Title to the Drawing

A. New York Law on the Recovery of Stolen Chattel

"[I]n New York, a thief cannot pass good title." Bakalar, 619 F.3d at 140 (citing Menzel v. List, 267 N.Y.S.2d 804 (1966)). Thus, "absent other considerations an artwork stolen during World War II still belongs to the original owner, even if there have been several

---

[3] On remand, Vavra and Fischer adopted the rationale advanced by Judge Korman in his concurring opinion as a new theory of their counterclaim. In a demonstration of the dangers of dicta, the concurrence spawned substantial additional briefing concerning an argument that, after due consideration, this Court finds to be without merit. As Justice Frankfurter observed, "[d]eliberate dicta . . . should be deliberately avoided." United States v. U.S. Gypsum Co., 333 U.S. 364, 411 (1948) (Frankfuter, J., concurring). Courts should "avoid passing gratuitously on an important issue . . . where due consideration of [that issue] has been crowded out by complicated and elaborate issues that have to be decided." Gypsum Co., 333 U.S. at 411.

subsequent buyers and even if each of those buyers was completely unaware that []he was buying stolen goods." Bakalar, 619 F.3d at 141 (quoting Michelle I. Turner, Note, The Innocent Buyer of Art Looted During World War II, 32 Vand. J. Transnat'l L. 1511, 1534 (1999).). When "an issue of fact exists as to whether the [chattel] was stolen . . . , the burden of proof with respect to this issue is on [the possessor]." Bakalar, 619 F.3d at 142 (quoting Solomon R. Guggenheim Found. v. Lubell, 550 N.Y.S.2d 618 (App. Div. 1990). Accordingly, if "Vavra and Fischer [make] a threshold showing that they have an arguable claim to the Drawing, New York law places the burden on Bakalar, the current possessor, to prove that the Drawing was not stolen." Bakalar, 619 F.3d at 147.

    B.  Whether the Drawing was Stolen

        Defendants offer two competing theories of the Drawing's theft.  First, they argue that the Drawing may have been stolen by the Nazis.  Second, even assuming that the Drawing remained in the family, Defendants argue that Bakalar cannot establish that Lukacs acquired possession in a manner that permitted her to convey title to Galerie Gutekunst.

        1.  Appropriation by the Nazis

        This Court previously found that the Drawing was possessed by Grunbaum prior to his arrest in 1938 and by Lukacs in 1956.[4] Bakalar, 2008 WL 4067335, at *2-5. The most reasonable inference to draw from these facts is that the Drawing remained in the Grunbaum family's possession and was never appropriated by the Nazis. The alternative inference—that the Drawing was looted by the Nazis and then returned to Grunbaum's sister-in-law—is highly unlikely. This is true even though the Nazis inventoried the art collection in Grunbaum's

---

[4] The concurring opinion notes that this Court could only "speculate" about how the Drawing made its way out of Austria. But the precise route of the Drawing's export is not nearly as significant as its final destination—with Mathilde Lukacs in Switzerland. A determination that the Nazis did not seize the Drawing, based on this single fact, is not speculation. It is an entirely appropriate inference supported by a preponderance of the evidence.

apartment. While an inventory may have been a preliminary step in the looting of Jewish property, it is not proof that the Drawing was seized. Indeed, the Drawing was not specifically catalogued in the inventory and may not have even been among the unnamed works of art in Grunbaum's apartment. In any event, Lukacs' possession of the Drawing after World War II strongly indicates that such a seizure never occurred. Accordingly, what little evidence exists— that the Drawing belonged to Grunbaum and was sold by one of his heirs after World War II— suffices to establish by a preponderance of the evidence that the Drawing was not looted by the Nazis.

### 2. Lukacs's Title to the Drawing

#### a. Inter Vivos Gift

Bakalar suggests that the most likely explanation for Lukacs's possession of the Drawing is that it was given to her through a voluntary transfer such as a gift or for safekeeping. To create an inter vivos gift, "there must exist the intent on the part of the donor to make a present transfer; delivery of the gift, either actual or constructive to the donee; and acceptance by the donee." Gruen v. Gruen, 496 N.E.2d 869, 872 (N.Y. 1986). "[T]he proponent of a gift has the burden of proving each of these elements by clear and convincing evidence." Gruen, 496 N.E.2d at 872. As evidence of donative intent, Bakalar notes that Grunbaum's relatives were aware of Lukacs's possession of Grunbaum property and declined to pursue any claims against her. However, mere possession by a family member is insufficient to establish donative intent. See In re Kelly's Estate, 285 N.Y. 139, 140 (1941). Moreover, even if Grunbaum's heirs were aware of Lukacs's possession of the Drawing—or of Grunbaum property generally—inaction in the face of this knowledge is subject to multiple inferences, including, for example, a waiver of their claims. Ultimately, as even Bakalar concedes, there is simply no evidence as to how

9

Lukacs acquired the Drawing, nor is there any evidence that might explain why Grunbaum's relatives did not pursue any claims against Lukacs. Without such evidence, Bakalar cannot meet his burden of proof on this issue.

### b. Voidable Title

Under the New York Uniform Commercial Code ("U.C.C."), "[a] person with voidable title has power to transfer a good title to a good faith purchaser for value." N.Y.U.C.C. § 2-403(1). Although the U.C.C. does not define the term, "[t]he key to the voidable title concept appears to be that the original transferor voluntarily relinquished possession of the goods and intended to pass title." Bakalar, 619 F.3d at 136 (Korman, J., concurring) (quoting Franklin Feldman & Stephen E. Weil, Art Law § 11.1.3 (1986)). Bakalar argues that because the Drawing was likely given to Lukacs through some form of voluntary transaction, her title was at worst "voidable" under the U.C.C., and not "void." However, Article 2 of the U.C.C. applies only to "sales," defined as the "passing of title from the seller to the buyer for a price." N.Y.U.C.C. § 2-106(1) (emphasis added); see also Takisada Co., Ltd v. Ambassador Factors Corp., 556 N.Y.S.2d 788, 790 (App. Div. 1989) ("Article 2 of the UCC . . . applies only to transactions of the sale of goods."); 93 N.Y. Jur. 2d Sales § 15 (noting the "obvious distinction" between a gift and a sale, "in that the former is a voluntary transfer without consideration or compensation whereas a sale is a transfer of title for a consideration called the price"). Accordingly, this argument also fails because Bakalar has not presented any evidence that Lukacs acquired the Drawing through a "sale." Moreover, because there is no evidence as to how Lukacs acquired the Drawing, Bakalar cannot establish by a preponderance of the evidence that Grunbaum voluntarily relinquished possession of the Drawing, or that he did so intending to pass title.

10

c. Duress

Judge Korman suggests that the power of attorney that Grunbaum executed in Dachau was the product of duress and therefore any subsequent transfer was not just voidable, but void. See Bakalar, 619 F.3d at 148 (Korman, J., concurring). Although Judge Korman's discussion was dicta, on remand, Defendants embrace his theory as their own, arguing that the power of attorney precluded Grumbaum from passing valid title to Lukacs. The concurring opinion and Defendants' briefs rely on two decisions to buttress this point, Vineberg v. Bissonnette, 548 F.3d 50 (1st Cir. 2008), aff'g 529 F. Supp. 2d 300 (D.R.I. 2007), and Menzel v. List, 49 Misc. 2d 300 (N.Y. Sup. Ct. 1966). But both authorities are inapposite to the facts of this case. In Vineberg, a Jewish art collector was deemed by the Nazis to "lack[] the requisite personal qualities to be a suitable exponent of German culture" and was directed to liquidate his collection. Vineberg, 548 F.3d at 53. The evidence established that as a result, he consigned the works to a Nazi-approved auction house, where they were sold at below-market value. Vineberg, 548 F.3d at 53. Similarly, in Menzel, a painting was labeled as "decadent Jewish art" and seized by the Nazis, who left a receipt indicating that it had been seized for "safekeeping." Menzel, 267 N.Y.S.2d 804, 806. Faced with indisputable evidence of Nazi seizure, both courts found that the works were not transferred voluntarily. Vineberg, 529 F. Supp. 2d at 307; Menzel, 267 N.Y.S.2d at 810. Here, however, there is no similar evidence that the Nazis ever possessed the Drawing, and therefore unlike Vineberg and Menzel, this Court cannot infer duress based on Nazi seizure. Indeed, as discussed above, Lukacs's possession of the Drawing establishes by a preponderance of the evidence that the Nazis did not appropriate the Drawing.

Moreover, assuming arguendo that a transfer of property to a family member subsequent to a compelled power of attorney is void as a product of duress, the concurrence

11

overlooks the fact that there is no way of knowing whether the Drawing was in fact transferred

pursuant to the power of attorney. It is equally possible that Lukacs obtained the Drawing before

the power of attorney was executed. Although Lubell established that the burden of proving that

a chattel was not stolen rests with the possessor, 569 N.E.2d at 431, that holding did not alter the

well-established principle that the burden of proof to establish duress is on the party asserting the

defense, see Stewart M. Muller Const. Co., Inc. v. N.Y. Tel. Co., 359 N.E.2d 328, 328 (N.Y.

1976) (the defense of economic duress "permits a complaining party to void a contract and

recover damages when it establishes that it was compelled to agree to the contract terms because

of a wrongful threat by the other party which precluded the exercise of its free will"); Finserv

Computer Corp. v. Bibliographic Retrieval Servs., Inc., 509 N.Y.S.2d 187, 188 (App. Div. 1986)

("It was incumbent on defendant to establish evidence of all elements of economic duress.").

Accordingly, absent any evidence as to when Lukacs acquired the Drawing, Defendants cannot

meet their burden to establish that the Drawing was transferred under duress. Any contrary

holding would be pure speculation.

### d. Intestacy

Finally, Bakalar argues that because Lukacs was one of Grunbaum's intestate

heirs, she owned at least a portion of the Drawing, and was therefore able to pass good title. The

parties agree that Austrian law governs Lukacs's intestate rights, and that under Austrian law she

was entitled to a fraction of the Grunbaum estate. See EPTL § 3-5.1(b)(2) ("The intrinsic

validity, effect, revocation or alteration of a testamentary disposition of personal property, and

the manner in which such property devolves when not disposed of by will, are determined by the

law of the jurisdiction in which the decedent was domiciled at death.") The parties disagree,

however about whether Austrian or New York law governs an heir's transfer of title to personal

property in the absence of formal intestacy proceedings.  While the laws of Austria and New York differ in this regard, the outcome is the same.

   In order for an intestate heir to take possession of an inheritance under Austrian law, the heir must first state explicitly that she accepts the inheritance, and a court must issue a decree of distribution, which constitutes a formal transfer of the estate to the intestate heir.  (Def. Ex. Y4: Expert Report of Dr. Katherine Höfer ("Höfer Rep.") ¶ 2.1.)[5]  An heir may independently dispose of her intestate share only after the issuance of a decree of distribution.  (Höfer Rep. ¶ 5.)  However, even after the decree's issuance, an heir possesses only a fractional interest in the estate, rather than any actual property.  (Höfer Rep. ¶ 5.)  In other words, an heir who owns a one-fourth share of an estate would acquire a one-fourth interest in <u>each item in the estate</u>.  An heir receives sole title to specific personal property only after the estate has been partitioned.  (Höfer Rep. ¶ 5.)  Here, it is undisputed that no decree of distribution was issued and that no partition took place prior to Lukacs's sale of the Drawing to Galerie Gutekunst in 1956.  In the absence of such occurrences, Lukacs was not lawfully entitled to dispose of the Drawing under Austrian law.

   In New York, when a decedent dies intestate, legal title to real property vests automatically in the statutory distributees as tenants in common.  <u>See</u> <u>In re Seviroli</u>, 818 N.Y.S.2d 249, 251 (App. Div. 2006); <u>Pravato v. M.E.F. Builders</u>, 629 N.Y.S.2d 796 (App. Div. 1995); <u>In re Kania's Estate</u>, 126 N.Y.S.2d 395, 401 (N.Y. Sur. 1953).  Legal title to <u>personal</u> property, on the other hand, passes first to the administrator of the estate, and not to the distributees.  N.Y.E.P.T.L. § 13-1.1(a) ("For purposes of the administration of an estate, the following assets of the decedent are personal property and together with every other species of

---

[5] Although Bakalar submitted a competing expert report, he does not dispute Defendants' characterization of Austrian estate law.  (<u>See generally</u> Ex. 16: Expert Report of Dr. Thomas Kustor.)

personal property pass to the personal representative."); see also Kania, 126 N.Y.S.2d at 402;

Christoforo v. Shore Ridge Assocs., 500 N.Y.S.2d 528 (App. Div. 1986) (noting that a leasehold

is personal property that passes to the estate).  Rather than obtaining immediate legal title, the

distributees receive an "equitable title or interest" in the personal property.  Kania, 126 N.Y.S.2d

at 402.  This "anomalous situation" was best explained by the Surrogate Court in Kania:

> "Upon the death of the owner, title to his real estate passes to his
> heirs or devisees.  A different rule applies to personal property.
> Title to it does not vest at once in heirs or legatees.  But
> immediately upon the death of the owner there vests in each of
> them the right to his distributive share of so much as shall remain
> after proper administration and the right to have it delivered upon
> entry of the decree of distribution.  Upon acceptance of the trust
> there vests in the administrators or executors, as of the date of the
> death, title to all personal property belonging to the estate; it is
> taken, not for themselves, but in the right of others for the proper
> administration of the estate and for distribution of the residue". . . .
> The synthesis [is] that, though title vests in the executor, this is a
> vesting of legal title analogous to that in the case of a trustee.  In
> fact, the executor is a trustee, first, for creditors of the estate and,
> second, for legatees under the will of his testator.  He holds legal
> title, but subject only to the composite effect of the estate's
> obligations, the legatees acquired the equitable title upon their
> testator's death.

Kania, 126 N.Y.S.2d at 402-03 (quoting Brewster v. Gage, 280 U.S. 327, 334 (1930) (citations

omitted) (emphasis added).[6]

Thus, under New York law, Lukacs would have received only equitable title on

---

[6] Kania predates the 1966 enactment of the EPTL, which purports to eliminate the distinction
between real and personal property.  See N.Y.E.P.T.L § 1-2.15 (defining "property" as "anything
that may be the subject of ownership, and is real or personal property"); 38 N.Y. Jur. 2d § 54
("The Estates, Powers and Trusts Law statute of descent and distribution has eliminated the
former distinction between real and personal property and both kinds of property are treated alike
under the statute.").  Nevertheless, the "anomalous situation" noted in Kania has survived.  See
Servoli, 818 N.Y.S.2d at 251; 41 N.Y. Jur. 2d § 1900 (noting that N.Y.E.P.T.L. § 13-1.1(a)
"implies that older cases holding that real property does not pass to the executor or administrator,
but devolves at the moment of death directly to the distributees or devisees, without the necessity
for any act by the fiduciary, may still be good law.").  In any event, even if the law relating to
real property is unsettled, the law relating to personal property is not.

the Grunbaums' deaths. She would not have received legal title until the administration of the estate had been completed. As all parties concede, this did not occur prior to Lukacs's sale of the Drawing in 1956.

Bakalar relies on a single case, Morgold, Inc. v. Keeler, 891 F. Supp. 1361 (N.D. Cal. 1995), in support of his intestacy argument. In Morgold, a fifty-percent co-owner of a painting sold it without the consent of the other co-owner in violation of a joint ownership agreement. In response to the argument that the seller converted the painting and therefore could not pass good title, the court held that "there was no such conversion . . . [because the Seller] was a co-owner of the painting." Thus, in Morgold, there was no dispute that the seller owned a fifty percent interest in the painting. The seller, holding at least partial title, could therefore pass that title to a buyer. In this case, however, whether Lukacs in fact had title to the painting—or even a partial interest—is the core of the dispute. And as discussed, Bakalar cannot establish that Lukacs held title to the painting at the time it was sold to Galerie Gutekunst. Accordingly, Morgold provides no support for Bakalar's argument that an intestate heir can pass title to an estate asset prior to formal intestacy proceedings.

II. Laches

Having failed to establish that Lukacs acquired valid title to the Drawing, this Court must address whether laches bars Defendants' claims. This defense is governed by New York law. Bakalar 550 F. Supp. 2d at 551; see also Fireman's Fund Ins. Co. v. Fraund, No. 88 Civ. 2765 (MBM), 1989 WL 31490, at *5 (S.D.N.Y. Mar. 31, 1989) ("[T]he forum state's rule for choosing a statute of limitations is used to determine the timeliness of all claims for relief, no matter what substantive law governs those claims."); Restatement (Second) of Conflict of Laws,

§ 142 cmt. d (1971) ("[T]he local law of the forum determines whether an action is barred by laches."). In order prove laches, Bakalar must show that: (1) Defendants were aware of their claim, (2) they inexcusably delayed in taking action; and (3) Bakalar was prejudiced as a result. Bakalar, 2006 WL 2311113, at *3; see also Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir. 1998). The opposing party need not have had actual knowledge of the claim; rather, it is sufficient that the opposing party should have known. Phillipine Am. Lace Corp. v. 236 W. 40th St. Corp., 822 N.Y.S.2d 25, 27 (App. Div. 2006); Kraker v. Roll, 474 N.Y.S.2d 527, 533 (App. Div. 1984). "In the context of claims of lost or stolen works of art or cultural artifacts, the doctrine of laches safeguards the interests of a good faith purchaser of lost or stolen art by weighing in the balance of competing interests the owner's diligence in pursuing his claim." The Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc., 98 Civ. 7664 (KMW), 1999 WL 673347, at *7 (S.D.N.Y. Aug. 30, 1999) (quotations and alterations omitted). Thus, to establish laches, Bakalar must show Defendants' lack of due diligence in "attempting to locate the property."[7] Greek Orthodox, 1999 WL 673347, at *7; see also Sanchez v. Trustees of the Univ. of Penn., 04 Civ. 1253 (JSR), 2005 WL 94847, at *2 (S.D.N.Y. Jan. 18, 2004). This inquiry "focuses not only on efforts by the party to the action, but also on efforts by the party's family." Bakalar, 2006 WL 2311113, at *3; see also Sanchez, 2005 WL 94847, at *2-3 (considering lack

---

[7] The burden of establishing laches typically rests with the party asserting the defense. See Ikelionwu, 150 F.3d at 237 (2d Cir. 1998). The full quote from Greek Orthodox, however, states that "the Patriarchate [i.e., the party against whom laches was asserted] must show due diligence in attempting to locate the property to defeat the laches defense." Greek Orthodox, 1999 WL 673347, at *7. Thus, Greek Orthodox appears to shift the burden of proof away from the party asserting the defense. Given the considerable passage of time between the core events of that case and the time the case was decided—over 80 years—such burden shifting is understandable, and even equitable. Placing the burden on the possessor of an artifact in such cases, decades after any alleged theft, puts the possessor in the unenviable position of proving a negative—lack of diligence—on the basis of a meager and often non-existent historical record. Thus, perversely, the longer a potential claim lays dormant, the more difficult it becomes for a possessor to prove laches. Nevertheless, consistent with the governing law, this Court places the burden squarely on Bakalar to establish the elements of this defense.

of effort made by plaintiffs' father and grandfather); Wertheimer v. Cirker's Hayes Storage Warehouse, Inc., 752 N.Y.S.2d 295, 297 (App. Div. 2002) (noting absence of inquiries by family over time).

Greek Orthodox and Sanchez are particularly instructive on the issue of due diligence. Greek Orthodox involved a dispute over possession of a tenth century palimpsest containing two works by Archimedes. 1999 WL 673347, at *1. Although the palimpsest resided in a monastery during the nineteenth and early twentieth centuries, it came into the possession of a French businessman sometime in the 1920s, through unclear means. Greek Orthodox, 1999 WL 673347, at *2. Despite indications in the 1930s that the palimpsest was no longer in the monastery's collection, the monastery did not file a lawsuit, conduct any search, or announce the disappearance until shortly before seeking to enjoin its sale in 1998. Faced with these facts, Judge Wood found the question of diligence "easily answered": "the [monastery] was not diligent at all." Greek Orthodox, 1999 WL 673347, at *10.

Similarly, Sanchez involved a collection of pre-Columbian gold objects found by the plaintiffs' grandfather in 1909 that disappeared around 1920 and eventually found its way to the University of Pennsylvania. Sanchez, 2005 WL 94847, at *1. As in Greek Orthodox, the plaintiffs' efforts to recover the artifacts were "limited." Sanchez, 2005 WL 94847, at *1. First, "[p]laintiffs . . . offered no evidence that their grandfather, from whom the collection was allegedly stolen, undertook any search or made any effort whatever to recover the [c]ollection." As for the plaintiff himself, he

> visited the Metropolitan Museum of Art and several New York art galleries to look for the [artifacts]. He did not, however, write to any galleries or museums in an attempt to find information about [them], nor did he ask for any help from any experts on archaeology or pre-Columbian art. On two occasions over the years, Sanchez also attempted to interest lawyers in helping him

17

search for the [artifacts], but they declined.

Sanchez, 2005 WL 94847, at *2.  Faced with these facts, the court concluded that "[t]he

desultory efforts [plaintiff] engaged in between 1970 and the present are not remotely enough to

satisfy the requirements of a diligent search."  Sanchez, 2005 WL 94847, at *3.

Vavra and Fischer argue that laches cannot apply because they were unaware of

any claim against Bakalar and did not know of the Drawing's whereabouts until 2005.  These

arguments, however, construe the laches inquiry too narrowly.  To have "knowledge" of their

claim, Defendants need not have been aware of a claim against Bakalar specifically; it is enough

that they knew of—or should have known of—the circumstances giving rise to the claim, even if

the current possessor could not be ascertained.  See Sanchez, 2005 WL 94847, at *1-3 (laches

found despite the fact that the possessor of the allegedly stolen artifacts was unknown by the

plaintiff until shortly before the lawsuit was filed); Greek Orthodox, 1999 WL 673347, at *10

(same); In re Flamenbaum, 899 N.Y.S.2d 546 (N.Y. Sur. Ct. 2010) (same).

Nor did Vavra and Fischer need to have specific knowledge of the Drawing.

Particularly for large art collections with several minor works, such a requirement would defeat

laches in virtually every case.  Even if a claimant had knowledge of the collection as a whole, it

would be unreasonable to require the current possessor to establish the claimant's particularized

knowledge of every work within that collection.  Where several items were purportedly stolen

under common circumstances, these items may be treated collectively for the purposes of

establishing knowledge.  See Sanchez, 2005 WL 94847, at *1 (several pre-Columbian gold

objects treated as a "collection," rather than as individual objects, for the purposes of laches

inquiry).  The scope of the knowledge inquiry also informs the scope of required diligence.

Thus, where several items are treated collectively for the purposes of knowledge, the current

18

possessor may show a lack of diligence with respect to the collection as a whole, rather than the individual items. See Sanchez, 2005 WL 94847, at *3.

Here, Vavra was aware since childhood of both Grunbaum's substantial art collection and his death in a concentration camp. He became an heir to Grunbaum in 1994 when his aunt, Bakalova, passed away. Yet prior to being contacted by an attorney in 1998, he made no effort to locate or claim title to any Grunbaum property. Indeed, he acknowledged that to the best of his knowledge, "no such attempts were made by any member of the Vavra family." (Pl. Ex. 125 at Resp. 15.) Elise Zozuli—Grunbaum's sister and Vavra's grandmother—displayed a similar lack of diligence. Like Vavra, Zozuli was aware of Grunbaum's art collection and her potential intestate rights to Grunbaum's property, as evidenced by her correspondence with an Austrian lawyer concerning Grunbaum's music royalties. But there is no indication that she ever attempted to pursue a claim to Grunbaum's art collection. Nor did she announce the supposed "theft" of these pieces or write to museums or galleries regarding their whereabouts. See Greek Orthodox, 1999 WL 673347, at *10 (no diligence where monastery neither asserted claims to other similar missing manuscripts nor announced that they were missing).

Similarly, although the name "Grunbaum" was unfamiliar to Fischer prior to 1999, he was aware that a close family member had died in the Holocaust. His predecessors were aware of these events in greater detail. Indeed, Fischer's grandfather, Max Herzl, was intimately involved in his family's plight during the Holocaust and attempted without success to bring the Grunbaums to safety in Belgium. Fischer's parents and grandparents remained in close contact with Lukacs for years afterwards. And Fischer and his parents even visited her in Switzerland in 1959. The Fischers therefore had ample opportunity to inquire about Fritz Grunbaum's property, yet to Fischer's knowledge, neither he nor any of his predecessors made

any such inquiries or claims. See Sanchez, 2005 WL 94847, at *2-3.

However laches is applied in this case, it will work a certain inequity on the losing party, and this Court is "in the unenviable position of determining who gets the artwork, and who will be left with nothing despite a plausible claim of being unfairly required to bear the loss." United States v. Davis, --- F.3d ----, 2011 WL 2162897, at *1 (2d Cir. Jun. 3, 2011). On the one hand, a finding of no unreasonable delay would deprive Bakalar of property he purchased in good faith almost fifty years ago. On the other hand, a ruling for Bakalar will deprive Grunbaum's rightful heirs of a Drawing that, but for the atrocities of the Holocaust, might have remained in the family until today. Indeed, as to Vavra and Fischer personally, the applicability of laches is doubtful given that Vavra only became an heir to Grunbaum's estate in 1994, and Fischer only became aware of the existence of Grunbaum's estate in 1999. But ultimately, both Vavra's and Fischer's ancestors were aware of their relationship to the Grunbaums and their eventual deaths in concentration camps. Given this knowledge, this Court finds by a preponderance of the evidence that Defendants' ancestors were aware of—or should have been aware of—their potential intestate rights to Grunbaum property, and Vavra and Fischer are bound by the knowledge of their respective families. See Wertheimer, 752 N.Y.S.2d at 297 (noting plaintiff's grandfather's lack of diligence); Sanchez, 2005 WL 94847, at *3 (same).

As for diligence, given the inevitable vagaries in property rights arising from the Holocaust, World War II, and the subsequent political and economic turmoil, a certain amount of delay or lack of specificity might be excused. It may have sufficed in this case if Vavra, Fischer, or their ancestors had been diligent in their efforts to recover Grunbaum's property generally, even if such efforts were not specifically related to art; or if they had made intermittent efforts, provided such efforts were made. But both Defendants stated that to their knowledge, no such

efforts were made by any member of their families, and the only evidence of any effort by any

heir to recover Grunbaum property is Zozuli's aborted effort to recover Grunbaum's music

royalties. That was in 1952, and no further efforts were made. And although Vavra asserts that

the political situation in Czechoslovakia at that time would have made such recovery both

dangerous and virtually impossible, Zozuli's account of her own efforts in relation to the music

royalties belies this assertion. Accordingly, this Court finds that Vavra's and Fischer's ancestors

were not diligent in pursuing their claims to the Drawing.

   The resulting prejudice to Bakalar is clear. Defendants' delay in pursuing their

claim "makes it difficult [for Bakalar] to garner evidence to vindicate his . . . rights." Greek

Orthodox, 1999 WL 673347, at \*10. It has "resulted in deceased witnesses, faded memories, lost

documents, and hearsay testimony of questionable value." Sanchez, 2005 WL 94847, at \*3

(quoting Guggenheim, 550 N.Y.S.2d at 621 (quotations and alterations omitted)). Of the greatest

significance is the death of Mathilde Lukacs in 1979, perhaps the only person who could have

elucidated the manner in which she came to possess the Drawing, or indeed, whether she owned

it at all.

   Defendants argue that because Bakalar did not inquire into the provenance of the

Drawing when he purchased it and failed to investigate its provenance for over forty years, any

prejudice to Bakalar was due to his own conduct, rather than the Defendants' delay. However,

this Court previously found that Bakalar purchased the Drawing in good faith, and there is no

reason to disturb that finding. Moreover, Bakalar, as an ordinary non-merchant purchaser of art,

had no obligation to investigate the provenance of the Drawing, and this Court will not saddle

him with a greater duty than the law requires. See Graffman v. Espel, 96 Civ. 8247 (SWK),

1998 WL 55371, at \*6 (S.D.N.Y. Feb. 11, 1998) ("As a matter of law, the [purchasers] had no

obligation to investigate the provenance of the Painting. . . . [They] are not art dealers and are under no obligation to adhere to commercial standards applicable to art dealers."); cf. N.Y.U.C.C. § 2-103 ("Good faith in the case of merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." (emphasis added)); Morgold, 891 F. Supp. at 1368 (under New York law, "a dealer in art must take reasonable steps to inquire into the title to a painting." (emphasis added)).

        Finally, Defendants argue that a laches defense is unavailable because Bakalar has unclean hands. "Courts apply the maxim requiring clean hands where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine." PenneCom B.V. v. Merrill Lynch & Co., Inc., 372 F.3d 488, 493 (2d Cir. 2004). Thus, "the equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage." PenneCom, 372 F.3d at 493 (quoting Bein v. Heath, 47 U.S. 228, 247 (1848)). Defendants base their unclean hands argument on the fact that in 1990, and again in 1999, a catalogue raisonne of Schiele's complete works referenced Bakalar in the provenance but listed the current owner only as "private collection," despite Bakalar's continued ownership. In addition, the catalogue raisonne listed Galerie Gutekunst as the earliest known provenance, and made no reference to either Lukacs or Grunbaum. From this, Defendants conclude that Bakalar concealed his ownership of the Drawing and information about the Drawing's provenance that might indicate to others that the Drawing may be stolen. This limited circumstantial evidence is a bridge too far. Bakalar may have had any number of reasons for keeping his possession of the Drawing confidential, and this Court will not infer any fraud, deceit, or unfairness based on such speculation. Nor can this

Court conclude that the failure of Kallir to include Lukacs or Grunbaum in the Drawing's provenance in the catalogue raisonnees was the result of any fraudulent behavior on the part of Bakalar. There is simply no evidence in the record to support this assertion.

Accordingly, Defendants' claims against Bakalar are barred by laches.

III. Motion to Strike

By letter dated April 13, 2011, Defendants requested a pre-motion conference to move to strike a decision of the Austrian Restitution Committee ("Committee"), a governmental body whose members were appointed by the Minister of Education, Art, and Culture, which was attached to Bakalar's moving brief. The decision addressed, inter alia, whether Lukacs's ownership of certain Grunbaum art after World War II permitted an inference of Nazi theft. The Committee found that it did not, and Bakalar relied heavily on this decision in his moving brief. This Court denied Defendants' request for a pre-motion conference as futile, and Defendants moved for reconsideration. This Court now construes the Defendants' motion for reconsideration as a motion to strike. However, although this Court reached the same determination as the Austrian Restitution Committee, it did not rely on the Committee's decision. Accordingly, Defendants' motion is moot.

CONCLUSION

For the foregoing reasons, this Court awards judgment to Plaintiff David Bakalar, concluding that he holds lawful title to the Drawing and that Defendants' counterclaims are barred by laches. Accordingly, Defendants Milos Vavra's and Leon Fischer's counterclaims for declaratory judgment, conversion, and replevin are denied. The parties are directed to submit a proposed judgment by August 31, 2011. The Clerk of Court is directed to terminate all pending

motions and mark this case closed.

Dated: August 17, 2011
       New York, New York

                              SO ORDERED:


                              _____
                              WILLIAM H. PAULEY III
                                     U.S.D.J.


*Counsel of Record*

William Laurence Charron
James A. Janowitz
Pryor Cashman LLP
7 Times Square
New York, NY 10036-6569
*Counsel for Plaintiff*

Raymond James Dowd
Dunnington, Bartholow & Miller, LLP
1359 Broadway
New York, NY 10018
*Counsel for Defendants*